## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **REPUBLIC OF KAZAKHSTAN**<br>8, Mangilik Yel Avenue<br>010000, Astana<br>Republic of Kazakhstan, | ) ) ) ) ) |
| **Plaintiff,** | ) ) ) |
| v. | ) ) |
| **ANATOLIE STATI**<br>20 Dragonmirna Street<br>Chisinau, Republic of Moldova, | ) ) ) ) |
| **GABRIEL STATI**<br>1A Ghioceilor Street<br>Chisinau, Republic of Moldova, | ) ) ) ) |
| **ASCOM GROUP, S.A.**<br>75 A. Mateevici Street<br>Chisinau, MD-2009, Republic of Moldova, | ) ) ) ) |
| **TERRA RAF TRANS TRAIDING LTD**<br>Don House, Suite 31<br>30-38 Main Street, Gibraltar, | ) ) ) ) |
| **Defendants.** | ) ) ) ) |

Civil Action No. 1:23-cv-00565

**DEMAND FOR A JURY TRIAL**

## COMPLAINT

1.     This is an independent action brought by Plaintiff Republic of Kazakhstan ("**the Republic**" or "**Plaintiff**"), through its undersigned counsel, pursuant to Federal Rule of Civil Procedure 60(d)(1) for relief from the judgment (the "**Judgment**") obtained by Defendants Anatolie Stati, Gabriel Stati, Ascom Group, S.A. ("**Ascom**"), and Terra Raf Trans Traiding Ltd ("**Terra Raf**") (collectively, the "**Statis**" or "**Defendants**") in Civil Action No. 1:14-cv-1638-ABJ

(D.D.C.).[1]  In addition, the Republic seeks to set aside the Judgment pursuant to Federal Rule of Civil Procedure 60(d)(3) for fraud on the Court.  In support thereof, the Republic alleges as follows:

## **INTRODUCTION**

2.      In the Judgment, the Statis have made this Court an unwitting instrument of a massive fraud.  This fraud of the Statis is of such magnitude and scope that it justifies the exceptional remedy of ordering relief from the Judgment under Rule 60(d)(1) so as to prevent a grave miscarriage of justice.  In addition, the Statis also committed a fraud on this Court in obtaining the Judgment, and this fraud is sufficiently egregious as to also require setting aside the Judgment under Rule 60(d)(3).

3.      The Judgment implements a March 23, 2018 Order in which the Court granted the Statis' petition to confirm a circa $500 million international arbitration award (the "**Arbitration Award**") that the Statis obtained against the Republic.  The March 23, 2018 Order was affirmed on appeal by the D.C. Circuit in a per curiam unpublished opinion.

4.      Over the course of the past several years, the Republic has been engaged in a painstaking process of obtaining indisputable proof of the Statis' fraud.  This has been a gradual process.  At each stage, the evidence of the Statis' fraud has become stronger and, as importantly, new and different elements of the Statis' unlawful schemes have been discovered.

5.      However, as the Republic was gradually uncovering evidence of the Statis' fraud, the Republic sought at various time to introduce the evidence it had then-discovered into courts around the world.  In response, the Statis interposed misrepresentations and other acts of deception

---

[1] In the Civil Cover Sheet, the present action is not marked as related to the action in which the Judgment issued given that the prior action has been "terminated" and therefore is not pending, nor was it dismissed, and, accordingly, none of the LCvR 40.5(b) requirements are met.

for the purpose of concealing and thus perpetuating their fraud, preventing the courts from admitting this evidence altogether (as happened in this Court) or distorting its meaning.

6.      The Statis' deceptions succeeded, but only for a time.  Thus, during the period from 2014 to 2020, the Statis obtained confirmation of their Arbitration Award in this Court, as well as in the courts of England, Italy, Belgium, the Netherlands, and Luxembourg.

7.      Now, the tide has turned.  The evidence of the fraud that the Republic has now obtained is clear, convincing, and indisputable.  As the Republic has been able to present this full fraud case in multiple jurisdictions around the world, the courts have reversed course and held that the Statis obtained the Arbitration Award by fraud, vacated prior orders that confirmed the Arbitration Award, and refused to enforce the Arbitration Award because of the fraud.  In one jurisdiction, the Statis have now been criminally indicted.  In another jurisdiction, the Statis are facing substantial damages claims because of their unlawful actions.

8.      The Statis' fraud schemes that have now been uncovered and proven in multiple courts have had multiple elements and multiple victims.  Described in general terms, the Statis' fraud schemes had at least the following five components.  One, the Statis "deceived" their auditors, KPMG, into issuing audit reports that certified the Statis' financial statements as materially correct when, in fact, the statements were materially false.  Two, the Statis used these fraudulently-obtained KPMG audit reports for various illicit purposes, including to cover-up their embezzlement and laundering of hundreds of millions of dollars from their companies in Kazakhstan, which in turn defrauded the Statis' investors.  Three, to further cover-up this embezzlement, the Statis instituted international arbitration proceedings against the Republic. Therein, the Statis heavily relied upon the fraudulently-obtained KPMG audit reports and falsified financial statements, as well as other deceptions, for multiple purposes – at the jurisdictional,

liability, and damage phases of the proceedings.  In so doing, the Statis obtained the Arbitration Award by fraud.  Four, when the Republic initiated legal proceedings to annul and/or set-aside the Arbitration Award at the seat of the arbitration – Sweden – the Statis deliberately misled the Swedish courts so as to conceal their fraudulent schemes and protect their fraudulently-obtained Arbitration Award.  Five, in multiple courts around the world, including in this Court, the Statis then weaponized the Swedish court rulings that they had obtained by deception, and made other fraudulent representations, in order to conceal their fraud and obtain confirmation of the Arbitration Award.

9.      The courts of Belgium were the first to conclusively confirm the Statis' fraud. There, in a final judgment dated November 17, 2021 (the "**Belgium Judgment**"), the Brussels Court of Appeal held that the Republic's existing fraud case demonstrates "beyond any possible doubt the fraudulent behavior of the Statis," that the Statis committed fraud before, during, and after the Arbitration, and that this fraud included the Statis deceiving the Swedish courts during the annulment proceedings.[2]

10.     The Brussels Court of Appeal issued this judgment after it, first, rejected the Statis' attempt to prevent the Republic from introducing its full fraud case, second, permitted both parties multiple rounds of written submissions, and third, held in-person hearings.  On the basis of this full record, the Brussels Court of Appeal found that the Statis obtained the Arbitration Award by fraud, overturned the prior Belgium court orders obtained by the Statis that had confirmed the Arbitration Award, and held that confirmation of the Arbitration Award would violate Belgium's public policy against confirming international arbitration awards obtained by fraud.  Now, the

---

[2] Nov. 16, 2021 Judgment of the Brussels Court of Appeal, ("**Belgium Decision**") at 29.  The Belgium Decision is attached hereto as Exhibit A, in its original French and in an English translation.

Statis are facing substantial damages claims in Belgium as a result of their unlawful actions, and the Statis' assets have been frozen pursuant to court order.[3]

11.     The Statis' fraud was also recently confirmed in the courts of the Netherlands. There, in an order issued earlier this year, on January 9, 2023 (the "**Amsterdam Judgment**"), the Amsterdam District Court held that the Statis committed "material deceit" prior to the Arbitration and "procedural deceit" during the Arbitration.  The court further held that the Statis' fraud schemes were sufficiently egregious that recognition and enforcement of the Arbitration Award would violate Dutch public policy against confirming arbitral awards obtained by fraud.[4]

12.     The Amsterdam District Court issued this decision after it conducted multiple rounds of written submissions, held in-person hearings, and reviewed all the presently-existing evidence.  And, this decision came after the Netherland's highest court (the Court of Cassation), in December 2021, vacated the prior Dutch judgments obtained by the Statis that had confirmed the Arbitration Award, and remanded the case to the Amsterdam District Court for fresh proceedings.  In these fresh proceedings, over the Statis' objections and unlike in the prior Dutch proceedings, the Republic was allowed to present its full fraud case.

13.     Luxembourg is a third jurisdiction in which the courts have reversed course. There, in September and November 2022, Anatolie Stati and his son, Gabriel Stati, were criminally

---

[3] In May 2022, the Statis' long-time attorneys – the law firm of King & Spalding LLP ("**King & Spalding**") – withdrew from representing the Statis, after the Statis' fraudulent conduct was established by the Brussels Court of Appeal in the above-referenced November 2021 decision.  King & Spalding had represented the Statis in this matter for more than a decade, from the filing of the international arbitration proceedings in 2010, to acting as global enforcement counsel for the Statis in their efforts to confirm and enforce the Arbitration Award.  This representation included King & Spalding appearing for the Statis in the confirmation proceedings in this Court, as well as in related proceedings in federal courts in New York, Texas, and California.  King & Spalding also represented Mr. Lungu at his April 2019 deposition.

[4] January 9, 2023 Judgment of the Amsterdam District Court ("**Amsterdam Judgment**") at 11, 15.  The Amsterdam Judgment is attached hereto as Exhibit B, in its original Dutch and in a certified English translation.

indicted by the Luxembourg judicial authorities for fraud, forgery, and money laundering in connection with their attempts to recognize and enforce the fraudulent Arbitration Award in Luxembourg (the "**Luxembourg Indictments**").

14.     These indictments came after Luxembourg's highest court (the Court of Cassation), in a February 2021 order in parallel civil proceedings, reversed the lower court orders obtained by the Statis that had confirmed the Arbitration Award and, on remand, the Statis' further attempts to confirm and enforce the Arbitration Award were stayed until the conclusion of the criminal proceedings.

15.     The Amsterdam Judgment, the Belgium Judgment, and the Luxembourg Indictments are based on evidence that was not available to the Republic during the prior confirmation proceedings in this Court that resulted in the Judgment.  This newly discovered evidence also was not available to the Republic during the underlying Arbitration, during the Swedish annulment proceedings, and during the initial confirmation proceedings in the above-referenced foreign jurisdictions.  This newly discovered evidence significantly changed the picture drawn from the previously available, limited evidence of the Statis' fraud.

16.     The Republic began to discover this evidence more than a year after the Court issued its March 23, 2018 Order confirming the Arbitration Award.

17.     First, in April 2019, the Republic obtained the deposition of the Statis' former Chief Financial Officer, Mr. Artur Lungu.  In his sworn testimony, Mr. Lungu admitted *inter alia* that the Statis deceived their outside auditors (KPMG) through a series of material misrepresentations.  The Statis made these misrepresentations in order to deceive KPMG into issuing audit reports stating that the Statis' financial statements were materially accurate when, in

fact, they were materially false.[5]  The Statis deployed these fraudulently-obtained audit reports, and underlying financial statements, to perpetrate their multiple fraud schemes.

18.     Second, in August 2019, KPMG took the extraordinary step of withdrawing all of its audit reports for the Statis' financial statements.  KPMG took this action after it reviewed Mr. Lungu's deposition testimony and conducted its own independent investigation of the Statis' accounting fraud.

19.     Third, also in August 2019, the Republic obtained Latvian bank records for over three dozen shell companies the Statis secretly controlled.  These bank record showed that the Statis had embezzled and laundered hundreds of millions of dollars from their companies in Kazakhstan, but then falsely represented in their financial statements that they had "invested" these monies in their Kazakh companies.[6]

20.     Fourth, in October 2019, the Republic discovered prior correspondence between the Statis and KPMG dating back to 2016 in which, as of that date, KPMG had questioned the truthfulness of the Statis' financial statements.  This evidence established that the Statis had been making knowing misrepresentation to multiple courts during the post-Arbitration judicial proceedings, including in particular the Svea Court of Appeal during the Swedish annulment proceedings.  Specifically, the Statis knowingly and falsely represented to multiple courts that KPMG had reviewed and approved all of the Statis' financial statements without question and on the basis of full information.

21.     Fifth, on the basis of the newly discovered evidence, a number of the world's leading experts in the fields of accounting, international arbitration, international law, ethics, and

---

[5] Deposition of Artur Lungu ("**Lungu Dep.**") at 183:15-22, 157:7-18.
[6] Amsterdam Judgment at 10.

criminal law issued reports and opinions that confirmed *inter alia* that (a) the Statis obtained the Arbitration Award by fraud; (b) the Statis continued their fraudulent and deceptive practices in multiple post-Arbitration court proceedings; and (c) because of the Statis' fraud, transactions in any proceeds of the Arbitration Award would constitute money laundering under the laws of multiple jurisdictions, including the United States.

22.     These experts include: (a) PricewaterhouseCoopers LLP, one of the world's leading accounting firms; (b) BDO Mälarden AB, a member of the BDO international network of public accounting, tax, consulting, and business advisory firms; (c) Professor Christoph Schreuer, a leading expert in the field of international investment law and international arbitration; (d) Professor George Bermann, a professor of law at Columbia, and internationally recognized expert on the law of international arbitration, transnational litigation, European Union law, and the law of multiple European jurisdictions; (e) Stefan D. Cassella, former Deputy Chief of the U.S. Department of Justice's Asset Forfeiture and Money Laundering Section, and a recognized expert in money laundering; (f) Professor Catherine Rogers, a leading expert in the field of ethics in international arbitration and professor of law at Pennsylvania State University; (g) Professor Bernard Hanotiau, one of the world's leading international arbitrators, and an expert in international commercial law and arbitration; (h) Mark Pieth, a prominent anti-corruption expert, former Chair of the OECD Working Group on Bribery, and a founding member of the Financial Action Task Force (FATF); and (j) Patrik Schöldström, now a judge on the Svea Court of Appeal in Sweden.

23.     The findings of the Statis' fraud made in the Amsterdam Judgment and the Belgium Judgment collaterally estop the Statis from relitigating these issues in this action. Even if that were not true, the evidence supporting these judgments constitutes indisputable proof of the

Statis' fraud.

24.     Based on the newly discovered evidence, the Statis committed fraud on this Court during the proceedings that resulted in the Judgment.  When the Statis filed their petition to confirm the Arbitration Award in this Court in 2014, the Republic had not discovered even the first shred of evidence of the Statis' fraud.  As a result, throughout the briefing on the defenses to the Statis' petition to confirm, which closed in May 2015, the Republic was not able to assert that the Arbitration Award was obtained by fraud.

25.     After the Republic uncovered the first pieces of evidence of fraud, the Statis successfully persuaded the Court in April 2016 that the Republic should not be permitted to amend its pleadings to present this evidence.

26.     The Statis did this by making several knowing misrepresentations to the Court. First, the Statis represented that they had not obtained the Arbitration Award by fraud.  In fact, the Statis knew when the filed their petition to confirm, and at all times throughout the confirmation proceedings, that they had obtained the Arbitration Award by fraud.  Second, the Statis represented to the Court that the Republic's then-existing, limited fraud allegations would be given a full and fair hearing in the concurrent annulment proceedings in Sweden.  In fact, as is now known and as has been confirmed by the Brussels Court of Appeal, the Statis knowingly deceived the Swedish courts during these annulment proceedings.  Third, the Statis then used these same deceptively-obtained Swedish annulment decisions to persuade this Court that the Arbitration Award should be confirmed.  As a result, the Statis obtained confirmation of the Arbitration Award.

27.     The deception practiced by the Statis on this Court was part of their global efforts to deceive multiple courts, which also were successful until recently.  As set forth above and alleged below in further detail, before the full existing evidence of the Statis' fraud was uncovered,

courts in the Netherlands, Belgium, and Luxembourg, like this Court, had also confirmed the Arbitration Award.  Like this Court, courts in those jurisdictions had, on the basis of a preliminary evidentiary record, and as a result of various deceptions of the Statis, accepted the Statis' false arguments that (i) the fraud did not exist; (ii) even if it did exist, the fraud was immaterial to the Arbitration Award; and (iii) the Republic's fraud case had been fully and fairly litigated in the courts of Sweden, and rejected.

28.     However, once the Republic was able to uncover evidence showing the full extent of the Statis' fraud, and was allowed to present this full fraud case, the courts in all three of these jurisdictions reversed course, vacated the prior decisions that had confirmed the Arbitration Award, and either held that the Arbitration Award is unenforceable because the Statis obtained it by fraud (Belgium and the Netherlands) or criminally indicted the Statis for their efforts to enforce the fraudulently-obtained Arbitration Award (Luxembourg).

29.     England is another jurisdiction in which the Statis' efforts to confirm the Arbitration Award have failed because of their fraud.  There, in August 2018, prior to the Republic obtaining the above-referenced newly discovered evidence, the Statis voluntarily dismissed their own confirmation proceedings so that they could avoid trial on just one of the fraud schemes now discovered by the Republic – the LPG Plant fraud.  However, this voluntary dismissal only was permitted by the English Court of Appeal upon the Statis agreeing to three harsh conditions.  One, the Statis had to agree to the vacatur of a preliminary English court order that had confirmed the Arbitration Award.  Two, the Statis had to promise to never again attempt to enforce the Arbitration Award in England.  Three, the Statis had to agree to reimburse the Republic for the legal fees and expenses it incurred in successfully defeating the Statis' efforts to recognize the Arbitration Award in England.

30.     Although the Statis' fraud has now been established by indisputable proof, and decisively determined or otherwise validated in the courts of Belgium, the Netherlands, Luxembourg, and England, here, in this Court, the Statis still hold a legitimate judgment against the Republic.  This is a perversion of the law and a manifest injustice that must be corrected.

31.     The Judgment gives the force of U.S. law to a fraudulently-obtained $500 million Arbitration Award and, as importantly, actually perpetuates the Statis' fraud.  The Judgment was the direct result of the Statis foisting on this Court an arbitral award that they, at all times, knew was the product of fraud.  Further, in the proceedings in this Court in which the Republic attempted to challenge confirmation of the Arbitration Award, the Statis engaged in further deception and misrepresentations in order to continue to conceal and therefore perpetuate their fraud.  Finally, because the Arbitration Award is based in fraud, transactions in any proceeds of the Arbitration Award, *i.e.*, collections on the Judgment, would, in the view of recognized experts, likely constitute money laundering under the laws of the United States and other countries.

32.     The purpose of this lawsuit is to right the egregious wrongs perpetrated by the Statis via the Judgment, and specifically to relieve the Republic from the Judgment pursuant to Rule 60(d)(1), to set aside the Judgment pursuant to Rule 60(d)(3), and to obtain any further compensation that the Court deems just and proper.

## THE PARTIES

33.     Plaintiff Republic of Kazakhstan is a sovereign state.

34.     Defendant Anatolie Stati is an individual.  On information and belief, Anatolie Stati is a natural citizen of Moldova and Romania and his address is 20 Dragonmirna Street, Chisinau, Republic of Moldova.

35.     Defendant Gabriel Stati is an individual.  On information and belief, Gabriel Stati is the son of Anatolie Stati and is also a natural citizen of Moldova and Romania.  On information

and belief, his address is 1A Ghioceilor Street, Chisinau, Republic of Moldova.

36.     Defendant Ascom is a joint stock company incorporated under the laws of Moldova, with headquarters located at 75 A. Mateevici Street, Chisinau, MD-2009, Republic of Moldova.  Anatolie Stati owns one-hundred (100) percent of Ascom.

37.     Defendant Terra Raf is a limited liability company incorporated under the laws of Gibraltar, with an address at Don House, Suite 31, 30-38 Main Street, Gibraltar.  Anatolie Stati and Gabriel Stati each own fifty (50) percent of Terra Raf.

## JURISDICTION AND VENUE

38.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 1367(a).  This Court has ancillary jurisdiction over this independent action given that it is brought in the same court that gave the Judgment.

39.     This Court has personal jurisdiction over Defendants because they filed the action in this Court in which the Judgment was given.

40.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) given that a substantial part of the events or omissions giving rise to the claims occurred in this district.

## FACTUAL ALLEGATIONS

41.     The operative facts concerning the Statis' fraud schemes have now been conclusively determined in the Belgium Judgment and the Amsterdam Judgment.

42.     As the Republic has now discovered and proven, the Statis accomplished their fraudulent schemes by *inter alia* lying to their auditors, KPMG, to obtain audit opinions stating that their financial statements were materially accurate when, in fact, they were materially false. Using these fraudulently-obtained KPMG audit reports, as the Republic now knows, the Statis covered up the fact that they overstated the costs of their "investments" in Kazakhstan by hundreds

of millions of dollars in order to embezzle these monies into their own accounts. And, as has also been recently discovered, the Statis used this embezzlement to manufacture a false "liquidity crisis," which they then falsely blamed on the Republic.

43. In the Arbitration, the Statis relied repeatedly on the fraudulently-obtained KPMG audit reports, underlying falsified financial statements, and various other documents that relied on those financial statements and audit reports, to argue that their investments in Kazakhstan were legitimate and worth hundreds of millions of dollars. The Arbitration Tribunal relied on these misrepresentations – in making determinations regarding jurisdiction, liability, and damages – and awarded the Statis over $500 million in the Arbitration Award.

44. In the post-Arbitration court proceedings in Sweden, when the Republic attempted to annul the Arbitration Award, the Statis then engaged in further acts of deception. Not only did the Statis make material misrepresentations and knowingly rely on fraudulent evidence during the Swedish annulment proceedings, the Statis also actively concealed from the Swedish courts key evidence – including that KPMG had questioned the Statis' fraudulent financial statements as early as 2016. At the same time as KPMG was raising these questions, the Statis continued to knowingly misrepresent to the Swedish courts that their financial statements could be relied upon because they had been audited and approved by a "Big Four" accounting firm.

45. At the same time as the Statis were deceiving the Swedish courts, the Statis were attempting to convert their fraudulently-obtained Arbitration Award into enforceable court judgments around the world through confirmation proceedings brought under the New York Convention. In those proceedings, the Statis falsely denied the existence of their fraud and, as importantly, they used the Swedish court decisions that they obtained through acts of deception to falsely argue to the various courts, including to this Court, that the Republic's fraud allegations

had been fully and fairly litigated in Sweden.

## I.    THE BELGIUM JUDGMENT ESTABLISHES THE EXISTENCE OF THE STATIS' FRAUD

46.    In its Judgment dated November 16, 2021, the Brussels Court of Appeal reviewed the Republic's full fraud case and all the evidence gathered in support thereof – the first court in the world to do so – and on this basis conclusively determined in a final judgment that the Statis had committed fraud before, during, and after the Arbitration, and that this fraud included the Statis deceiving their auditors (KPMG), obtaining the Arbitration Award by fraud, and deceiving the Swedish courts during the annulment proceedings.

47.    On this basis, the Brussels Court of Appeal court vacated the prior Belgium court orders obtained by the Statis that had confirmed the Arbitration Award, and held that confirmation of the Arbitration Award would violate the Belgium public policy against confirming international arbitral awards obtained by fraud.

### A.    Procedural History Of The Belgium Proceedings

48.    After the English Court issued its June 2017 judgment holding that the Republic had *prima facie* established the existence of the LPG Plant Fraud, the Statis engaged in forum shopping and initiated proceedings to attempt to recognize and enforce the Arbitration Award in multiple other jurisdictions.

49.    One of these other jurisdictions was Belgium.  On November 13, 2017, the Statis filed an *ex parte* application for confirmation of the Arbitration Award ("exequatur") before the Brussels Court of First Instance, which was granted on December 11, 2017.

50.    The Statis were represented in these proceedings by the law firm NautaDutilh, which acted as local counsel on behalf of King & Spalding.

51.    On February 2, 2018, the Republic filed an opposition to the confirmation order

and presented its then-known, limited evidence of the Statis' fraud.

52.     In response, the Statis falsely denied the Republic's fraud allegations, falsely represented that the Republic's fraud case had been rejected during the Swedish annulment proceedings after being fully and fairly litigated, and falsely represented that KPMG had access to knowledge of all relevant information when auditing the Statis' financial statements.

53.     On December 20, 2019, the Brussels Court of First Instance authorized confirmation of the Arbitration Award in Belgium.  In its decision, the court did not address the merits of the Republic's then-existing fraud evidence.  Rather, it held that there was no proof of a determinative causal link between the then-alleged fraud and the outcome of the Arbitration.[7]

54.     The Republic timely appealed to the Brussels Court of Appeal.

    **i.     The Statis' Fraud Was Fully Litigated In The Brussels Court Of Appeal**

55.     A preliminary question before the Brussels Court of Appeal was whether the Republic would be permitted to introduce all of its existing evidence of the Statis' fraud or whether the record would be restricted to the limited evidence that was filed during the lower court proceedings.

56.     The Brussels Court of Appeal resolved this issue in the Republic's favor and granted its request for a full appeal, such that all evidence of the Statis' fraud could be considered on appeal.

57.     Thereafter, the Republic and the Statis engaged in multiple rounds of written

---

[7] Tribunal de Première Instance Francophone de Bruxelles [Civ.] [French Language Court of First Instance of Brus On November 17, 2020, the Brussels Court of Appeal, over the objection of the Statis, granted the Republic's request for a full appeal on the merits, such that all evidence of the Statis' fraud could be considered on appeal, not just the limited evidence that was filed during the proceedings in the Brussels Court of First Instance.sels], 4me ch. Dec. 20, 2019, 18/1312/A, at 26, 29.

submissions.

58.     On February 26, 2021, the Statis made their first written submission.  It consisted of 278 pages with an additional 6,517 pages of exhibits.

59.     On April 30, 2021, the Republic made its first written submission.  It consisted of 214 pages with an additional 17,106 pages of exhibits.  In support, the Republic included all the new evidence of the Statis' fraud it had obtained to that date, including the April 2019 Lungu deposition, the August 2019 KPMG withdrawal of its audit reports, the Stati banking records that had been obtained in Latvia in August 2019, the 2016 KPMG correspondence that had been discovered in October 2019, and expert reports and opinions that assessed the then-existing evidence of the Statis' multiple fraud schemes.

60.     On May 31, 2021, the Statis responded in their second written submission.  It consisted of 278 pages with an additional 739 pages of exhibits.

61.     On June 30, 2021, the Republic responded with its second and final written submission.  It consisted of 227 pages with an additional 301 pages of exhibits.

62.     On July 28, 2021, the Statis made their final written submission.  It consisted of 310 pages with an additional 889 pages of exhibits.

63.     After the written submissions were completed, the Brussels Court of Appeal held multiple hearings at which counsel for the Republic and counsel for the Statis were present.  On October 5, 2021, the court held a three-hour hearing on the merits of the Republic's submissions and evidence of the fraud.  On October 12, 2021, the court held a three-hour hearing on the merits of the Statis' defenses.  On October 19, 2021, the court held a final one-hour hearing, during which counsel for the Statis and counsel for the Republic presented rebuttal arguments.

64.     The Statis did not testify in these proceedings – nor have they ever testified in any

of the post-Arbitration proceedings.

**B.     The Belgium Judgment – Specifics Of The Statis' Fraud**

65.     On November 16, 2021, the Brussels Court of Appeal issued the Belgium Judgment.  Therein, the court rejected each of the Statis' arguments and found conclusively that the Statis had committed the frauds alleged by the Republic.

66.     With respect to the Statis' fraud committed <u>before</u> the Arbitration, the Brussels Court of Appeal found *inter alia* that:

   a.     the Statis falsely recorded related-party transactions in their financial statements as being at arms-length with independent third parties;[8]

   b.     "[t]he Statis had purposefully misled their auditor [KPMG] in order to give credibility to their financial statements in the eyes of third parties";[9]

   c.     the Statis have since "admitted to concealing [Stati-owned company] Perkwood from their financial statements, in clear violation of IFRS [International Financial Reporting Standards], with the view in particular to avoid a review of the transactions between Perkwood and TNG by an independent third party" in order to "deliberately conceal[] the true status of Perkwood";[10] and

   d.     the "Statis' investment in Kazakhstan was conducted in bad faith."[11]

67.     With respect to the Statis' fraud committed <u>during</u> the Arbitration, the Brussels

---

[8] Belgium Decision at 20.

[9] *Id.* at 27.

[10] *Id.* at 28-29.

[11] *Id.* at 29.

Court of Appeal found *inter alia* that:

a. the Statis legitimized their fraudulent financial statements by relying on audit reports which were later withdrawn in August 2019 by KPMG so that "no reliance should be placed on [them]";[12]

b. the Statis obtained damages on the basis of an indicative offer that they knew was based on their fraudulent financial statements and fraudulently obtained audit reports;[13]

c. the Statis failed to disclose the true status of Perkwood, the company that the Statis secretly owned but falsely represented was an independent third-party supplier, and that this failure to disclose was the result of a purposeful scheme by the Statis to manipulate and inflate their construction costs;[14]

d. the Statis relied on documents that Mr. Lungu, the Statis' former CFO, confirmed in his April 2019 deposition were materially false;[15]

e. the Statis' false evidence "had an influence on the [award] both at the stage of assessing the causal link between [the Republic's] liability and the damage and at the stage of assessing the quantum of the damage claimed by the Statis";[16]

f. the Statis insisted on the supposed "reliability" of their financial statements to demonstrate the legality of their investment in Kazakhstan, and that they

---

[12] *Id.* at 20, 24.

[13] *Id.* at 28-29.

[14] *Id.* at 20, 29.

[15] *Id.* at 21-22.

[16] *Id.* at 22.

had been audited by a "Big Four" auditing firm [KPMG], without disclosing that the auditors had been deceived;[17] and

g.    "due to the Statis maneuvres and withholding of information, the arbitrators were misled. They were prevented from taking cognizance of the real financial situation of the Statis, which was essential to be able to adjudicate the matter."[18]

68.    On this basis, the Brussels Court of Appeal held that the Arbitration Tribunal "relied on evidence that is now known to be inaccurate and tainted by material misstatements."[19] The court further held that all the evidence gathered by the Republic since the Arbitration Award was issued demonstrates "beyond any possible doubt the fraudulent behavior of the Statis."[20]

69.    With respect to the Statis' fraud committed <u>after</u> the Arbitration, the Brussels Court of Appeal held *inter alia* that:

a.    the Statis deceived the Swedish courts during the proceedings initiated by the Republic in 2014 to set-aside/annul the Arbitration Award;

b.    specifically, the court held that the Statis "knowingly concealed… the truth" and "deliberately misled the Swedish courts…which – purposefully – prevented these jurisdictions from ruling on the matter on the basis of all the information and evidence available."[21]

70.    This component of the Statis' fraudulent schemes was egregious because the Statis

---

[17] *Id.* at 23, 30.

[18] *Id.* at 29.

[19] *Id.* at 28-29.

[20] *Id.* (emphasis added).

[21] *Id.* at 7-8.

then deployed these Swedish annulment decisions in multiple courts around the world, including in this Court, to erroneously assert that the Republic's fraud claims had no merit.[22]

71.      Based on these findings, the Brussels Court of Appeal rejected the Statis' claim that any of the prior Swedish court judgments were entitled to *res judicata* effect, and it further found that subsequent courts that had relied on the Swedish decisions similarly did not have all the relevant information and evidence in confirming the Arbitration Award.[23]

72.      The Brussels Court of Appeal also rejected the Statis' argument that the Arbitration Tribunal was required to investigate the fraud and take "initiative when the documents that are produced during the proceedings are of such a nature as to suggest that they involve fraudulent acts," noting that this argument

> *implies necessarily that the arbitrators were properly informed, and that if audited financial statements are produced and their reliability is highlighted, they are assured that they can rely on them and examine the arguments of the parties in light of such information that is presented as correct.*
>
> *It is obvious that, if it turns out afterwards that the arbitrators were deceived by one of the parties, this finding entails a violation of the rights of defense of the party who was unable to prepare its defense with the relevant knowledge before the arbitral tribunal.[24]*

73.      In March 2022, the Statis appealed the Brussels Court of Appeal's decision to the Belgium Court of Cassation (the highest court in Belgium).  In this appeal the Statis have only raised discrete points of law and have not challenged the Brussels Court of Appeal's factual determinations regarding the fraud.

---

[22] *Id.* at 9-14.

[23] *Id.*

[24] *Id.* at 5.

C.      **The Damages Proceedings Against The Statis In Belgium**

74.     One consequence of the Belgium Judgment is that the monetary attachments that the Statis obtained in Belgium in their attempts to recognize and enforce the Arbitration Award were deemed unlawful *ab initio*.

75.     These attachments were first obtained by the Statis in September 2017, as a result of an *ex parte* application filed in the Brussels Court of First Instance to attach assets of the National Fund of Kazakhstan (the "**National Fund**") held in trust by the London branch of the Bank of New York Mellon SA/NV ("**BNYM**"). The funds were held by BNYM pursuant to a Global Custody Agreement with the National Bank of Kazakhstan ("**NBK**") that was governed by English law.

76.     On October 11, 2017, the Brussels Court of First Instance issued an *ex parte* garnishment order.  In response, BNYM froze National Fund cash and securities in the amount of approximately $22 billion (including $589 million in cash).

77.     The Republic filed an application to set aside the garnishment order, which the Statis opposed.  In May 2018, the court upheld the Statis' attachment but limited the amount to the amount of the Arbitration Award inclusive of interest, which equaled circa $530 million at that time.

78.     The National Fund assets held by BNYM remained frozen until the Brussels Court of Appeal's November 2021 decision finding that the Statis' obtained the Arbitration Award by fraud.  Thereafter, because the attachments were deemed unlawful as a result of the Belgium Judgment, the Statis were required to instruct BNYM to release the frozen assets.

79.     On December 13, 2021, the Republic sought permission from the Brussels Court of First Instance to file a claim for damages caused by the Statis' unlawful attachments.  On

January 3, 2022 NBK joined this request and reserved its right to file a claim itself.  By order dated June 13, 2022, the court allowed these claims to proceed.

80.     On September 26, 2022, the Republic filed its damages claim.  The quantum of its claim was provisionally assessed at approximately $70 million.  On November 25, 2022, NBK filed its own damages claim amounting to approximately $123 million.

81.     The Republic and NBK are scheduled to make further written submissions in April and June 2023, respectively, and the Statis are scheduled to make further submissions in September 2023.  A final hearing is scheduled in October 2023 to determine  the damages claims of the Republic and NBK.

## II.     THE AMSTERDAM JUDGMENT CONFIRMS THE EXISTENCE OF THE STATIS' FRAUD

82.     On January 9, 2023, the Amsterdam District Court issued its Judgment finding that the Statis obtained the Arbitration Award by fraud.  Specifically, the court held that the Statis had committed "material deceit" prior to the Arbitration and "procedural deceit" during the Arbitration.[25]  On this basis, the court rejected the Statis' application to enforce the Arbitration Award in the Netherlands.  In addition, the court held that, based on the evidence presented by the Republic, the Statis engaged in money laundering schemes with respect to their Kazakh operations.

83.     The Amsterdam Judgment came after months of contested proceedings in which the court reviewed all of the evidence of fraud put forth by the Republic, reviewed multiple rounds of pleadings, considered the arguments of counsel for both the Republic and the Statis, and held an in-person hearing.

---

[25] Amsterdam Judgment at 11, 15.

A.        **Procedural History Of The Netherlands Proceedings**

84.        Another jurisdiction in which the Statis initiated recognition and enforcement proceedings after the English June 2017 *prima facie* judgment was issued was the Netherlands.

85.        There, in September 2017, the Statis filed an application in the Amsterdam Court of Appeal for confirmation ("exequatur") of the Arbitration Award.  Again, the Statis were represented by NautaDutilh, which acted as local counsel in these proceedings on behalf of King & Spalding.

86.        The Republic put forth the limited fraud evidence it had discovered at the time, which consisted primarily of evidence concerning the LPG Plant fraud, *i.e.*, that the Statis had concealed their company, Perkwood, as a related party and thereby inflated the stated costs of the LPG Plant.

87.        In response, the Statis falsely denied the existence of the fraud, and further asserted, falsely as is now known, that KPMG was fully aware of Perkwood's related-party status at that the time it audited the Statis' financial statements.

88.        On July 14, 2020, the Amsterdam Court of Appeal issued a judgment granting confirmation of the Arbitration Award, finding that although the Republic's then-existing evidence showed that the Statis made payments to Perkwood and other related entities, and that there was no clear factual or legal basis for those payments, there was no proof that these payments were made to intentionally inflate the value of the LPG Plant in the Arbitration.

89.        The Republic appealed, and in an order dated December 24, 2021, the Dutch Supreme Court quashed the confirmation decisions that the Statis obtained, holding that the Statis had filed the proceedings in the wrong Dutch court.  The Dutch Supreme Court remanded the case to the correct court – the Amsterdam District Court – for fresh proceedings.

**B.      The Statis' Fraud Was Fully Litigated In The Amsterdam District Court**

90.      As was the case in the proceedings in the Brussels Court of Appeal, a preliminary issue in the fresh proceedings before the Amsterdam District Court was whether the Republic would be permitted to introduce all of its then-existing evidence of the Statis' fraud, as the Republic requested, or whether the record would be restricted to the limited evidence that was filed during the prior confirmation proceedings in the Netherlands, as the Statis requested.

91.      In June 2022, the Amsterdam District Court resolved this issue in the Republic's favor and granted its request to present all its then-existing evidence of the Statis' fraud.

92.      Thereafter, the Republic and the Statis engaged in multiple rounds of written submissions.  The Statis' updated application to obtain confirmation of the Arbitration Award consisted of 70 pages with an additional 222 pages of exhibits.  The application included the Statis' defenses to the Republic's then-known fraud allegations.

93.      On July 26, 2022, in response, the Republic submitted its updated statement of defense.  The submission consisted of 90 pages with an additional 10,148 pages of exhibits.  On September 20, 2022, the Statis made a second written submission responding to the Republic's fraud allegations.  The submission consisted of 83 pages with an additional 1,050 pages of exhibits.

94.      On November 21, 2022, the Amsterdam District Court held a hearing on the Statis' application to confirm the Arbitration Award and the Republic's fraud case.  The hearing lasted circa 8 hours, and counsel for the Statis and the Republic were both present.

**C.      The Amsterdam Judgment's Findings Regarding The Statis' Fraud**

95.      On January 9, 2023, the Amsterdam District Court issued the Amsterdam Judgment, a 16-page reasoned decision. Therein, the Amsterdam District Court found that the Statis had committed many of the frauds identified in the Belgium Judgment as well as some

additional frauds.

96.     With respect to the "material" fraud committed by the Statis prior to the
Arbitration, the Amsterdam District Court found that the Statis had engaged in such fraud by:

    a.     "withdrawing large amounts from [their Kazakh companies] KPM and
TNG during the sale of crude oil and by using those amounts for unusual
and personal expenses via the Hayden company controlled by Stati et al.";[26]

    b.     "withdrawing dozens of millions of dollars from TNG during the
construction of the LPG installation via not at arm's length transactions with
Perkwood, which is the party secretly controlled by it";[27]

    c.     "concealing the withdrawals in its financial statements as 'assets' and
'costs' as a result of which the financial statements contain material
misstatements";[28] and

    d.     causing the alleged liquidity deficit for which they blamed the Republic in
the Arbitration, "which arose (at least in part) from the withdrawals
(concealed in the financial statements) carried out by [the Statis] from [their
Kazakh companies] KPM and TNG."[29]

97.     With respect to the Statis' fraud committed during the Arbitration, the Amsterdam
District Court found that:[30]

    a.     the Statis relied on financial statements and audit reports to value their

---

[26] *Id.* at 11.

[27] *Id.*

[28] *Id.*

[29] *Id.* at 12.

[30] *Id.* at 11-12.

investments in Kazakhstan that "KPMG has since withdrawn … because those financial statements contain material misstatements, inter alia because certain withdrawals had been included in the aforementioned investment costs as 'construction costs'";

b.  the Statis submitted in the Arbitration "various other documents" that relied on their falsified financial statements that they had "drawn up in 2008 within the context of the proposed sale of KPM and TNG…. Indicative and other bids made by potential buyers of the LPG installation were based on those documents";

c.  the "arbitral tribunal assumed those bids in its assessment of the loss estimate, because those bids formed the best basis for the valuation of the LPG installation" and awarded the Statis $199 million in the Arbitration Award "on this ground";

d.  the Statis "expressly denied before the arbitral tribunal that it withdrew funds from KPM and TNG. The arbitral tribunal therefore held that the liquidity deficit was a consequence of external circumstances";

e.  the Statis "argued during the arbitration proceedings that as a result of the liquidity deficit it had to rely on external financing of USD 60 million (the 'Laren Loan')" at unfavorable terms, which argument the Arbitration Tribunal accepted; and

f.  the Statis "argued in the arbitration proceedings that KPM and TNG were in sound financial condition in 2008," which was also accepted by the Arbitration Tribunal.

98.     On the basis of these findings, the Amsterdam District Court held that there existed "a causal connection between the procedural deceit and award" and that "the award could have read differently if the arbitral tribunal had been aware of the procedural deceit."[31]

99.     The Amsterdam District Court further held that the Arbitration Tribunal did not assess the Republic's fraud allegations during the Arbitration, as the Statis had argued.  The court instead held that the Republic "demonstrated sufficiently that the accounting fraud was not part of the debate between the parties during the arbitration," and that any of the Republic's "suspicions" of fraud were unsupported by evidence at the time and were "expressly contested" by the Statis.[32]

100.     In support of this conclusion, the Amsterdam District Court cited the following key new evidence that emerged after the Arbitration Award was issued:

    a.     the April 2019 deposition testimony of Mr. Lungu;

    b.     the August 2019 withdrawal by KPMG of all of its audit reports for the Statis' financial statements;

    c.     the 2016 KPMG correspondence to the Statis in which it questioned the accuracy of their financial statements;

    d.     the Statis' Latvian bank statements discovered in 2019 revealing suspicious "*withdrawals during the sale of oil*";

    e.     powers of attorney discovered in August 2019 in the Statis' Latvian bank records showing that the Statis secretly controlled Perkwood, the company that the Statis misrepresented in their financial statements was an unrelated

---

[31] *Id.* at 14.

[32] *Id.* at 10.

third party in order to inflate the costs of their Kazakh investments;[33] and

f.     a witness statement made by Mr. Lungu in separate arbitral proceedings in 2015, in which the Statis stated that the amount of the LPG Plant's construction costs was far lower than what the Statis had stated in the Arbitration against the Republic.

### D.   The Amsterdam Judgment's Findings Regarding The Statis' Money Laundering

101.    The Amsterdam District Court also held that the Statis engaged in money laundering schemes in connection their operations in Kazakhstan.

102.    Specifically, as further set forth below, the Stati bank statements obtained by the Republic from Latvia in 2019 showed that Anatolie Stati and Gabriel Stati secretly controlled a number of third parties they presented as independent third parties.[34]   An analysis of the bank statements of these entities undertaken by PricewaterhouseCoopers revealed that the Statis secretly withdrew circa $230 million from their Kazakh companies, KPM and TNG, during the sale of crude oil and used these amounts for "unusual and personal expenses."[35]   The Statis did this through use of another secretly-related party, Hayden Intervest Ltd ("**Hayden**"), that they falsely claimed in their financial statements was an independent third party in order to conceal the improper withdrawals.[36]

103.    The role of Hayden to conceal the improper withdrawals was not known to the

---

[33] *Id.* at 10.

[34] *Id.*

[35] *Id.* at 10-11.

[36] *Id.* at 11.

Republic or to the Arbitration Tribunal during the Arbitration.[37]  In fact, the Statis expressly denied in the Arbitration that they withdrew funds from KPM and TNG, and the Arbitration Tribunal relied on these misrepresentations to hold that "the liquidity deficit was a consequence of external circumstances, that this deficit was allegedly aggravated by Kazakhstan and that Kazakhstan had provided insufficient evidence that the liquidity deficit was caused by [the Statis'] own actions."[38]

104.    Therefore, "[t]he (alleged) liquidity deficit in 2009," the Amsterdam District Court held, "arose (at least in part) from the withdrawals (concealed in the financial statements) carried out by [the Statis] from KPM and TNG," and this alleged deficit was "included by the arbitral award in its assessment, in particular where it concerned causality and the loss estimate, inter alia with respect to the alleged damage to the oil fields."[39]  Since this evidence was revealed, the court held, the Statis have failed to provide any credible explanation for the withdrawals of hundreds of millions of dollars from KPM and TNG and do not contest the existence of these withdrawals.[40]

## III.    THE LUXEMBOURG CRIMINAL INDICTMENTS OF THE STATIS

105.    In May 2019, the Republic filed a Criminal Complaint before the Investigating Judge of the Luxembourg District Court based on the evidence of the Statis' fraud that had been collected at that time, including the April 2019 deposition testimony of Mr. Lungu.

106.    The Criminal Complaint asserted that the Statis, by attempting to enforce the fraudulent Arbitration Award in Luxembourg, had violated multiple provisions of the Luxembourg

---

[37] *Id.* at 10.

[38] *Id.* at 12.

[39] *Id.*

[40] *Id.* at 10.

Criminal Code.

107.     On February 2, 2021, the Republic updated its Criminal Complaint by submitting the newly discovered evidence of the Statis' conduct, including the evidence of the Statis' money laundering schemes discovered in the Latvian bank records described herein.

**A.     Criminal Indictments Of Anatolie Stati And Gabriel Stati**

108.     On September 26 and 27, 2022, the Investigating Judge interrogated Anatolie Stati concerning a number of topics arising from the Criminal Complaint.  Anatolie Stati attended the interrogation by videoconference from a courtroom in Moldova and was represented by attorneys present both in the courtroom in Luxembourg and in the courtroom in Moldova.  Attorneys for the Republic were also present in the courtroom in Luxembourg and they, alongside attorneys for Anatolie Stati, were also allowed to question Anatolie Stati.

109.     On September 27, 2022, at the end of the interrogation, the Investigating Judge officially indicted Anatolie Stati on all of the charges put forward in the Criminal Complaint, *i.e.*:, that the Statis by attempting to enforce the fraudulent Arbitration Award in Luxembourg had engaged in:

> a.     forgery and use of forgery, or attempted forgery and use of forgery, committed in violation of Sections 196 and 197 of the Luxembourg Criminal Code;
>
> b.     defrauding or attempting to defraud a court within the meaning of Section 496 of the Luxembourg Criminal Code; and
>
> c.     money laundering or attempted money laundering within the meaning of Section 506-1 of the Luxembourg Criminal Code.

110.     On November 14, 2022, the Investigating Judge interrogated Gabriel Stati in the

criminal proceedings.  Following the interrogation, the Investigating Judge officially indicted Gabriel Stati on the same aforementioned charges put forward in the Criminal Complaint.

111.    Under the Luxembourg Criminal Code, an indictment (*l'inculpation*) means that an investigating judge (*juge d'instruction*) considers there to be sufficient evidence to establish guilt (*indices* suffisants *de culpabilité*).  An indictment is made on the basis of the evidence obtained through interrogations, searches, or other sources provided to the investigating judge.  An indictment is not a judgment.  Depending on the facts that come to the attention of the investigating judge during the course of the investigation, an indictment may be amended or not confirmed.

112.    Following the indictments of Anatolie Stati and Gabriel Stati, the Investigating Judge is continuing the investigation.  Once the Investigating Judge considers the investigation to be complete, the judge will issue a closure order (*ordonnance de clôture*), which is not subject to appeal, and send the file to the Public Prosecutor's Office for further proceedings, including a criminal trial if serious and corroborating evidence of guilt (*indices graves et concordants de culpabilité*) is determined.

### B.    Procedural History Of The Statis' Confirmation And Enforcement Proceedings In Luxembourg

113.    The criminal indictments of Anatolie Stati and Gabriel Stati arose from their efforts to recognize and enforce the fraudulent Arbitration Award in Luxembourg.  There, as in Belgium and the Netherlands, the Statis initiated recognition and enforcement proceedings after the June 2017 English *prima facie* judgment.

114.    Specifically, the Statis filed an *ex parte* application to confirm the Arbitration Award in Luxembourg on August 24, 2017, which was granted on August 30, 2017.  The Statis were again represented in these proceedings by NautaDutilh acting at the direction of King & Spalding.

115.     The Republic appealed to the Luxembourg Court of Appeal, and on December 19, 2019, the confirmation order was upheld.  In this decision, the Luxembourg Court of Appeal did not assess the Republic's evidence – or whether the actual fraud took place – and instead relied in part on the Swedish court rulings in the annulment proceedings.

116.     The Republic filed an appeal to the Luxembourg Court of Cassation (the country's highest court), and in February 2021, the Court of Cassation ruled in the Republic's favor and overturned the order upholding confirmation of the Arbitration Award.  The basis for the ruling was that the Republic had been deprived of due process in connection with how the Luxembourg Court of Appeal dealt with key evidence of the Statis' fraud, namely the 2019 correspondence in which KPMG withdrew all of its audit reports for the Statis' financial statements.

117.     On remand, in December 2021, the Court of Appeal then stayed the Statis' further efforts to confirm the Arbitration Award pending the outcome of the criminal proceedings against the Statis.  In issuing this stay, the Court of Appeal took note of the evidence regarding the Statis' fraud and found a genuine link between the offenses investigated in the Luxembourg criminal proceedings and the legitimacy of the Arbitration Award.

## IV.    NEWLY DISCOVERED FACT EVIDENCE OF THE STATIS' FRAUD

118.     The Amsterdam Judgment, the Belgium Judgment and the Luxembourg Indictments are based on evidence that was not available to the Republic during the prior confirmation proceedings in this Court that resulted in the Judgment.  This newly discovered evidence also was not available to the Republic during the underlying Arbitration, during the Swedish annulment proceedings, and during the initial confirmation proceedings in the above-referenced foreign jurisdictions.

### A.      April 2019 – The Statis' Former CFO Testifies To Key Elements of The Fraud

119.      As a part of its investigation to uncover evidence of the Statis' fraud, the Republic was able to depose Artur Lungu, the Statis' former Chief Financial Officer, in April 2019 through proceedings brought pursuant to 28 U.S.C. § 1782.

120.      The Republic was only able to depose Mr. Lungu after it discovered that he was now living in Houston, Texas.   Mr. Lungu was represented by King & Spalding, the Statis' attorneys, at his April 3, 2019 deposition.

121.      At the beginning of his deposition, Mr. Lungu confirmed *inter alia* that he understood: (a) his testimony was under oath and subject to the penalty of perjury; (b) that it is a "serious crime to lie under oath"; and (c) that he would only answer questions that he understood and that there was no reason why he could not "provide 100 percent truthful and accurate testimony."[41]

122.      Mr. Lungu testified that the "treasury" function at their companies, namely Ascom, Tristan Oil Ltd. ("**Tristan**"), KPM, TNG, was controlled by Anatolie Stati, which included controlling all bank relationships, opening bank accounts, having "signing authority," and making payments for Ascom and other Stati companies.[42]

#### i.      The Fraud Concerning KPMG And The Statis' Financial Statements

123.      Mr. Lungu testified that Anatolie Stati knowingly misled KPMG in the course of its audits of the financial statements for the Statis' Kazakh companies, TNG and KPM, by failing to identify Perkwood, and other Stati-controlled companies, as related parties.

---

[41] Lungu Dep. 16:8–17:22.

[42] *Id.* 122:5–125:1, 129:18–24.

124.     Specifically, Mr. Lungu testified that in the Stati group of companies the only person who had the authority to incorporate or dissolve a company like Perkwood was Anatolie Stati,[43] that Anatolie Stati controlled the finances of Perkwood, and that therefore he knew at all times that Perkwood was a related party to Tristan, KPM, and TNG.[44]

125.     Mr. Lungu testified that he did not learn of Perkwood's related–party status until he was preparing his October 2013 witness statement in the separate arbitration between the Statis and their business partner, Vitol.[45]  Despite uncovering that Perkwood was a related party, Mr. Lungu admitted that he did not take any corrective or remedial action – although the Arbitration against the Republic was still pending at this time.[46]

126.     Mr. Lungu agreed that a "significant proportion" of the Statis' business was "conducted through transactions with related parties,"[47] and he further admitted that the correct identification of related parties and related party transactions on the financial statements was "key" because they had so many related party transactions.[48]  He also admitted that the requirement for accurately disclosing related parties and related party transactions was because such transactions had the inherent risk for fraud and abuse.[49]

127.     Mr. Lungu testified that, based on his current knowledge, Anatolie Stati intentionally misled KPMG in its audits of the financial statements of Tristan, KPM, TNG by

---

[43] *Id.* 112:5–19, 127:10-19.

[44] *Id.* 111:25–112:19, 121:5–13, 121:21–122:1, 129:7–130:4, 147:24–148:9, 274:13-21.

[45] *Id.* 145:11– 146:22, 147:7–23, 165:19–166:3.

[46] *Id.* 148:16–20.

[47] *Id.* 156:18–157:2.

[48] *Id.* 262:20–263:5.

[49] *Id.* 199:3–16.

failing to identify Perkwood as a related party.[50]

128.    Mr. Lungu testified that Anatolie Stati did this by falsely stating in each of the relevant Management Representation Letters to KPMG that all related parties and related party transactions were accurately disclosed, when in fact Perkwood was not disclosed as a related party and its transactions were not disclosed as related party transactions.  Mr. Lungu admitted that these omissions rendered the Management Representation letters materially false.[51]

129.    With respect to the financial statements of the Statis' Kazakh companies, Mr. Lungu testified that each of year-end financial statements for 2007, 2008, and 2009, as well as various interim financial statements, were materially false because they failed to identify Perkwood as a related party and failed to identify the Perkwood transactions as related-party transactions.[52]

130.    One of the fundamental items of information that must be disclosed in a company's financial statements is the identity of "related parties" and any transactions and outstanding balances with related parties.  The objective regarding this disclosure is set forth in International Accounting Standard ("**IAS**") 24.1:

> *The objective of this standard is to ensure that an entity's financial statements contain the disclosures necessary to draw attention to the possibility that its financial position and profit or loss may have been affected by the existence of related parties and by transactions and outstanding balances of such parties.*

131.    Mr. Lungu testified that he was familiar with IAS 24 and understood that it defines what "related party transactions are" and "requires disclosure of related parties and related party

---

[50] *Id.* 145:4–8, 150:7–18, 157:10–18, 166:19–167:11, 182:16–183:22, 197:15–198:4, 198:17–199:16, 200:16–201:4.

[51] *Id.* 144:16–145:8, 147:24–148:9, 150:9–18, 182:16–183:22, 198:11–199:2; 199:18–201:4.

[52] *Id.* 163:16–20, 197:15-198:4, 199:24–200:6, 205:10–18, 212:24–213:6, 213:19–214:7.

transactions."[53]

132.     On this basis, Mr. Lungu agreed that Perkwood was "at all material times related to TNG (and Ascom) within the meaning of IAS 24," and that "all of the transactions between TNG and Perkwood should have therefore been disclosed as related party transactions."[54]

133.     Mr. Lungu admitted that the failure to disclose Perkwood as a related party was a breach of IAS 24.[55]

### ii.     The Fraud Concerning KPMG And The Statis' Financial Statements

134.     During his deposition, Mr. Lungu was shown the Information Memorandum prepared by third party Renaissance Capital in the course of the Statis' potential sale of TNG and KPM, pursuant to which the Statis obtained an offer from KazMunaiGas ("**KMG**"), a state-owned oil and gas company in the Republic, for the LPG Plant.  The Statis later used this offer from KMG in the Arbitration to value the LPG Plant, as further set forth herein.

135.     Mr. Lungu confirmed that this document (the Information Memorandum) was used to solicit bids for the Stati assets in Kazakhstan and was false, to the extent it relied on the underlying false financial statements.[56]

### iii.     The Fraud Concerning The Tristan Noteholders

136.     At various times, the Statis raised capital from investors through the issuance of notes by their company, Tristan.  The terms of the notes were set in an Indenture, and the relevant terms of the Indenture are described at the end of the Information Memorandum.  Under these

---

[53] *Id.* 132:21-133:3.

[54] *Id.* 133:4–21.

[55] *Id.* 183:2–14; 214:5–7.

[56] *Id.* 242:5–9, 244:24–245:12.

terms, Mr. Lungu confirmed that the Tristan was required to obtain varying levels of approval for related party transactions, including a Board resolution and an independent fairness opinion for all transactions over $10 million.[57]

137.    Mr. Lungu further admitted that the Perkwood transactions for the construction of the LPG Plant would have triggered the $10 million threshold.  By failing to disclose Perkwood as a related party, Mr. Lungu admitted, the Statis avoided having to obtain the required Board resolution and independent fairness opinion for the Perkwood transactions.[58]

### iv.    The Fraud Concerning The KPMG Due Diligence Report

138.    During his deposition, Mr. Lungu was shown a copy of a draft Vendor Due Diligence Report that was being prepared by KPMG in August–September 2008 as part of the Statis' potential sale of their Kazakh operations.[59]  This draft version of the report correctly identified Perkwood as a Stati-related party.  Mr. Lungu admitted that the final version of the Vendor Due Diligence report that was eventually disseminated to projected buyers, including to KMG, was materially false because it identified Perkwood as an unrelated independent party.

139.    Specifically, Mr. Lungu testified that he expressly directed KPMG to change the identification of Perkwood in the Vendor Due Diligence Report from that of a "related party" to that of an unrelated "third party."  KPMG followed this direction and created an amended Report in which all references to Perkwood being a related party were changed so that the report stated that Perkwood was an unrelated 'third–party."[60]  Mr. Lungu admitted that he directed this change

---

[57] *Id.* 238:19–241:7.

[58] *Id.* 241:8–242:9.

[59] *Id.* 260:16–261:18.

[60] *Id.* 261:25–277:21.

— which he now acknowledges falsified the Report — on the instruction of Anatolie Stati, and because he thought at the time that Perkwood was not a related party.[61]

### v.    The Fraud Concerning The Construction Of The LPG Plant

140.    As the Republic has now learned, to construct the LPG Plant, the Statis had interposed Perkwood (a secretly related party) and created sham contracts to fraudulently inflate their investments in the LPG Plant.  The Statis did this by having Perkwood "sell" to TNG, and TNG pay for, the same LPG Plant equipment already purchased from Tractebel Gas Engineering GmbH ("**Tractebel**"),  (the main supplier of the LPG Plant equipment and an independent third party), but at almost triple the price.

141.    Upon being shown the sham agreement for the Perkwood sale, Mr. Lungu testified that the "E. Ozerov" that signed this sham agreement on behalf of Perkwood was actually Elena Ozerov, the accountant economist who worked in the "accounting department" of Ascom.[62]

142.    Mr. Lungu further admitted that the "E. Kazumov" that signed various of the annexes to the sham agreement: (1) was Eldar Kazumov, the personal chauffeur of Anatolie Stati;[63] (2) that Mr. Kazumov did not have any business training or experience of which Mr. Lungu was aware;[64] (3) that Mr. Kazumov's signatures on the agreement were a "red flag";[65] and (4) that it certainly was not the practice for chauffeurs to sign corporate documents during Mr. Lungu's ten–year tenure at the Stati companies.[66]

---

[61] *Id.* 275:15–277:21.

[62] *Id.* 95:18–97:2, 229:14–20.

[63] *Id.* 93:18-94:12.

[64] *Id.* 134:12– 21.

[65] *Id.* 221:3– 21.

[66] *Id.* 221:13–222:14.

143.     On the circa $59 million increase in price on the equipment for which Perkwood ultimately charged TNG (for $93 million total), Mr. Lungu stated that he could think of no reason for this increase and, further, from his personal experience, he could think of no other situation during his ten years at the Stati companies where there had been a comparable price increase.[67]

### vi.     The Alleged Liquidity Crisis

144.     Mr. Lungu admitted in his deposition that the Stati "Group" of companies were facing a short–term and medium–term liquidity crisis in October 2008, and that this was not caused by any action of the Republic, and that Anatolie Stati knew this.[68]

### B.     August 2019 – KPMG Withdrawal Of All Audit Reports For The Statis' Financial Statements

145.     On August 21, 2019, KPMG issued a letter to the Statis in which it confirmed that the Statis had failed to disclose material transactions in their financial statements and withdrew all of its audit reports for the Stati financial statements – 18 audit reports covering three years of financial statements.[69]

146.     Specifically, the letter stated that the transactions between TNG and Perkwood between 2007, 2008, and 2009 were not disclosed in the Statis' financial statements for TNG and KPM and that such transactions "should have been disclosed in [the Statis] annual and interim financial statements for those reporting periods."   The letter said KPMG had requested explanations for the misstatements set forth in the Statis' financial statements and noted that the Statis failed to respond to KPMG's questions.

---

[67] *Id.* 235:18–23, 236:19–237:5.

[68] *Id.* 250:16–254:20.

[69] Letter from Ashley Clarke, Head of Audit, KPMG Audit LLC, to Anatolie Stati, (Aug. 21, 2019) ("**August 2019 Letter**").  A true and correct copy of the August 2019 Letter is attached hereto as Exhibit C.

147.    KPMG stated that it took this extraordinary action after it "concluded an independent assessment" of the evidence of the Statis' misrepresentations, including Mr. Lungu's deposition testimony in which he admitted that the Statis made material misrepresentations to KPMG and its own "workpapers."

148.    KPMG further informed the Statis that these misrepresentations were "material" to the financial statements for both TNG and KPM.

149.    KPMG therefore instructed the Statis that they "should immediately take all necessary steps to prevent any further, or future, reliance on" the KPMG audit reports for these financial statements.  KPMG stated: "This includes ensuring that anyone in receipt of the relevant financial statements and Reports is informed of this development."

150.    In violation of this instruction, the Statis did not inform any of the courts (or any other parties apparently) of KPMG's withdrawal.  Instead, the Statis continued to knowingly rely on the fraudulently-obtained audit reports and falsified financial statements in the various courts to attempt to refute the Republic's fraud allegations.

151.    In further violation of KPMG's instruction, the Statis did not, and have not to date, taken any of the "necessary steps to prevent any further, or future, reliance on" the KPMG audit reports.

152.    Upon information and belief, the Statis have also not informed any person in receipt of their fraudulent financial statements and the audit reports of this "development," *i.e.,* KPMG's withdrawal of the audit reports.

### C.    October 2019 – Discovery Of The 2016 KPMG-Stati Correspondence

153.    In October 2019, the Republic discovered that more than three years prior, in February 2016 (when the annulment proceedings in Sweden and other confirmation proceedings,

including in this Court, were still pending), KPMG had written to the Statis and questioned the truthfulness of their financial statements.[70]  In this correspondence, KPMG notified the Statis that it had recently become aware of certain facts that called into question the legitimacy of its prior audit reports, notably:

    a.    that there were serious doubts that the recorded LPG Plant construction costs were legitimate;

    b.    that serious doubts surrounded the $44 million management fee that TNG allegedly paid to Perkwood which served to elevate the apparent total construction cost of the LPG Plant to the circa $245 million recorded in TNG's financial statements for the year ending December 31, 2009;[71]

    c.    that Perkwood was not the "actual supplier of the equipment for the LPG Plant," but instead was a dormant company that was passing through costs that were "significantly different from the corresponding cost" charged by the actual supplier of the equipment, *i.e.*, Tractebel;[72] and

    d.    that, while the Statis had presented Perkwood as an independent third party, Perkwood was in fact a Stati company.[73]

---

[70] Letter from Assel Khairova, Managing Partner for Kazakhstan and Central Asia, KPMG Audit LLC to Anatolie Stati (Feb. 15, 2016) ("**February 2016 Letter**").

[71] *Id.*

[72] *Id.* at 2.

[73] *Id.*  PwC also found that identifying related parties and related-party transactions is important due to the heightened risk that transactions between related parties may not reflect normal market conditions and can seriously distort the profit or loss and financial position of an entity. Thus, it is essential that company management truthfully identify related parties so that "a separate set of audit procedures would … be undertaken to establish the 'arm's length' nature of the related party transactions." Second Expert Report of PwC at ¶ 10, Jan. 21, 2020 ("**PwC II**").

154.    In light of the facts that had come to its attention, KPMG demanded that the Statis provide "explanations and supporting evidence" in response to a series of six questions.[74]  KPMG also put the Statis on notice of the provisions of IAS 580 – "Written Representations" – and their statement that "written representations by management and by those charged with governance are [a] necessary part of audit evidence required in connection with an audit."[75]

155.    Being aware of the fact that the Republic had initiated proceedings to annul the Arbitration Award in Sweden and that such proceedings were then-ongoing, KPMG closed by warning the Statis that if it did not receive the requested "explanations or additional representations," it reserved its rights to "seek to prevent future reliance on [its] audit reports and in particular withdraw [its] audit reports and to inform about such withdrawal all parties who are still, in [its] view, relying on these reports, including but not limited [to], [the] Ministry of Justice of the Republic and the Svea Court of Appeals."[76]

156.    The Statis never answered KPMG's questions and instead issued a threat to KPMG if it proceeded to withdraw its audit reports for the Statis' financial statements, stating in pertinent part: "[W]e expressly reserve the right to hold your firm accountable should you choose not to co-operate with us and/or proceed to withdraw your audit reports."[77]

157.    This correspondence demonstrates that the Statis knew as early as February 2016 that KPMG did not believe that its audit reports of the Statis' financial statements were made on a true and accurate basis.   The Statis also knew that KPMG was expressly questioning the

---

[74] February 2016 Letter.

[75] *Id.* at 3.

[76] *Id.*

[77] Letter from Anatolie Stati to KPMG Audit LLC (Feb. 26, 2016).

truthfulness of the Statis' financial statements.

158.     Despite this knowledge, the Statis continued to rely in the Swedish proceedings on their falsified financial statements and the fraudulently-obtained audit reports, and falsely claimed that KPMG knew of Perkwood's function, when the exact opposite was true.  For example, the Statis made the following representation to the Swedish court:

> *During the review of the annual financial accounts, TNG's auditors, KPMG, had full access to all accounting records. KPMG was aware of Perkwood's function.*

159.     The Statis also concealed this correspondence throughout the subsequent recognition and enforcement proceedings in multiple jurisdictions, and the Republic was not aware of its existence until it was discovered in October 2019.

### D.     August 2019 To July 2020 – Discovery Of Latvian Bank Records Showing Additional Fraud And Money Laundering Schemes

160.     In August 2019, with the assistance of the Prosecutors Office of the Republic of Latvia, the Republic obtained certain documents from Rietumu Bank in Latvia.  These bank statements revealed that the Statis were affiliated with approximately three dozen shell companies having bank accounts at Rietumu Bank.  PwC thereafter performed an analysis of these bank statements.  PwC's analysis took circa 1400 hours to complete given their volume and complexity.[78]

161.     PwC's analysis of the bank statements revealed that the Statis systematically stripped their Kazakh companies, KPM and TNG, of hundreds of millions of dollars using a web of companies to conceal the flow, and ultimate location of, the funds.  As the Amsterdam District Court has now determined, this evidence directly contradicts the misrepresentations made by the

---

[78] Amsterdam Judgment at 4.

Statis during the Arbitration – which were accepted by the Arbitration Tribunal in assessing both liability and damages – that their Kazakh companies were in financial distress because of the actions of the Republic.[79]

162.    For example, PwC's analysis revealed for the first time that the Statis used Hayden – a company they secretly controlled – to collect funds channeled out of Kazakhstan before these funds were transferred further, which hid their ultimate location.  Some of these funds were used for making certain payments, which included nine transfers between October 2007 and June 2008 to the daughter of Kazakhstan's then-Deputy Minister of Energy.  These illicit payments were described in the bank statements as payment "for scholarship."[80]

163.    Millions of dollars were also used by the Statis to pay politicians and state employees in Moldova, Congo, Romania, South Sudan, and Kurdistan.[81]

164.    The funds were also used by the Statis for their private endeavors, including for the construction of the Statis' castle in Moldova and the purchase of high-end items including cars and watches, instead of being invested in the Statis' Kazakh operations as intended.[82]

## V.    EXPERT EVIDENCE REGARDING THE STATIS' FRAUD SCHEMES

165.    The Statis' fraud schemes are now attested to and evidenced by a number of the world's leading experts in international law, international arbitration, and accounting.

---

[79] *Id.* at 12 (finding that "[t]he (alleged) liquidity deficit in 2009, which arose (at least in part) from the withdrawals (concealed in the financial statements) carried out by Stati et al. from [their Kazakh companies] was included by the arbitral tribunal in its assessment.").

[80] Fourth Expert Report of PwC at ¶ 3.71, July 29, 2020 ("**PwC IV**").

[81] *Id.* ¶¶ 3.62–3.71.

[82] *Id.* ¶¶ 3.7–3.13, 3.74.

A.       **Expert Reports Of PricewaterhouseCoopers LLP**

166.     PricewaterhouseCoopers LLP, one of the world's largest professional services networks, issued a series of reports in which it reviewed and analyzed the newly discovered evidence of the Statis' fraud.

167.     PwC issued its first report in August 2019, after Mr. Lungu's deposition.  Therein, PwC analyzed the Statis' financial statements and considered "whether the transactions with Perkwood were recorded and disclosed in these financial statements in accordance with applicable financial reporting standards."  PwC concluded, *inter alia*, that:

a.       "Based on the information contained in the representation letters that [it] ha[d] been provided with and on the deposition testimony of Mr. Lungu, TNG's auditors [i.e., KPMG] were provided with false representations as to Perkwood's status as an unrelated party";[83] and

b.       "each of the material misstatements and the serious impairment of the integrity of TNG's management would render [TNG's audited financial statements] unreliable."[84]

168.     In January 2020, after KPMG withdrew all of its audit reports for the Statis' financial statements, PwC issued its second report ("**PwC II**"), in which it confirmed that such a withdrawal is "highly unusual and serious":[85]

> *The decision by KPMG in 2019 to take steps to prevent any further,
> or future, reliance on the audit opinions that had previously been
> issued by KPMG in respect of TNG et al. is a highly unusual and
> serious issue.*

---

[83] First Expert Report of PwC ¶ 52, Aug. 19, 2019 ("**PwC I**").

[84] PwC I ¶ 57.

[85] PwC II ¶ 32.

169.     PwC further explained that KPMG's withdrawal of all of its audit reports was not limited to specific transactions but instead represented in effect a complete withdrawal by KPMG of all of its opinions regarding the Statis' financial statements:

> *The actions taken by KPMG do not only go to specific transactions, for example in relation to those between Perkwood and TNG, but represent in effect a complete 'withdrawal' by KPMG of its audit opinions over all of the financial information of the Financial Statements. This includes but is not limited to KPMG's report on the TNG financial statements to 30 June 2008 that formed the basis of the costs and EBITDA figures that fed into the calculation of the Awarded Amount. As set out in the KPMG Correspondence, it further extends as well to a wider range of 26 sets of financial statements prepared by the Stati Parties for which KPMG had previously issued audit reports.*[86]

170.     In July 2020, PwC issued its third report ("**PwC III**") and fourth report ("**PwC IV**").  These reports were based on the bank statements of over thirty (30) Stati companies that the Republic had obtained in late 2019 in Latvia and accounting data of TNG and KPM.

171.     In the third report, PwC reviewed how the Statis had used the funds of TNG and KPM.  Therein, PwC stated that it had identified "a significant number of related party transactions for which  [PwC had] been unable to establish the commercial basis" and concluded *inter alia* that:[87]

> a.     "the related party transactions undertaken by TNG and KPM were not at arm's length" and "do not appear to have been undertaken in accordance with the requirements of the "Indenture" governing the Tristan Notes";88 and

---

[86] *Id.* ¶ 31.

[87] Third Expert Report of PwC, July 29, 2020 ("**PwC III**") ¶ 6.22.

[88] PwC III ¶ 6.22.

b. there were "over USD 150 million of related party transactions between 2007 and 2009 which were not disclosed as related party transactions in TNG's and KPM's audited financial statements" and that "to the extent that such documents . . . also failed to disclose the related party transactions . . . , then those statements too would be inaccurate." [89]

172.    In its fourth report, PwC reviewed the Statis' transactions for money laundering risks.   Therein, PwC identified "a number of transactions by the [Statis] which display characteristics that are relevant to the risk set out under the red flags of money laundering" and "an effective 'ring' of related parties (some of which the [Statis] failed to identify as related parties to professional advisors such as their auditors, KPMG) established by the [Statis] around TNG and KPM."[90]  It concluded, *inter alia*, that "the use of the related party structure that was established by the [Statis] . . . display characteristics which fall under the red flags of money laundering."[91]

**B.    Expert Opinion Of BDO**

173.    In November 2019, BDO Mälarden AB ("**BDO**"), a member of the BDO international network of public accounting, tax, consulting, and business advisory firms, issued an expert opinion on the "effect from an auditor's perspective of KPMG's letter dated August 21, 2019" withdrawing all of its audit reports for the Statis' financial statements.[92]  It concluded, *inter alia*, that:

a. KPMG's decision to withdraw its audit reports was made on the basis of a

---

[89] *Id.* ¶ 6.23.

[90] PwC IV ¶ 3.73.

[91] *Id.* ¶ 3.74.

[92] Expert Opinion of BDO at ¶ 13, Nov. 25, 2019.

"proper investigation" by KPMG;[93] and

b.     KPMG's decision to "actively work to ensure that no one relies on" its audit
reports was in compliance with IAS 560, which "provide[s] guidance on
how an auditor should act when the auditor becomes aware of facts after the
auditor submits its report."[94]

## C.     Expert Opinion Of Professor Christoph Schreuer

174.     In January 2020, Professor Christoph Schreuer, a leading expert in the field of
international investment law and international arbitration, issued a legal opinion on "the question
of the effect of false or fraudulent evidence" on the Arbitration Award.[95]  He concluded, *inter alia*,
that:

a.     the evidence of the Statis' fraud that led to KPMG's withdrawal of its audit
reports "would have had a material impact on the ECT Arbitration and the
Award";[96]

b.     the "unusual and serious step of auditors withdrawing their audits, because
their client has provided them with false information, renders the entire
financial information relating to the investment unreliable and thus deprives
the Award providing compensation for losses relating to such investment of
any reliable basis";[97] and

c.     the evidence of the Statis' fraud uncovered by the Republic, including the

---

[93] *Id.* ¶ 39.

[94] *Id.* ¶ 24.

[95] Legal Opinion of Professor Christoph Schreuer at ¶ 1, Jan. 21, 2020.

[96]  *Id.* ¶ 71.

[97] *Id.*

KPMG correspondence and the fraudulent financial statements, "clearly demonstrates the [Statis'] illicit conduct and bad faith."[98]

### D.     Expert Opinions Of Professor George Bermann

175.     Two expert opinions were prepared by Professor George A. Bermann, a professor at Columbia Law School and an internationally recognized expert on the law of international arbitration, transnational litigation, European Union law, and the law of multiple European jurisdictions.

176.     In January 2020, Professor Bermann issued his first expert opinion ("**Bermann I**").[99]  Therein, he concluded *inter alia*, that "it cannot be doubted that there exist in this case both credible evidence of fraud and a sufficient connection between such fraud and the outcome of the arbitration."[100]

177.     In January 2021, Professor Bermann issued his second expert opinion ("**Bermann II**") in which he conducted a comprehensive assessment of the evidence of the Statis' fraud before, during, and after the Arbitration.[101]  Based on this evidence, Professor Bermann concluded, *inter alia*, that:

  a.     the Statis operated in Kazakhstan by means of a "deceptive corporate structure" and "sham companies" through which they were able to "enrich themselves at the expense of others";[102]

  b.     during the Arbitration, "had the Tribunal been aware of the full measure of

---

[98] *Id.* ¶ 72.

[99] First Expert Opinion of Professor George A. Bermann ¶ 6, Jan. 21, 2020.

[100]  *Id.* ¶ 60.

[101] Second Expert Opinion of Professor George A. Bermann ¶ 90-91, Jan. 17, 2021.

[102] *Id.* ¶ 90-91.

the Statis' fraudulent conduct, it would have most likely come to the conclusion that the Statis unlawfully stripped the Kazakh companies of hundreds of millions of dollars, blamed [the Republic] for the financial distress of these companies and unjustifiably requested the Tribunal to order [the Republic] to pay compensation for these '*lost*' funds";[103]

c.   the Statis' "fraud did not end with the Kazakh operations, the Arbitration or the post-Award proceedings. It is continuing today by ongoing misrepresentations in the actions pending in various courts;"[104]

d.   specifically, "the Statis systematically misled the national courts on a number of critical issues" and the national courts – other than those of the U.K. – "assumed the truthfulness of the information provided by the Statis and ruled in favor of them, without realizing the extent to which the Statis' case, as well as their presentation of it, were the product of fraud";[105] and

e.   the Statis have "repeatedly misrepresented the findings of one court to another" in order to perpetuate their fraud.[106]

---

[103] *Id.* ¶ 199.

[104] *Id.* ¶ 203.

[105] *Id.* ¶ 201.

[106] *Id.* ¶ 202.

E.     **Expert Opinion Of Stefan D. Cassella** In July 2020, Stefan D. Cassella, former Deputy Chief of the U.S. Department of Justice's Asset Forfeiture and Money Laundering Section, issued an expert opinion in which he assessed the then-existing evidence of the Statis' fraud in the context of potential violations of money laundering laws of the United States and other jurisdictions.

179.    Mr. Cassella concluded *inter alia* that the Statis' "transactions involving . . . fraudulently obtained funds constitute criminal violations of Latvian money laundering laws" and that "because one part of the [Statis'] scheme involved investors in the United States whose funds were transferred overseas, . . . the transactions constituted criminal violations of US money laundering laws as well."[107]

180.    Mr. Cassella further concluded that "it appears that the [Statis] may have perpetrated a fraud upon the Tribunal in the ECT Arbitration," and in such a case, the "ECT Award would constitute the proceeds of crime (i.e. fraud), and any attempt by the [Statis] to collect on the Award could constitute a money laundering offense under US law or the law of any other country where the collection occurred."[108]

181.    On this basis, Mr. Cassella concluded that there is evidence that the Statis "could be prosecuted criminally in Latvia for money laundering offenses involving the proceeds of the Tristan Notes scheme, the Sales of Oil and Gas scheme, and the Perkwood scheme, and in the United States and in other jurisdictions for conducting any future financial transaction involving the Award from the Tribunal in the ECT Arbitration."[109]

---

[107] Legal Opinion of Stefan D. Cassella at 4-5, July 30, 2020.

[108] *Id.* at 5.

[109] *Id.* at 20-21.

### F.      Expert Opinion Of Patrik Schöldström

182.     In August 2020, Patrik Schöldström, now a judge on the Svea Court of Appeal, issued an expert opinion that addressed, among other issues, the Republic's applications to set aside and/or annul the Arbitration Award in the Swedish courts.  He concluded that that the Statis, in the Swedish proceedings, "violated the duty to tell the truth and the duty not to litigate 'against better knowledge'" and that accordingly, the Svea Court "did not have a correct and truthful basis for its 2016 Decision" in which it refused to set aside the Arbitration Award.[110]

183.     Mr. Schöldström also found that the Swedish courts never reached the merits of the Republic's allegations of fraud, concluding that "the Swedish courts [had] not found that the Stati Parties did not commit fraud, money laundering and bribery of public officials,"[111] and that, in any event, the "discovery of new evidence . . . starting from the summer of 2015 and [which] is still going on…had [not] been before the Svea Court in the Swedish Annulment Proceedings nor was it known at the time to the RoK or disclosed by the Stati parties."[112]

### G.      Expert Opinion Of Professor Catherine Rogers

184.     In January 2021, Professor Catherine Rogers, a leading expert in the field of ethics in international arbitration and a professor at Pennsylvania State University School of Law, issued an expert opinion regarding "the applicable ethics rules and related considerations that apply when a party to an international arbitration is credibly accused of submitting false or fraudulent evidence to the arbitral tribunal."[113]

---

[110] Expert Opinion of Patrik Schöldström ¶¶ 84, 87, Aug. 23, 2020.

[111] *Id.* ¶ 10.

[112] *Id.* ¶¶ 20-21.

[113] Expert Opinion of Professor Catherine Rogers at ¶ 1, Jan. 21, 2021.

185.    Professor Rogers reviewed the operative facts concerning the Statis' fraud, focusing on KPMG's withdrawal of its audit reports for the Stati financial statements.

186.    Professor Rogers found, *inter alia*, that "the tribunal's decision-making would have been affected by a determination by the [Statis'] own independent professional auditors that their financials were completely unreliable and had been procured through material misstatements or omissions."[114]

187.    Professor Rogers concluded that "this new evidence would have raised independent concerns that the [Statis] had engaged in underlying fraud and corruption that should preclude them altogether from bringing claims in investment arbitration."[115]

### H.    Expert Opinion Of Professor Bernard Hanotiau

188.    In April 2021, Professor Bernard Hanotiau, one of the world's leading international arbitrators and an expert in international commercial law and arbitration, issued an expert opinion on "whether the facts and evidence discovered after the Award could have affected the arbitration proceedings and the Arbitral Tribunal's Awards" on, *inter alia*, jurisdiction and arbitrability, the assessment of liability, the causal link, and the quantum of damages.[116]

189.    Professor Hanotiau *inter alia* concluded: "it seems obvious to me that if the documents and evidence obtained after the notification of the Award had been in the possession of the Arbitral Tribunal, they would have had a material and fundamental impact on the Award."[117]

190.    Specifically, Professor Hanotiau concluded that "if the new elements and evidence

---

[114] *Id.* ¶ 190.

[115] *Id.*

[116] Expert Opinion of Professor Bernard Hanotiau ¶ 2, April 20, 2021.

[117] *Id.* ¶ 148.

discovered since the notification of the Award been known at the time of the arbitration proceedings, both [the Republic] and the Arbitral Tribunal would have been dealing with a dispute of a totally different nature and content" and that "[t]he new documents and evidence would have had a fundamental impact on the arbitral proceedings and on the Award."[118]

191.    Professor Hanotiau further opined: "The Arbitral Tribunal would have given no credibility, or at most, little weight to the testimonies, financial statements, assertions and other erroneous or falsified documents produced by the Stati[s]"[119] and "it is certain that the content of the Award and the findings of the Arbitral Tribunal regarding its jurisdiction, liability, causation and the quantum would have been totally different."[120]

## I.    Expert Opinion Of Mark Pieth

192.    In June 2022, Mark Pieth, a prominent anti-corruption expert, former Chair of the OECD Working Group on Bribery, and a founding member of the Financial Action Task Force (FATF), issued an expert opinion that assessed the evidence of the Statis' fraud in the context of money laundering laws of Sweden, Belgium, Luxembourg, and the United Kingdom.[121]

193.    Mr. Pieth concluded that "the Statis have continued with their fraudulent scheme into the arbitration and post-arbitration phase," and that "[s]uccessfully collecting on the [Arbitration Award], and any further use, transfer, concealment etc. of the assets would constitute money laundering."[122]

194.    Mr. Pieth further concluded that according to an "analysis of relevant national

---

[118] *Id.* ¶ 154.

[119] *Id.* ¶ 156.

[120] *Id.* ¶ 157.

[121] Expert Opinion of Mark Pieth, June 16, 2022.

[122] *Id.* ¶ 83, 109.

laws,[] concrete activities to enforce a fraudulently obtained award would constitute at least an attempt to money laundering…[and] [a]s far as the Statis are repeating the manipulative statements and re-using the misleading documents, they are committing a new fraud on the court, letting prescription start all over."[123]

## VI.   IN ENGLAND, THE AWARD IS UNENFORCEABLE BECAUSE OF THE STATIS' FRAUD

195.   One of the first jurisdictions in which the Statis attempted to confirm the Arbitration Award was England.  There, the Statis initiated proceedings in 2014 and obtained an *ex parte* confirmation order, subject to an application by the Republic to set aside the order.

196.   On April 7, 2015, the Republic filed its application and put forward its then-known defenses, none of which included any alleged fraud because, at that point in time, the first shreds of evidence of the Statis' fraud had not been discovered.

197.   In August 2015, after the initial discovery of evidence that the Statis engaged in fictitious transactions with respect to the construction of the LPG Plant, the Republic applied for permission to amend its pleadings to introduce the defense that the Arbitration Award was unenforceable as a matter of English public policy because it was obtained in part by fraud.  After the Statis opposed this application, the English High Court *sua sponte* stayed the proceedings pending the outcome of the then-pending Swedish annulment proceedings.

198.   In December 2016, the Svea Court of Appeal rejected the Republic's annulment petition.  It was in these proceedings, as was later established in the November 2021 Belgium Judgment, that the Statis deceived the Svea Court of Appeal in the Swedish proceedings.

199.   In February 2017, long before the Statis' deception in the Swedish annulment

---

[123] *Id.* ¶ 161.

proceedings was discovered, the English High Court held a two-day hearing on the Republic's application to amend its defenses to the Statis' request to confirm the Arbitration Award.  In advance of this hearing, the Republic presented its then-available, limited evidence of the Statis' fraud and the parties made extensive written submissions.

200.    On June 6, 2017, the English High Court granted the Republic's application.   In a 22-page, fully reasoned opinion, the English High Court reviewed the then-available evidence concerning the LPG Plant fraud and held that "there is a sufficient prima facie case that the Award was obtained by fraud" and that the Statis had committed "fraud on the [Arbitration] Tribunal." The court further held that the "interests of justice" required the Republic's allegations regarding the LPG Plant fraud to be "examined at trial and decided on their merits."[124]

201.    However, in February 2018, in advance of a pre-trial disclosure deadline, the Statis unexpectedly filed a notice to voluntarily discontinue the English enforcement proceedings.

202.    The English High Court rejected this notice, finding that the Statis' stated basis for discontinuance – a supposed lack of funds – was not credible and that, in reality, the Statis only were seeking to avoid the risks of the impending trial and final judgment on the fraud concerning the LPG Plant.

203.    However, on appeal, the Statis were allowed to discontinue, but only after they were required to agree to three harsh conditions: (i) to never again attempt to enforce the Arbitration Award in England; (ii) to reimburse the Republic for its legal fees and costs; and (iii) to vacate an earlier English court order that had deemed the Arbitration Award enforceable.

204.    The consequence of the English appeal court's ruling was that the Statis suffered

---

[124] A copy of this judgment is reported at 2017 EWHC 1348 (Comm) and can be found online at http://www.bailii.org/ew/cases/EWHC/Comm/2017/1348.html (last accessed March 1, 2023).

a permanent loss in England – the Arbitration Award is unenforceable in England because of the LPG Plant fraud – but the Statis were able to escape trial and a final judgment on merits of this one fraud.

## VII.    THE STATIS' FRAUD BEFORE THE ARBITRATION

205.    Based on the evidence that the Republic has now obtained,  the Statis' fraud has taken  several forms, including but not limited to the following five schemes:

a.    The **"Tristan Circular Fraud"** – The Statis represented to investors in the Tristan Notes that $70 million of the monies raised from the sale of the Tristan Notes would be applied by the Statis to repay amounts which one of their other companies, Terra Raf, owed to TNG.  In fact, the Statis did not use the $70 million for this purpose but instead diverted it to their other companies.

b.    The "**LPG Plant Fraud**" – The Statis fraudulently inflated the construction expenses of the LPG Plant in Kazakhstan.  This was done through a series of covert, fraudulent related-party transactions.  For example, the principal equipment for this LPG Plant, it is now known, cost the Statis only circa $35 million, but in their financial statements the Statis claimed that they had invested $245 million in the construction of the LPG Plant.  The Statis diverted into their own pockets the difference between the amount of their actual costs and the fraudulently inflated $245 million.

c.    The "**Oil Skimming Fraud**" – The Statis fraudulently skimmed circa $228 million from sales of oil and gas from the Kazakh fields.  They did this by "selling" the oil and gas at artificially low prices to their own companies,

and then re-selling it to a third party at market prices. The Statis then diverted the amount of the price differential into their own pockets rather than, as they should have, returning the full market price to their Kazakh companies (KPM and TNG).

d.  The "**Laren Transaction Fraud**" – The Statis made fraudulent misrepresentations concerning Tristan's issuance of an additional $111,110,000 in notes to Laren Holdings Ltd. ("**Laren**") in June 2009.

e.  The "**Cash Collateral Fraud**" – In violation of the documents governing the issuance of the Tristan Notes, the Statis used for their own purposes cash that should have been sequestered as collateral for repayment of the Tristan Notes.

206.  In addition, the Statis paid their own companies – including Kaspy Asia Service Company Limited ("**KASKO**") and Ascom – an estimated half billion dollars for drilling services at artificially inflated prices.  And the Statis paid nearly $100 million in "salaries," "dividends," and "management fees" directly to themselves, despite a lack of any justification for these payments.

**A.    The Tristan Circular Fraud**

207.  In 2006 and 2007, the Statis raised money through the capital markets by causing Tristan, a company wholly owned by Anatolie Stati, to issue notes to investors.

208.  Pursuant to an Indenture and its amendments,  Tristan issued 10.5% senior secured loan notes in the aggregate principal amount of $300 million on or about December 20, 2006 and a second tranche of notes in the aggregate principal amount of $120 million on or about June 7, 2007.   Through Jefferies, these Tristan Notes were fully subscribed.  The maturity date of the

notes was January 1, 2012.   Prior to maturity, the Indenture required that the Statis make regular interest payments to the Tristan Noteholders.

209.     Multiple financial institutions purchased the Tristan Notes.

210.     An after-market in these Notes developed in which the original Noteholders sold their Notes and/or purchased Notes from other Noteholders.

211.     The Statis falsely represented to the purchasers of the Tristan Notes that the funds raised from them would be used for legitimate business purposes of KPM and TNG.  For example, the Statis represented that proceeds from the Tristan Notes would be used to repay KPM's and TNG's existing debt, to make a shareholder distribution, and to fund their working capital, general corporate purposes, and capital expenditures, including for construction of the LPG Plant.  These representations were false, and known by the Statis to be false, when made.  As described below, through the mechanism of multiple fraudulent related-party transactions, the Statis inflated the stated costs of KPM and TNG, stole, embezzled and/or misappropriated the delta, and defrauded the Tristan Noteholders.

212.     The Indenture named Wells Fargo N.A. ("**Wells Fargo**")[125] as the Trustee for the Tristan Notes and KPM and TNG as the Guarantors of the Statis' obligations thereunder.  Anatolie Stati executed the Indenture on behalf of Tristan, KPM, and TNG.    He also executed a Tristan Note Guarantee on behalf of KPM and TNG.

213.     The Indenture included a mechanism by which related-party transactions between Tristan, KPM, and TNG, and any other Stati company, defined as "**Affiliates**," were prohibited unless the Statis satisfied certain conditions, with the conditions increasing in line with the dollar

---

[125] Effective March 8, 2021, Wells Fargo resigned as Trustee and was replaced by GLAS Trust Company.

value of the related-party transaction.

214.     Specifically, Section 4.12 of the Indenture stated that Tristan, KPM, and TNG could not "make any payment to, or sell, lease, transfer or otherwise dispose of any of its properties or assets to, or purchase any property or assets from, or enter into or make or amend any transaction, contract, agreement, understanding, loan, advance or guarantee with, or for the benefit of, any Affiliate" unless the Statis satisfied the following conditions:

a.     transactions greater than $1 million (in aggregate) were required to be on an arm's length basis (*i.e.*, they must be on terms no less favorable than a comparable transaction "with an unrelated Person");

b.     transactions greater than $3 million further required that the Statis deliver to the Trustee (Wells Fargo) a board resolution and an officer's certification that a majority of the disinterested members of the board and at least one independent director determined that the terms were no less favorable than a comparable transaction at an arm's length basis; and

c.     transactions greater than $10 million further required an independent fairness opinion, *i.e.*, an opinion "issued by an accounting, appraisal or investment banking firm of national standing" as to the fairness of the transaction to Tristan, TNG, or KPM, as applicable.

215.     The Indenture also required that the Statis provide audited financial statements to the Tristan Noteholders on a regular basis.   Specifically, Section 4.03 of the Indenture required that the Statis furnish the Tristan Noteholders with combined financial statements of Tristan, KPM, and TNG on a quarterly and annual basis, as well as a reserve report from an independent petroleum engineer on an annual basis.   The combined financial statements were to include audit

reports by a certified independent accountant.

216.    Tristan, KPM, and TNG also were required to conduct conference calls to discuss the information furnished in the audited financial statements and reserve reports and to post the audited financial statements on Tristan's website.

217.    Section 4.04(b) of the Indenture required that the year-end financial statements delivered pursuant to Section 4.03 be accompanied by a written statement of Tristan's independent public accountants that "in making the examination necessary for certification of such financial statements, nothing has come to their attention that would lead them to believe that [Tristan] has violated any [of the Indenture's] provisions."

218.    The Statis violated the above terms of the Indenture by, *inter alia*, falsely certifying the identity of related parties and related-party transactions to their auditors, failing to obtain the necessary approvals for certain related-party transactions, and circulating to the Tristan Noteholders the fraudulently obtained audit reports and underlying falsified financial statements. The Statis repeated these misrepresentations in their quarterly conference calls with the Tristan Noteholders.

219.    The Statis' schemes breached each of the covenants in Section 4.12(a) of the Indenture that prohibited related-party transactions.

220.    Also in breach of their representations and covenants under the Indenture, the Statis diverted millions of dollars of the proceeds of the Tristan Notes received from investors to a Stati company in South Sudan, Ascom Sudd Operating Limited, which was subsequently placed on the U.S. Department of Commerce's list of companies "reasonably believed to be involved, or to pose a significant risk of being or becoming involved, in activities contrary to the national security or foreign policy interests of the United States."   According to the U.S. Government, the companies

on this list contribute to the crisis in South Sudan because they supply the country with significant "revenue that, through public corruption, is used to fund the purchase of weapons and other material that undermine the peace, security, and stability of South Sudan rather than support the welfare of the South Sudanese people."[126]

221.     One of the Statis' motives in misleading the Tristan Noteholders was to cover up the fact that they were defrauding the Tristan Noteholders of hundreds of millions of dollars that, had been advanced to TNG by Tristan.

**B.     The Statis Fraudulently Inflate The Stated Costs Of The LPG Plant — The LPG Plant Fraud**

222.     The LPG Plant was to be owned by TNG and operated jointly by Ascom and an affiliate of another company, Vitol.  The principal equipment for the LPG Plant was supplied by Tractebel, an independent third party.

223.     Rather than having TNG purchase the equipment directly from Tractebel, the Statis instead interposed two sham companies that they owned and/or controlled.   Specifically, the Statis structured the transactions so that **Azalia** (a Stati sham company) would purchase the equipment from Tractebel at the market price of approximately $35 million.   The Statis then had Azalia "sell" the same equipment at wildly inflated prices to **Perkwood** (another sham company the Statis secretly owned) for a total of $93 million.    Then, the Statis created a sham contract – the "**Perkwood Agreement**" – under which the same equipment was again "re-sold" to TNG at the same grossly inflated prices.    Through these machinations, and others described herein, the Statis

---

[126] *Addition of Certain Persons to the Entity List and Removal of Certain Persons From the Entity List; Correction of License Requirements*, 83 Fed Reg. 12,475–12,476 (Mar. 22, 2018); 15 South Sudanese Entities Added to the Entity List (Mar. 22, 2018), U.S. DEPARTMENT OF COMMERCE, https://www.bis.doc.gov/index.php/regulations/export-administration-regulations-ear/17-regulations.

falsely inflated the price of the LPG Plant equipment and defrauded the Tristan Noteholders in excess of $100 million.

224.    Perkwood was a critical element in the Statis' fraudulent schemes.   To the outside world, the Statis presented Perkwood as an independent, London-based company with which they engaged in arm's length business transactions.   In fact, Perkwood was a sham company, covertly owned and operated by the Statis, and used by the Statis for the fraudulent purposes alleged herein.

225.    The Statis took extraordinary measures to conceal the fact that Perkwood was their company.   They created a series of forged documents, including their financial statements, and made a series of false declarations to present Perkwood as an independent third party.   This was done to give the impression that payments from TNG to Perkwood were legitimate and at arm's length, when in fact the payments were fraudulently inflated.

226.    The Perkwood transactions were a sham and intended by the Statis to disguise the fact that they were defrauding the Tristan Noteholders.   A number of facts confirm this:

  a.    Perkwood was under the ultimate ownership and control of the Statis at all times.

  b.    Anatolie Stati and Gabriel Stati were the signatories and sole beneficiaries of Perkwood's bank account at Rietumu Bank in Latvia.

  c.    Perkwood was a shell company.   It had no employees, premises, or operations.   It paid no taxes, salaries, or rent, and it did not incur any costs normally incurred by a company that actually carries out business.   From 2006 to 2009 – the same time period when TNG was recording on its books purchases of LPG Plant equipment from Perkwood in the amount of hundreds of millions of dollars – the Statis filed dormant accounts for

Perkwood with the British Companies House.   Under English law, for a company to legally file dormant accounts, that company must not have carried out any substantial business transactions for the relevant time period.

d.   The sole director and shareholder of Perkwood was Sarah Petre-Mears.   Her husband, Edward Petre-Mears, was the company secretary.   Mr. and Mrs. Petre-Mears are identified in public documents as sham directors and the "directors" of thousands of companies.[127]   In furtherance of the fraudulent scheme, Mr. and Mrs. Petre-Mears granted a series of general powers of attorney to Anatolie Stati and Gabriel Stati to act for Perkwood.

e.   Franjo Zaja was the lead engineer for Tractebel, the German company that actually supplied the main equipment for the LPG Plant.   Mr. Zaja was personally involved in the construction of the LPG Plant and worked on site until the Statis abandoned the construction in early 2009.   Mr. Zaja testified in a witness statement that he was not aware of a company called Perkwood. Mr. Zaja further testified that the equipment "sold" from Perkwood to TNG is the identical equipment that Tractebel delivered to the Statis under its contract with Azalia, but that it was presented by the Statis in the Perkwood Agreement as different equipment and at materially inflated prices.

227.   The Statis used multiple, overlapping schemes to fraudulently inflate the LPG Plant construction costs.   These schemes included: (1) the "**Resale Fraud**"; (2) the "**Double-Billing**

---

[127] James Ball, The Guardian, *Sham Directors: the woman running 1,200 companies from a Caribbean rock,* Nov. 25, 2012, https://www.theguardian.com/uk/2012/nov/25/sham-directors-woman-companies- caribbean.

Fraud"; (3) the "**Equipment for Construction Fraud**"; (4) the "**Management Fee Fraud**"; and (5) the "**Interest Fraud**."   Alleged below is an overview of each scheme:

a.   **Resale Fraud** – The Statis had Perkwood "sell" to TNG, and TNG pay for, the LPG Plant equipment already purchased from Tractebel, but at almost triple the price – inflating the stated LPG Plant costs by approximately <u>$58 million</u>;

b.   **Double-Billing Fraud** – The Statis had Perkwood "sell" to TNG certain of the same LPG Plant equipment twice, using differently worded descriptions – inflating the stated LPG Plant costs by approximately <u>$22 million</u>;

c.   **Equipment for Construction Fraud** – The Statis included non-existent equipment in the Perkwood Agreement – inflating the stated LPG Plant costs by approximately <u>$72 million</u>;

d.   **Management Fee Fraud** – The Statis had TNG "pay" Perkwood a fictitious "management fee" – inflating the stated LPG Plant costs by approximately <u>$44 million</u>; and

e.   **Interest Fraud** – The Statis charged inter-company interest on the fraudulently inflated LPG Plant costs – inflating the stated LPG Plant construction costs by up to approximately <u>$60 million</u>.

**C.   Payments To Perkwood**

228.    Between on or about April 19, 2006 and on or about April 14, 2009, the Statis caused TNG to pay the total sum of approximately $175 million to Perkwood using the monies invested by the Tristan Noteholders.

229.    The bulk of this $175 million was then laundered by the Statis through their various

companies.   During the same period, Perkwood paid approximately $175 million to Azalia.   In addition to making legitimate payments to Tractebel of approximately $34 million, Azalia also paid a total of approximately $148 million to two Stati companies – approximately $94 million to Hayden and the remainder (approximately $54 million) to Terra Raf.   Neither company had any contractual entitlement to receive this money from Azalia.

230.    Because the $148 million paid to Hayden and Terra Raf was the product of the Statis' fraud, and was paid by the Statis to themselves using the monies of the Tristan Noteholders, the Statis thus defrauded the Tristan Noteholders.

**D.    The Statis Siphon Money From TNG By Skimming Payments For Oil And Gas – The Oil Skimming Fraud**

231.    Between 2005 and 2010, TNG produced and exported millions of barrels of oil and gas to third party Vitol.   It did so via intermediary companies owned by the Statis, including Terra Raf.   The contracts by which the sales were executed were sham contracts pursuant to which Terra Raf sold the oil and gas to Stati-controlled intermediaries at below-market prices.

232.    Specifically, Vitol made payments of circa $665 million for the oil and gas to Stati-controlled intermediaries.   Only circa $437 million was ultimately paid to TNG.   The balance of circa $228 million was stolen, embezzled, and/or misappropriated by the Statis through related-party transactions.

233.    In TNG's audited financial statements for 2007, the Statis stated that market prices were being paid for TNG's oil and gas.   That statement was knowingly false.

**E.    The Statis Intentionally Falsify Their Financial Statements**

234.    The Statis included the fraudulently inflated LPG Plant costs in their financial statements and knew that such costs were false.   This made the financial statements materially false.

235.     In the combined 2007 annual report for Tristan, KPM, and TNG, the Statis made the following representation:

> **LPG Plant**. *TNG is currently building a new LPG processing facility for liquid petroleum gas. As of December 31, 2007 TNG has made advance payments of approximately $158.6 million related to the LPG project. TNG expects to spend a total of $232.6 million in capital expenditures on this project through 2008.*

236.     This representation was knowingly false and fraudulent.   The Statis had not invested these amounts in the construction of the LPG Plant, nor did they intend to.  These figures were based on the amounts of the related-party transactions through which the Statis fraudulently inflated the stated construction costs of the LPG Plant.

237.     In Tristan's 2008 annual report, the Statis made the following representation:

> **LPG Plant.** *TNG is currently building a new LPG processing facility for liquid petroleum gas. As of December 31, 2008 TNG has invested approximately $223.2 million in the LPG project. TNG expects to spend a total of $241.7 million in capital expenditures on this project through 2009.*

238.     This representation was knowingly false and fraudulent.   The Statis had not invested these amounts in the construction of the LPG Plant, nor did they intend to.   These figures were based on the amounts of the related-party transactions through which the Statis fraudulently inflated the stated construction costs of the LPG Plant.

239.     In Tristan's 2009 annual report, the Statis represented that the costs of construction of the LPG Plant as of December 31, 2009 were more than $248 million.

240.     This representation was false.   The Statis had not invested these amounts in the construction of the LPG Plant, nor did they intend to.   This figure was based on the amounts of the related-party transactions through which the Statis fraudulently inflated the stated construction costs of the LPG Plant.

F.      **The Statis Fraudulently Obtain Audit Reports For Their Fraudulent Financial Statements**

241.    Another key step in the Statis' schemes was to legitimize the fraudulent transactions recorded in their financial statements by obtaining the stamp of approval of an international accounting firm.   They accomplished this by falsely representing to their auditors that the transactions were on arm's length terms and by falsely representing that Perkwood was an independent third party when, in fact, it was a Stati company.

### i.      Principles Governing Financial Statements And Auditing

242.    A company's financial statements are the primary source of financial information available to interested third parties for the purpose of making economic decisions on the business. To be of value for its intended users, financial statements are prepared in compliance with an accounting standards framework.

243.    Financial statements are normally subject to an independent audit that ensures that the financial statements are complete, fair, and accurate.   To achieve this outcome, audit procedures are regulated by international standards, in particular the audit standards developed by the International Auditing and Assurance Standards Board ("**IAASB**"), which include the International Standards on Auditing ("**ISA**").

### ii.     The Importance Of Accurate Identification Of "Related Parties" And Related-Party Transactions: The IAS 24 Standard

244.    One of the fundamental items of information that must be disclosed in a company's financial statements is the identity of "related parties," as well as any transactions and outstanding balances with related parties.

245.    The objective regarding "Related Party Disclosures" is set forth in IAS 24.1:

> *The objective of this standard is to ensure that an entity's financial statements contain the disclosures necessary to draw attention to the possibility that its financial position and profit or loss may have*

> *been affected by the existence of related parties and by transactions and outstanding balances of such parties.*

246.     Per IFRS, a related party is "a person or an entity that is related to the reporting entity" as follows:

> *A person or a close member of that person's family is related to a reporting entity if that person has control, joint control, or significant influence over the entity or is a member of its key management personnel.*
>
> *An entity is related to a reporting entity if, among other circumstances, it is a parent, subsidiary, fellow subsidiary, associate, or joint venture of the reporting entity, or it is controlled, jointly controlled, or significantly influenced or managed by a person who is a related party.*

247.     The importance of identifying related parties and related-party transactions is due, in particular, to the heightened risk that transactions between related parties may not reflect normal market conditions (the concept of "arm's length").

248.     IAS 24.6 explains the reasons why related parties must be identified:

> *A related party relationship could have an effect on the profit or loss and financial position of an entity. Related parties may enter into transactions that unrelated parties would not. For example, an entity that sells goods to its parent at cost might not sell on those terms to another customer. Also, transactions between related parties may not be made at the same amounts as between unrelated parties.*

249.     For these reasons, and others, it is essential that a company and its management truthfully identify to their auditors all related parties and related-party transactions.

### iii.     The Statis Fraudulently Conceal That Perkwood Was A Related Party

250.     The Statis fraudulently represented that their financial statements were prepared in accordance with the International Financial Reporting Standards ("**IFRS**").

251.     KPMG audited the individual and combined financial statements of Tristan Oil,

TNG, and KPM (collectively referred to by KPMG as the "**Companies**") for 2007, 2008, and 2009. Deloitte audited the Stati financial statements for 2006.

252.     The Stati financial statements disclose that transactions with related parties were a key part of the Statis' "business model."   For example, the combined 2008 financial statements state that a "significant proportion of the Companies' business is conducted through transactions with related parties and the effect of these, on the basis determined between the related parties is reflected below.  The Companies' ultimate controlling party is Anatolie Stati."

253.     Because TNG (and Ascom) were at all relevant times controlled by the Statis, and Perkwood was also at all relevant times under the ownership and/or control of the Statis, Perkwood was at all relevant times a "related party" to TNG (and Ascom) within the meaning of IAS 24.

254.     Pursuant to the requirements of IFRS (and, in particular, IAS 24), the Statis should have disclosed that Perkwood was a related party, and should have identified all of the transactions between TNG and Perkwood as related-party transactions.

255.     IAS 24 also required that TNG's financial statements provide all of the information that was "necessary for an understanding of the potential effect of the relationship [between TNG and Perkwood] on the financial statements."

256.     In violation of these requirements, TNG's audited financial statements for 2007 to 2009 did not (i)  disclose that Perkwood was a related party; (ii) identify the transactions between TNG and Perkwood as related-party transactions; or (iii) disclose the information regarding those transactions required by IAS 24.

257.     Instead, and even though the financial statements stated that a "significant proportion of the Company's business is conducted through transactions with related parties and the effect of these, on the basis determined between the related parties is reflected below," the

Statis fraudulently omitted Perkwood from the list of Stati related companies.

258.    The Statis falsely stated that the (only) related parties with whom TNG had conducted transactions during the relevant time period were: (i) Ascom; (ii) Arpega Trading S.R.L.; (iii) General Affinity; (iv) KASKO; (v) KASKO-Petrostar; (vi) KPM; (vii) Stadoil; (viii) Terra Raf; (ix) Tristan Oil.

259.    As alleged above, Artur Lungu, the former Chief Financial Officer of Tristan Oil and Vice President of Ascom, testified at his April 2019 deposition that Anatolie Stati knowingly misled KPMG by failing to identify Perkwood as a related party in the financial statements.   Mr. Stati did this by falsely stating to KPMG in multiple management representation letters in 2008, 2009, and 2010 that all related parties and related-party transactions were accurately disclosed, when in fact Perkwood was not disclosed as a related party and the transactions with Perkwood were not disclosed as related-party transactions.   Mr. Lungu confirmed in his testimony that these omissions rendered the management representation letters materially false.

260.    As a result of the failure to disclose that Perkwood was a related party, the Statis concealed the materially falsified LPG Plant construction costs that they engineered through the sham Perkwood transactions, as set forth above.

261.    The Statis knew and intended that the fraudulently-obtained audit reports would be relied upon by the Tristan Noteholders.   Confirming this, Mr. Lungu admitted in his deposition that the audited financial statements were required under the Tristan Trust Indenture so that the Tristan Noteholders would have a true and accurate understanding of the financial position of KPM, TNG, and Tristan.

262.    Mr. Lungu further confirmed in his testimony that each of the year-end combined financial statements of Tristan, TNG, and KPM for 2007, 2008, and 2009, as well as various

interim financial statements, were materially false because they failed to identify Perkwood as a related party and failed to identify the transactions between TNG and Perkwood as related-party transactions.

263.    After receipt of these fraudulent misrepresentations, KPMG issued audit reports for 2007 to 2009 that opined that the combined financial statements of Tristan, TNG, and KPM fairly presented their combined financial position, their combined financial performance, and their combined cash flows in accordance with IFRS.   In fact, these financial statements were materially false.

264.    After receipt of these fraudulent misrepresentations, KPMG approved the combined interim financial statements for the periods ending March 31, 2008, June 30, 2008, September 30, 2008, March 31, 2009, June 30, 2009, and September 30, 2009.    All of these financial statements were materially false.

G.    **The Statis Use Their Fraudulent "Audited" Financial Statements To Obtain Inflated Bids For Their Kazakh Operations**

265.    In June 2008, the Statis used their fraudulent "audited" financial statements to obtain bids for their Kazakh operations from prospective purchasers.    This was done through a bidding process that the Statis called "Project Zenith."   The Statis then deployed these fraudulently obtained bids in the Arbitration, along with their fraudulent "audited" financial statements, to obtain an award of $199 million for the LPG Plant.

i.    **The Project Zenith "Teaser" Contained Misleading, False And Fraudulent Information**

266.    In June 2008, the Statis caused Ascom and Terra Raf (as the shareholders of KPM and TNG) to retain Renaissance Securities (Cyprus) Limited and Renaissance Capital Central Asia JSC (together, **"Renaissance Capital"**) as the financial advisor for Project Zenith.

267.     In July 2008, Renaissance Capital distributed a "teaser" offer (the "**Teaser**") to 129 potential purchasers.   The prospective purchasers included companies located in the United States, Europe, the Middle East, Russia, Asia, and Kazakhstan.   The Teaser stated that the information contained therein – "assembled by the management" of Tristan, TNG, and KPM with the assistance of Renaissance Capital – was "believed to be accurate and reliable."

268.     The Teaser further stated that the Statis expected to spend a minimum of $230 million in capital expenditures on the LPG Plant and had already spent $160 million to date.   For the reasons alleged herein, these statements were knowingly false, as they reflected the fraudulently inflated LPG Plant construction costs.

### ii.     The Project Zenith "Information Memorandum" Contained Misleading, False And Fraudulent Information

269.     For those parties that responded to the Teaser, the Statis caused Renaissance Capital to distribute an August 2008 Information Memorandum that contained false information about KPM and TNG.  The stated "sole purpose" of the Information Memorandum was to "assist" potential purchasers in "evaluating" the Statis' operations in Kazakhstan.

270.     Like the Teaser, the Information Memorandum stated that the information contained therein was "assembled by the management" of KPM and TNG with the assistance of Renaissance Capital and "believed to be accurate and reliable."

271.     The Information Memorandum included false financial information regarding the Statis' operations offered for sale, including the LPG Plant.   It stated that this financial information was derived from, among other things, the audited financial statements of KPM, TNG, and Tristan from 2005 to 2007.   Mr. Lungu confirmed at his 2019 deposition that the Information Memorandum was false to the extent it relied on the underlying fraudulent financial statements, as set forth above.

272.     The Information Memorandum further represented that these financial statements were audited and had been prepared in accordance with IFRS:

> *[KPM's, TNG's,] and Tristan Oil's financial statements have been prepared in accordance with International Financial Reporting Standards ("IFRS"). Prior to 01 January 2007, the combined and individual financial statements of Tristan Oil, KPM and TNG were audited by Deloitte. Following the best practice to change auditors periodically, the Companies and Tristan Oil changed to KPMG as auditor for the year ended 31 December 2007 and thereafter.*

273.     This representation was fraudulent, for the reasons alleged herein.   The financial statements had not been prepared in accordance with IFRS, and the Statis knew this.

274.     The Statis also fraudulently represented in the Information Memorandum that they had changed auditors from Deloitte to KPMG because they were "[f]ollowing the best practice to change auditors periodically."   In fact, the Statis changed auditors because Deloitte, despite having been appointed as the Statis auditor just a year before, had begun asking questions regarding the Statis' related-party transactions.

275.     The Information Memorandum also repeated the misrepresentations from the Stati financial statements regarding the LPG Plant construction costs.   Specifically, the Information Memorandum stated that the "LPG plant is expected to be commissioned in the second quarter of 2009 with total CAPEX requirement of US$233 million."   It also stated that "[a]s of 1 July 2008, TNG had spent approximately US$193 million on the LPG plant."   These representations were misleading, false and/or fraudulent, for the reasons alleged above.

276.     The Information Memorandum also described the Tristan Notes.   It highlighted the Indenture's covenant limiting the ability of Tristan, KPM, and TNG to enter into related-party transactions unless the requisite approvals and/or independent fairness opinions were obtained. The Statis highlighted this to create the false and deceptive impression that there were no Stati

related-party transactions on the books of Tristan, KPM, and TNG that did not have the approvals and/or independent fairness opinions required by the Indenture's covenants.

### iii.    The KPMG Vendor Due Diligence Report

277.    In connection with Project Zenith, the Statis retained KPMG's Tax and Advisory department to prepare a financial "Vendor Due Diligence" document intended to be circulated to potential investors, entitled "*Project Zenith – Vendor Due Diligence Report*" ("**VDD Report**"). The Statis induced KPMG to prepare this report so that it falsely stated that Perkwood was an independent third party, and <u>not</u> a Stati-related party.

278.    The purpose of the VDD Report was to report on the combined businesses of Tristan, KPM, and TNG.   The "primary source" for the data in the VDD Report was information and representations made to KPMG by the Statis.

279.    The final VDD Report stated that its contents had been reviewed in detail by the directors of Tristan, KPM, and TNG, who confirmed the factual accuracy of the report in writing and represented that there were no material facts or information omitted from the report that "may cause the view it gives of the Tristan Oil Group to be misleading."

280.    One of the VDD Report's key areas of analysis was related-party transactions.   In this respect, KPMG stated that its scope of work was to:

> *Identify significant related party transactions, enquire into their rationale, the underlying terms and nature of such transactions; [e]nquire if these transactions have been at arms' length and assess the financial impact and related risks; and [c]omment on the impact of discontinuing related party transactions on the business of the target companies.*

281.    On August 31, 2008, as set forth above, KPMG provided the Statis with a draft of the VDD Report.  This draft mentioned Perkwood four times and each time correctly identified Perkwood as a Stati "related party."

282.    If KPMG had issued the VDD Report with Perkwood identified as a Stati company, it would have exposed the Statis' fraudulent schemes.   Accordingly, the Statis had to procure the falsification of the report.

283.    As set forth above, Mr. Lungu testified at his 2019 deposition that, upon receipt of the draft VDD Report, he held a telephone call with KPMG in which, on the basis of his understanding from Anatolie Stati, he expressly instructed KPMG to change all identifications of Perkwood in the VDD Report from that of a "related party" to that of an unrelated "third party." KPMG followed this instruction and changed the report.   These changes materially falsified the VDD Report, as Mr. Lungu acknowledged at his deposition.

284.    The VDD Report also repeated the misrepresentations from the Stati financial statements regarding the LPG Plant construction costs, *i.e.*, that the total cost of the LPG Plant construction was estimated to be $233 million, of which $193 million had already been invested as of June 30, 2008.

285.    As a result of these misrepresentations, a document intended to be distributed to prospective purchasers for the Stati operations in Kazakhstan, including the LPG Plant, was intentionally falsified to describe Perkwood (the supplier of the LPG Plant equipment to TNG) as an unrelated "third party" and to overstate the LPG Plant construction costs.  The Statis deliberately engaged in these falsifications to conceal their fraudulent schemes and to deceive third parties.

### iv.    KMG Submits Bid On The Basis Of The Statis' Fraudulent Information

286.    KMG, a state-owned oil and gas company in the Republic, was one of the eight prospective purchasers that responded to the Teaser and the Information Memorandum.

287.    KMG's response was an "indicative offer" dated September 25, 2008 (the "**KMG Indicative Offer**").   The KMG Indicative Offer relied on the false information provided by the

Statis.   It stated: "[i]n formulating our Indicative Offer, we have relied upon the information contained in the Information Memorandum and certain other publicly available information.  Our valuation depends upon this information and assumptions being substantiated in the next round through due diligence materials and meetings."   KMG also stated that any final bid depended on a review of the documents constituting "[s]tandard customary due diligence from a buyer's point of view," which included "commercial, financing and related parties' contracts."

288.    With regard to the calculation of the value of the Statis' operations in Kazakhstan and in particular the LPG Plant, the Indicative Offer stated that among its "key assumptions" was that the $193 million in LPG Plant construction costs stated in the Information Memorandum was accurate.  Specifically, the Indicative Offer stated: "[O]ur estimates of the Company's value and the present Indicative Offer are based on the following key assumptions: . . . Historical production, revenues, costs and CAPEX were as reported in the Information Memorandum."

289.    The Indicative Offer also made clear that its $199 million valuation of the LPG Plant was calculated on the basis of the Statis' representation that they had incurred "[h]istorical costs of US $193 million" in constructing the LPG Plant.

290.    Thus, the KMG Indicative Offer was expressly based upon information in the financial statements, the Teaser and the Information Memorandum that the Statis knew to be false, *i.e.*, the fictitiously inflated construction costs of the LPG Plant and the concealed related-party status of Perkwood.

291.    If KMG had known of these false statements and the Statis' fraudulent schemes, it would not have made the KMG Indicative Offer.   At a minimum, if KMG had instead been provided with the true construction costs of the LPG Plant, then its valuation of the LPG Plant in the Indicative Offer would have been materially lower.

### H.     The Laren Transaction

292.    In June 2009, the Statis caused Tristan to issue additional notes (the "**Laren Notes**") to new investors (the "**Laren Noteholders**").  The Laren Notes were issued at a significant discount to their face value.    Specifically, Tristan issued $111,110,000 in notes to Laren in exchange for a $30,000,000 loan.    Laren then issued the Laren Notes to the Laren Noteholders (the "**Laren Transaction**").

293.    The Laren Transaction was engineered by the Statis by deception that included at least two different elements.

294.    First, Laren was an entity secretly created and controlled by the Statis.    As was the case with Perkwood, Laren was falsely presented by the Statis as an independent third party.

295.    Second, the Laren Transaction was structured so that Anatolie Stati could materially benefit from its supposed conditions.    Specifically, in the event that Anatolie Stati timely repaid the "loan," he stood to receive a substantial kickback – referred to as an "upside."

## VIII.   THE STATIS' FRAUD DURING THE ARBITRATION

296.    As alleged above, the Statis' fraudulent schemes centered on the key lie that their fraudulent related-party transactions involving KPM and TNG were legitimate business expenditures.    Through this key lie, the Statis stripped assets from KPM and TNG, laundered money through these companies, and falsely portrayed these companies as having more assets than they actually did.    This key lie is at the center of the Statis' fraud.

### A.     The Statis Initiate The Arbitration Against The Republic

297.    After the Statis defaulted on the interest payments due to the Tristan Noteholders on July 1, 2010, the Statis filed a Request for Arbitration with the Stockholm Chamber of Commerce on July 26, 2010, claiming that the Republic had engaged in a "campaign of harassment" that violated various provisions of the Energy Charter Treaty.    In respect of the LPG Plant, the

Statis claimed as damages (i) the purported amount of their actual investment in the LPG Plant, which they falsely claimed was approximately $245 million; and (ii) the additional profit that they contended would have been realized from the LPG Plant but for the Republic's alleged breaches of the Energy Charter Treaty, which the Statis asserted constituted an additional $84,077,000.

### B.    In Furtherance Of Their Fraudulent Schemes, The Statis Make Multiple Misrepresentations In The Arbitration

298.    During the Arbitration, the Statis made a series of false statements and submitted falsified evidence on a range of subjects, including false evidence supporting their key lie that the related-party transactions were legitimate business expenditures.

299.    With regard to the LPG Plant, the Statis contended that the LPG Plant should be valued based on the amount of the investment that they had allegedly made in the plant.

300.    The Statis, in making their arguments regarding the quantum of damages, made several misrepresentations, the falsity of which the Republic did not discover until years later.

301.    <u>First</u>, the Statis, in reliance on the fraudulently-obtained audit reports and fraudulent financial statements, represented that they had invested more than $245 million in the development and construction of the LPG Plant, and they demanded an award in that amount.    In fact, the amount invested by the Statis in the development and construction of the LPG Plant was substantially less, and the claimed $245 million had been fictitiously inflated through the LPG Plant fraud scheme described above.

302.    In addition to submitting fraudulent documentary evidence, the Statis made the following misrepresentations to the Arbitration Tribunal:

   a.    The Statis' May 18, 2011 Statement of Claim stated that they "invested more than USD 245 million in development and construction of the LPG plant."

b.  The First Witness Statement of Mr. Lungu, dated May 17, 2011, asserted that "[w]hen the State seized KPM and TNG and all of their assets, including the LPG Plant, in July of 2010, more than USD 245 million had been invested in construction of the LPG Plant."

c.  The May 17, 2011 expert report of FTI Consulting, Inc. ("**FTI**") stated that "[p]er the audited financial statements for the period ended 31 December 2009, TNG has invested approximately $245 million in the design and construction of the LPG Plant," and that "[a]s of 30 September 2008, TNG reported $208.5 million related to total capital costs invested into the LPG Plant."

d.  The Statis' May 7, 2012 Reply Memorial on Jurisdiction and Liability stated that "in May of 2009, Claimants ceased their capital outlays for construction of the LPG Plant, having already invested more than US $245 million in its construction."

e.  The Second Witness Statement of Anatolie Stati, dated May 7, 2012, stated that "[f]aced with this climate of fear and uncertainty, I [*i.e.*, Anatolie Stati] chose in May of 2009 to postpone the LPG Plant project, having already spent more than USD 245 million toward its construction."

f.  The supplemental expert report of FTI dated May 28, 2012 stated that the "[t]otal investment that the Claimants have invested in the LPG Plant is $245 million."

g.  The Statis' May 28, 2012 Reply Memorial on Quantum [*i.e.*, damages] reiterated that "[i]n the event the Tribunal chooses not to award the

prospective value of the LPG Plant, Claimants request an award of the investment value of the LPG Plant, as adjusted by FTI to account for the approximately US $37 million in additional expenditures by Claimants through May, 2009, in the sum of US $245 million."

h.    In oral evidence at a hearing during the arbitration proceedings, on October 2, 2012, Anatolie Stati repeated the false statement made in his Second Witness Statement that more than $245 million had been invested in the construction of the LPG Plant.

i.    In oral evidence at a hearing in the arbitration on January 28, 2013, Mr. Lungu repeated the false statement made in his First Witness Statement that more than $245 million had been invested in construction of the LPG Plant.

j.    The Statis' April 8, 2013 First Post-Hearing Brief stated that "Claimants invested more than $240 million in construction of the LPG plant," that the investment cost of the LPG Plant was $245 million, and that they were claiming their investment cost of $245 million for the LPG Plant.

k.    The Statis' June 3, 2013 Second Post-Hearing Brief stated that "TNG's audited 2009 financial statements . . . list the net book value of the LPG Plant as US $248 million at December 31, 2009, which corroborates FTI's assessment of US $245 million. Data from the Claimants' historical financial records, particularly data from audited financial statements, is perfectly reliable evidence, and is not simply FTI parroting the Claimants."

l.    On this basis, the Statis urged the Arbitration Tribunal to "award damages

> for the LPG Plant based on . . . Claimants' out-of-pocket investment costs of US $245 million."

303.     Each of the above statements was knowingly false because the Statis did not invest more than $245 million in the construction of the LPG Plant.   This $245 million number was materially and fraudulently inflated by the Statis through the above-referenced schemes, that included (but may not have been limited to) the Resale Fraud, the Double-Billing Fraud, the Equipment for Construction Fraud, the Management Fee Fraud, and the Interest Fraud.

304.     Second, the Statis concealed highly relevant documents from the Republic during the Arbitration.   On February 3, 2012, the Arbitration Tribunal ordered the Statis to disclose to the Republic, *inter alia*, documents in their possession, custody, or control "specifying the cost of construction and assembly operations, start-up and adjustment works in respect of basic facilities" of the LPG Plant.   Documentation regarding the transfers between Tractebel, Azalia, and Perkwood all fell directly within the scope of this Order, and these contracts should have been disclosed by the Statis.   In breach of the Order, the Statis failed to disclose these documents to the Republic.

305.     Third, the Statis used the KMG Indicative Offer to claim that the value of the LPG Plant, at minimum, was the $199 million included in the KMG Indicative Offer.   The Statis did this despite knowing that (i) they had procured the KMG Indicative Offer by fraud; and (ii) the KMG Indicative Offer was not, and could not be regarded as, a valid indicator of the market value of the LPG Plant.   For example, the Statis made the following misrepresentations:

   a.     The Statis' May 18, 2011 Statement of Claim stated that "[t]he non-binding indicative offers . . . provide a record of the actual reaction of willing and able buyers to an offer of the properties by a willing and able seller, with

each acting at arms' length in an open and unrestricted market, without compulsion to buy or sell, and each having knowledge of the relevant facts."

    b.    The Statis' May 7, 2012 Reply Memorial on Jurisdiction and Liability twice referred to the KMG Indicative Offer, once again representing that it comprised a relevant (if conservative) guide to the value of its subject matter.

    c.    The Statis' May 28, 2012 Reply Memorial on Quantum (*i.e.*, damages) invited the Tribunal to consider the KMG Indicative Offer in the following terms:

> *Indeed, the offer made for the LPG Plant by [KMG] at that time was US $199 million. While Claimants did not accept these offers because at the time they deemed them too low and did not feel that they would lead to a sale, the Tribunal should note that State-owned [KMG] itself offered almost US $200 million for the [LPG] Plant, more than six times the highest value assigned to the LPG Plant by Deloitte of US $32 million. Little more is needed to demonstrate that Deloitte's salvage value assumptions and calculations are worthless.*

    d.    The Statis' April 8, 2013 First Post-Hearing Brief, again referred to the KMG Indicative Offer, directly and indirectly, representing that it comprised a relevant (if conservative) guide to the value of its subject matter.

    e.    At a hearing on damages on January 28, 2013, the Statis submitted that damages should, at a minimum, be awarded in the amount of the KMG Indicative Offer.

306.    <u>Fourth</u>, the Statis submitted expert reports that relied on the fraudulently-obtained

audit reports, the fraudulent financial statements, the fraudulently-obtained KMG Indicative Offer, and the false testimony of Anatolie Stati and Mr. Lungu.

307. For example, the Statis retained FTI to assess the economic damages related to their Kazakh operations, including the LPG Plant.  FTI's May 28, 2012 supplemental expert report relied on two categories of the Statis' false information.   First, in Paragraph 7.5, it cited the indicative offers on the LPG Plant, including KMG's $199 million Indicative Offer, to demonstrate that the value of the LPG Plant was "well in excess of its salvage value":

> *Offers made by interested buyers in 2008 for buying Claimants' assets . . . valued the LPG Plant at $150 million on average. The offer made by state-owned KazMunaiGaz at that time was $199 million for the LPG Plant. Hence it is clear that the value of the LPG Plant at the 2008 Valuation Date was well in excess of its salvage value.*

308. This report also relied on the false representations in the Statis' fraudulent financial statements and annual reports when assessing the investment value of the LPG Plant.

309. At no point during the Arbitration did the Statis disclose that the KPMG audit reports were fraudulently obtained, the financial statements were fraudulent, and the indicative offers on which they relied were based on these fraudulent documents.

310. Instead, the Statis affirmatively relied on the fraudulent financial statements to support their claims.   For example, in their Second Post-Hearing Brief, the Statis defended criticisms of FTI's assessment of the investment value of the LPG Plant on the basis that the financial statements and annual reports were "prepared for investors in the ordinary course of business, and not for the purposes of litigation."   In the same document, the Statis falsely represented that their "historical financial  records, particularly data from audited financial statements," were "perfectly reliable evidence."

### C.      The Arbitration Tribunal's Decision

311.    The Statis' fraud had a substantial impact on the Arbitration Tribunal's determinations regarding jurisdiction, liability, and damages, as now confirmed by the Brussels Court of Appeal and the Amsterdam District Court.  For example, with respect to damages, the Arbitration Tribunal awarded the Statis total compensation in the amount of $497,685,101, comprised of the following: (i) $277.8 million for two oil and gas fields; (ii) $31.3 million for another contract area; and (iii) $199 million for the LPG Plant.  After deducting $10,444,899 in the Statis' debts (not including debt related to the Laren Transaction), the Arbitration Tribunal issued the final award in the amount of $497,685,101.[128]

312.    The Arbitration Tribunal concluded that the LPG Plant should be assessed in the amount of $199 million based on the amount of the KMG Indicative Offer.[129]  This decision was the result of fraud committed by the Statis, for at least three reasons.

313.    <u>First</u>, KMG almost certainly would not have issued the KMG Indicative Offer had it known of the Statis' fraudulent schemes, and particularly had it known that the audit opinions for the Statis' financial statements had been fraudulently obtained and that the LPG Plant costs stated in the financial statements were materially falsified and heavily inflated.   If the KMG Indicative Offer had not existed, the Tribunal could not have relied upon it to award the Statis $199 million in compensation for the LPG Plant.

314.    <u>Second</u>, the KMG Indicative Offer was expressly based on the historical costs of construction of the LPG Plant set forth in the Information Memorandum.[130]  The Information

---

[128] Arbitration Award ¶¶ 1856–59.

[129] *Id*. ¶ 1747.

[130] *Id*. ¶ 1747.

Memorandum was prepared by the Statis using the materially inflated and fictitious construction costs from the sham transactions with Perkwood (which they secretly owned) and Azalia. The Information Memorandum failed to mention the Perkwood/Azalia transactions and presented the construction costs as if they corresponded to the costs of supply of Tractebel, the actual supplier of the LPG Plant equipment. Despite this, the Statis affirmatively introduced the KMG Indicative Offer into the Arbitration and asked the Arbitration Tribunal to use the KMG Indicative Offer as a basis to award them damages.[131] Given that the Arbitration Tribunal accepted the Statis' request and awarded them $199 million on the basis of the fraudulently-obtained KMG Indicative Offer, the Statis obtained the Arbitration Award by fraud.

315. _Third_, the Arbitration Tribunal relied on the $199 million amount in the KMG Indicative Offer on the grounds that in its view, this was "the relatively best source of information."[132] However, this conclusion was based on the Statis' fraud, in that the Statis:

a. concealed a series of essential elements that determined the $199 million amount in the KMG Indicative Offer, including the artificially inflated costs and the fact that the suppliers of equipment at fictitiously inflated prices were related parties;

b. filed in the Arbitration falsified and fraudulent documents (_e.g._, the altered VDD Report, the annual accounts of TNG, the Information Memorandum, among other items described above), and on this basis falsely represented to the Tribunal that they had invested $245 million in construction costs for the LPG Plant; and

---

[131] _Id._ ¶ 1707.

[132] _Id._ ¶ 1747.

c.   urged the Tribunal to rely on the submitted KMG Indicative Offer as a valid minimum valuation for the LPG Plant.

## IX.   THE STATIS' FRAUD AFTER THE ARBITRATION

316.   After the Statis obtained the fraudulent Arbitration Award, they began recognition and enforcement proceedings against the Republic in a series of jurisdictions, including England, Italy, the Netherlands, Luxembourg, Belgium, and the United States.   The Republic initiated proceedings in Sweden to have the award set aside or invalidated.    In these proceedings, and as now confirmed by the Belgium Court, the Statis continued to perpetrate their fraudulent schemes.

317.   As the Statis prosecuted or defended these proceedings, they engaged in a series of misrepresentations to the various courts and the Republic.    This conduct furthered the fraud. Although the Statis and their counsel have made dozens of different misrepresentations in numerous proceedings, summarized below are four categories of material misrepresentations.

318.   The Statis knew that these representations were false.  Further, the Statis knew that they were attempting to enforce an arbitral award that they had procured by fraud, and that this was done in order to continue the cover-up of the underlying fraud.

### A.   The Statis Misrepresent That KPMG Endorsed Their Financial Statements Based On Access To Complete And Truthful Information

319.   The Statis relied heavily on the fact that their financial statements had been audited by KPMG to defend against the Republic's allegation that the statements were fraudulent.  In making this assertion, the Statis falsely claimed that KPMG had full access to all company records and that KPMG was fully aware of Perkwood's status as a related company.[133]

320.   For example:

---

[133] In its August 21, 2019 letter, KPMG confirmed that it was not aware that Perkwood was a related party and that transactions with Perkwood were related-party transactions.

a.   The Statis falsely told the Swedish court that "[w]hen reviewing the prepared annual statements, TNG's auditors, KPMG, had full access to all accounting records.  KPMG was aware of Perkwood's function."   The Statis also reiterated the false statement that "KPMG was aware of Perkwood's function" and that "KPMG had full access to all accounting documents."

b.   The Statis falsely told the Netherlands court that "[d]uring the examination of the annual financial accounts, TNG's auditors, KPMG, had full access to all the accounting records.  KPMG was aware of Perkwood's function."

c.   They falsely told the Luxembourg court that "TNG, who was also a co-contractor in the allegedly fictitious contract, was also independently audited by KPMG Audit LLC ('KPMG'), who had access to all of the accounting records concerning Perkwood. KPMG never issued the slightest remark regarding the existence of Perkwood or the incriminating contract."

321.   These representations were knowingly false, given the clear evidence that Anatolie Stati deliberately concealed from KPMG the fact that Perkwood was a Stati-related party and, further, through Artur Lungu, instructed KPMG's Tax and Advisory department to remove any reference to Perkwood as a related company from relevant documents.

322.   The knowing falsity of these Stati representations is proven by the February 2016 KPMG correspondence (that the Republic discovered in October 2019).   All of the misrepresentations alleged in this section were made after the Statis engaged in this correspondence with KPMG in 2016.

323.    The Statis' representations regarding KPMG also are proven false by the August 2019 decision by KPMG to withdraw all of its audit reports for the Stati financial statements after KPMG was provided Mr. Lungu's deposition testimony, after it conducted its own investigation, and after Anatolie Stati refused to answer KPMG's questions.

324.    In relation to their assertion that KPMG knew that Perkwood was a related company, the Statis falsely represented to the Netherlands court that the "Vendor Due Diligence report drawn up by KPMG, which was compiled in 2008 in the context of a possible sale of TNG by Stati, submitted in the Arbitration, mentions Perkwood as a 'related party' and supplier of materials for the LPG Plant."

325.    Similarly, in the Belgium proceedings the Statis falsely represented that:

> *Perkwood is further mentioned several times in a KPMG Due Diligence report entitled "Zenith Project" which was produced by the Statis in the course of the arbitral proceedings. More particularly, the report in question (i) refers to Perkwood as a 'related party' of the Statis; (ii) lists Perkwood as the main supplier of equipment for the LPG Plant; and (iii) was used by the Republic during the arbitration proceedings, for the cross-examination conducted on the Statis and their witnesses (Anatolie STATI and Artur LUNGU).*

326.    The Statis also falsely represented to the English High Court that "Perkwood's status as a related party to TNG was set out in the vendor due diligence report for Project Zenith."

327.    To the Luxembourg court, the Statis falsely represented that "Perkwood's status as a party affiliated to TNG was established in KPMG's due diligence report."

328.    These representations were knowingly false.  As Mr. Lungu admitted for the first time at his 2019 deposition, he instructed KPMG to change the draft Vendor Due Diligence Report so that it falsely stated that Perkwood was an unrelated third party.    KPMG followed these instructions.  As a result, the Vendor Due Diligence Report did not identify Perkwood as a

related party; to the contrary, it falsely identified Perkwood as an unrelated third party.

329.   The KPMG Vendor Due Diligence Report therefore was deliberately falsified by the Statis on the exact point – concealment of the fact that Perkwood was a Stati company – that the Statis are misrepresenting in the enforcement proceedings.

### B.   The Statis Misrepresent That They Never Concealed Perkwood's Status From KPMG Or The Outside World

330.   The Statis also consistently concealed the fact that Perkwood was a company they owned and controlled, and that the transactions with Perkwood were not at arm's length.   The Statis misrepresented this fact to various courts.

331.   For example, after evidence of the Statis' double accounting had been revealed in the U.S. discovery proceedings, the Statis continued to conceal the fact that Perkwood was a related party by refusing to admit or deny the fact before the Svea Court of Appeal.   In a submission to that court, the Statis attempted to fend off the Republic's complaint that they were evading the issue by stating that they "have not asserted that Perkwood was 'freestanding from the Investors' sphere.'  What has been stated by the Investors is that they do not concede to the fact that Perkwood was an affiliate in some – yet unspecified by Kazakhstan – way."   They also evaded the question by stating that they "have never been able to contest (but neither to admit) that Perkwood is in any particular way an 'affiliated' company."

332.   Only on September 5, 2016, once the Republic introduced documents that it had obtained from Latvian authorities showing that the Statis had full powers of attorney over Perkwood, were the Statis forced to admit that Perkwood was a Stati-related party.

333.   Despite this clear example of attempting to conceal Perkwood's status, the Statis continued to falsely claim to the various courts that they had never tried to conceal that information.   In Belgium, for example, they told the court that "it is therefore incorrect to claim

that 'the Statis never informed KPMG of their relationship with Perkwood.'"   They further insisted (falsely) in the same submission that "[i]t should be recalled that the Statis have never tried to hide the Perkwood Contract and Company" and that "it should be noted that the Statis never sought to conceal the facts of Perkwood being part of the group of companies they controlled/owned."

334.   The Statis continued to make such representations in Belgium in further submissions, stating that "it should be stressed that the Statis have never sought to conceal the status of Perkwood as part of the group of companies they controlled/possessed, unlike what Kazakhstan keeps repeating."   Ultimately, in overturning recognition of the Arbitration Award in November 2021, the Brussels Court of Appeal did indeed find that the Statis "deliberately concealed the true status of Perkwood."[134]

335.   The Statis consistently made this misrepresentation to other courts.   In England, the Statis falsely "denied that the Claimants at any time sought to conceal Perkwood's status as part of the group of companies owned and/or controlled by the Statis."   In Luxembourg, the Statis falsely asserted "[t]here was no deliberate concealment of Perkwood's status as a party affiliated to TNG within the meaning of the IFRS standards and IAS 24 or in any manner whatsoever."   In Italy, the Statis falsely asserted that neither Perkwood nor documentation regarding Perkwood had been concealed.

### C.   The Statis Misrepresent By Omission The Incriminating KPMG Correspondence And Conceal It From The Courts

336.   On February 2, 2016, after KPMG belatedly learned, as a result of the disclosures obtained by the Republic, that Perkwood was a Stati company, KPMG reached out to the Statis for an explanation.   It did so as part of its ongoing responsibility to revisit any audit reports "if we

---

[134] Belgium Decision at 27, 29.

become aware of facts which may have caused the audit reports to be amended, had such facts been known to us at the audit report date."

337.    The 2016 KPMG letter (which the Republic did not discover until October 2019) identified three primary issues that KPMG was unaware of at the time of the audits: (i)  that Perkwood charged a management fee of approximately $44 million; (ii) that Perkwood was a related party controlled by the Statis; and (iii) that Perkwood was not the "actual supplier of the equipment for the LPG Plant," but instead a dormant company that passed through costs that were "significantly  different  from  the  corresponding  cost"  charged  by  the  actual  supplier  of  the equipment.

338.    KPMG, in its 2016 letter, demanded written responses from the Statis to a series of six questions regarding these issues and warned that if it did not receive this information, it could "prevent future reliance on our audit reports and in particular to withdraw our audit reports and to inform about such withdrawal all parties who are still, in our view, relying on these reports, including but not limited, [the] Ministry of Justice of Kazakhstan and the Svea Court of Appeals." The Statis, however, did not substantively respond to KPMG's questions, but instead threatened legal action against KPMG.   The Statis never disclosed this 2016 correspondence to the courts or to the Republic during the enforcement proceedings or the annulment proceedings.

339.    After the Republic deposed Mr. Lungu in April 2019 and provided this deposition transcript to KPMG, along with other materials evidencing the Statis' fraud,  KPMG (as the Republic subsequently discovered in October 2019) contacted Anatolie Stati and demanded an explanation.  None was provided.

340.    For example, on August 5, 2019, KPMG reached out to the Statis and stated that "[o]ur audit files indicate that transactions with Perkwood were not disclosed in the financial

statements of the [Stati] Companies, and that Perkwood was not included in the list of related parties which management provided to us during our audits."   In this letter, KPMG again requested information regarding Perkwood's status.

341.   On August 21, 2019, after receiving no response from the Statis, KPMG withdrew all of its audit reports for the Stati financial statements, and further instructed the Statis to "immediately take all necessary steps to prevent any further, or future, reliance" on the audit reports, including informing all parties in receipt of the financial statements or audit reports of this "development," *i.e.*, KPMG's decision to withdraw the reports.

342.   Instead of complying with KPMG's instruction, the Statis continued to conceal the KPMG correspondence from the Republic, their investors, and the various courts.   The Statis did not inform any court, or other recipients of the audited financial statements, of KPMG's decision to withdraw its audit reports.   The Statis also did not submit the KPMG correspondence to any of the courts that were in the process of adjudicating issues relating to the Arbitration Award in late 2019, including the Amsterdam Court of Appeal and the Luxembourg Court of Appeal.

343.   Instead of preventing further reliance on the KPMG audit reports, the Statis continued to falsely represent to the courts that KPMG had performed its audits with full access to all documents and full knowledge of Perkwood's status despite knowing this was false.   When the Republic eventually learned of the KPMG correspondence in October 2019, the Statis sought to block the Republic from introducing the correspondence.

344.   For example, in Luxembourg, the Republic asked the Statis in a November 15, 2019 letter to disclose the KPMG correspondence to the Court of Appeal of Luxembourg even though the submission date for evidence had passed.   The Statis did not respond.   When the Republic attempted to submit the evidence itself, the Statis sought to block the request in a letter to the Court

of Appeal of Luxembourg.

345.   In the Netherlands, the Statis actively sought to falsify the record regarding the KPMG correspondence.   The Statis sent a letter to the Court of Appeal asking it to correct the record and add statements that were never pleaded before the court.   Specifically, the Statis attempted to include a reference to their offering to produce the 2016 KPMG correspondence, although no such offer had ever been made.

**D.     The Statis Falsely Claim That The Perkwood Transactions Were Legitimate**

346.   As alleged above, one component of the Statis' fraud was the fraudulent accounting at the LPG Plant, in which they falsely inflated the costs of the plant through related-party transactions.   After the Republic discovered the LPG Plant Fraud, and presented it in the post-Arbitration enforcement proceedings, the Statis made new misleading, false and/or fraudulent representations.

347.   After the Statis belatedly admitted that they actually owned Perkwood after hiding this fact for years, they continued to hide the fraudulent LPG Plant costs by falsely claiming in several proceedings that Perkwood was an operational company that handled the delivery of equipment to the Republic, so the markups could be attributed to delivery costs.  For example:

> a.   The Statis falsely told the Svea Court of Appeal in Sweden, without evidence or explanation,  that "Perkwood did deliver.  They did perform services."
>
> b.   The Statis falsely asserted to the Luxembourg Court of Appeal that:
>
>> *[D]espite being part of the group of companies that the Statis controlled/owned, the Perkwood Company had a separate legal personality, distinct from the Statis as individuals and other entities within the Statis' group of companies. The Perkwood company was able to have rights and obligations, regardless*

> *of the fact that it did not own any premises or employees . . . . [T]he Perkwood company was fully operational. The company was set up to take care of the bidding process and to take over equipment delivery to Kazakhstan, in order to allow the construction of the LPG [Plant] by TNG.*

    c.    Before the Rome Court of Appeals, the Statis falsely asserted that Perkwood was a fully functional company.   Using circular logic (and no evidence), the Statis argued that the fact that Perkwood filed dormant company accounts in the U.K. during all relevant years was irrelevant because Perkwood was a fully operational company.

348.   The Statis also made the false representation in various proceedings that the sham Perkwood transactions were a "bona fide transfer pricing agreement" and that their decision to use related parties was a legitimate "tax optimization scheme."   These misrepresentations were made notwithstanding the fact that the Statis knew that Perkwood was a sham company without employees or offices for which the Statis filed dormant company reports, and which could not offer any value.

349.   For example, in the Swedish proceedings:

    a.    The Statis falsely represented that the "Perkwood agreement was not a sham agreement.  Perkwood's role was to manage the purchasing and delivery of equipment for the construction of the LPG Plant.    In other words, there has been no question of any misleading arrangement or sham agreement between TNG and Perkwood."

    b.    The Statis falsely denied, without evidence, that the financial statements reflected the purchase of $72 million in equipment that, in fact, never existed.

    c.      The Statis falsely claimed, again without evidence, that up to $60 million in interest costs "corresponds to the actual cost."

    d.      The Statis falsely claimed that the "management fee" of $44 million paid to Perkwood was a legitimate cost: "this assertion that the management fee that was paid to Perkwood without any basis in any agreement, no account of performance in the form of services, well, we know that from the bank history that was not true."

350.    In England, the Statis repeated the key lie that the related-party transactions constituted a legitimate transfer pricing arrangement.   In their "Points of Defence," they falsely claimed:

> *Some of the Claimants' investments into the construction of the LPG Plant, in so far as they related to delivery of certain equipment for the LPG Plant, were structured using a transfer pricing arrangement involving transactions between related business entities affiliated with the Claimants    This constituted a lawful arrangement driven by tax optimisation purposes. At no point did this arrangement involve fraudulent trade or misinvoicing or any other dishonest practice.*

351.    To justify the fraudulent inflation, through which the stated cost of the LPG Plant equipment was tripled, the Statis falsely claimed "that Perkwood was responsible for the costly loading in Europe and unloading in Kazakhstan and the transportation in between" and that "Perkwood also bore all related insurance and storage costs relating to the requisite equipment during its delivery to Kazakhstan."   The Statis also falsely claimed that the "management fee was a legitimate add-on cost for the equipment supplied under the Perkwood Contract, corresponding to approximately a third of the total value of the Perkwood Contract."   The Statis knew that Perkwood was a dormant company and that, therefore, these representations were false.

352.    The Statis made the same false assertions in the Belgian exequatur proceedings.

For example, the Statis falsely asserted that:  "Perkwood had to bear the excessive costs and much higher for the loading of goods in Europe, their unloading in Kazakhstan and the corresponding transport.  Unlike Azalia, Perkwood also had to insure the goods concerned, as well as organize their storage to allow delivery to Kazakhstan."   They also falsely asserted that "[s]uch a tax optimization is a perfectly legal arrangement and is customary in a group of companies and in complex construction projects of this magnitude.   This tax optimization mechanism allowed Perkwood (and Azalia) to minimise their tax base for corporate income tax in their country of incorporation, namely Russia (for the Azalia Company) and England (for the Perkwood Company)."

353.    The Statis repeated these false assertions in the Luxembourg proceedings.  For example, they falsely asserted that:

> *The Perkwood Company and Contract were part of a Transfer Pricing Agreement, which involved operations between different entities, belonging to the Statis. It is around this Transfer Pricing Agreement, that a part of the investments made by the Statis in the construction of the LPG Plant (in particular as regards the delivery of certain equipment) was structured. Such a mechanism is a perfectly legal arrangement for tax optimisation purposes, as is customary in a group of companies and in complex construction projects of this size . . . . [T]hese 'fees and management fees' were initially perfectly legitimate, since Perkwood bore all costs and expenses relating to deliveries, storage, insurance and costs related to the conversion of EUR/USD currencies in relationship to equipment deliveries from Europe to Kazakhstan. They corresponded to about a third of the value of the Perkwood contract.*

354.    In the Netherlands, the Statis also made these false assertions.   For example, the Statis falsely claimed that a large part of the inflated LPG Plant costs were bona fide costs for the transport of equipment.   Later, the Statis changed their position and falsely claimed that the (non-existent) management fee was an explanation for the costs.

355.    In Italy, the Statis also falsely asserted that the Perkwood transactions were part of a lawful transfer pricing arrangement.   They falsely claimed that the price increase for the

equipment was explained by transportation costs, insurance costs, and the floating exchange rate between the US dollar and the Euro.   They also falsely asserted that the $44 million management fee paid by TNG to Perkwood was a legitimate construction cost and had a sound legal basis.

## X.     THE STATIS' FRAUD ON THE COURT

356.     In 2014, the Statis filed a petition to confirm the Arbitration Award in this Court.[135] In that petition, the Statis stated to the Court that "[n]one of the grounds for refusal or deferral of the Award set forth in the New York Convention applies."[136]  This statement was knowingly false. At the time the Statis filed the petition to confirm the Arbitration Award, they knew they had engaged in the fraudulent schemes alleged herein and that, as a part of those schemes, they had obtained the Award by fraud, and that such fraud does provide a grounds for refusal under the New York Convention.

357.     At the time briefing was completed on that petition in May 2015, the Republic was not yet aware of any of the Statis' fraud schemes, and its opposition did not contain any fraud-based arguments.

358.     In July 2015, the Republic uncovered the first shreds of evidence of the Statis' fraud.  Specifically, in discovery obtained from the law firm of Clyde & Co. in the Southern District of New York, the Republic learned that the Statis had claimed a substantially different amount of construction costs for the LPG Plant in other arbitration proceedings with their partner, the Vitol Group of companies.

---

[135] *See Stati v. Republic of Kazakhstan*, 302 F. Supp. 3d 187 (D.D.C. 2018), *aff'd sub nom. Stati v. Republic of Kazakhstan*, 773 Fed. Appx. 627 (D.C. Cir. 2019), *cert. denied*, 140 S. Ct. 381 (2019).

[136] Petition, September 30, 2014, *Stati,* No. 1:14-cv-01638-ABJ (D.D.C. Mar. 19, 2021), ECF No. 1.

A.     **The Republic Seeks Leave Of Court To Add Then-Existing Fraud Allegations, Which Is Denied After The Statis Object**

359.     In April 2016, the Republic moved for leave to submit additional grounds in support of its opposition to confirm the Arbitration Award in light of the limited fraud evidence it had discovered at the time.  Specifically, the Republic asked the Court for leave to allow it to present arguments and evidence showing that the Statis submitted false evidence to the arbitral tribunal concerning the LPG Plant construction costs, and that this portion of the Arbitration Award was therefore obtained by fraud.[137]  The Republic invoked Articles V(1)(b) and V(2)(b) of the New York Convention, arguing that the Statis deprived the Republic of the ability to effectively present its case to the Arbitration Tribunal and that the enforcement of the Arbitration Award would violate U.S. public policy.

360.     In their opposition to the motion for leave, the Statis denied the existence of the fraud: "Needless to say, Petitioners deny the ROK's allegations of fraud…"[138]

361.     The Statis also argued (falsely) that the Republic's additional grounds were "futile" because the Arbitration Tribunal had not relied on either party's submissions on the valuation of the LPG Plant and relied instead on what they claimed to be an independent assessment – the offer from KMG made during the prospective sale of their Kazakh companies.  When the Statis made this representation to the Court, however, they knew that the KMG offer was based explicitly on the "investments" recorded in their fraudulent financial statements and their fraudulently-obtained audit reports, and that the KMG offer itself thus was fraudulently procured.  The Statis also claimed

---

[137] *See* Respondent's Mot. for Leave to File Add'l Grounds in Supp. of Opp'n to Pet. to Confirm Arb. Award, Apr. 5, 2016, *Stati,* No. 1:14-cv-01638-ABJ (D.D.C. Mar. 19, 2021), ECF No. 32.

[138] Mem. Opp. to Respondent's Mot. for Leave to File Add'l Grounds in Supp. of Opp'n to Pet. to Confirm Arb. Award at 11, Apr. 25, 2016, *Stati,* No. 1:14-cv-01638-ABJ (D.D.C. Mar. 19, 2021), ECF No. 34.

that granting the motion would "not promote economic and speedy disposition" of the case because the Republic's claims with respect to the LPG Plant were "already being re-litigated in set-aside proceedings pending in Sweden, the seat of arbitration in this case."[139]

362.    Relying on the Statis' representations, the Court denied the Republic's motion (while it also expressly abstained from deciding the merits of the then-alleged fraud):

> *...Under those circumstances, and given the fact that the issue has already been presented to the Swedish authorities, it will not be in the interest of justice to conduct a mini-trial on the issue of fraud here when the arbitrators themselves disavowed any reliance on the allegedly fraudulent material.*[140]

363.    The Court further stated:

> *it would not be in the interest of justice to broaden the scope of this proceeding to consider whether petitioners did or did not mislead the foreign arbitration panel when it presented evidence related to the value of the plant in question. The Court has not come to conclusions about the legitimacy of the evidence presented to the arbitrators on this issue...*[141]

**B.    The Statis Continue To Deny The Fraud In Response To The Republic's Motion For Reconsideration**

364.    The Republic moved for reconsideration of the Court's order in May 2016 and sought to present evidence showing that KMG had, in fact, relied on the Statis' falsified financial statements in making its $199 million offer and that the Arbitration Tribunal had, in fact, directly relied on this fraudulently-procured evidence (the KMG offer) in issuing the Arbitration Award.

365.    In their opposition to the Republic's motion for reconsideration, the Statis again

---

[139] *Id.* at 10; *see also id.* at 11-12 ("The ROK has presented the very same fraud allegations to the courts of Sweden, which is the seat of arbitration and primary jurisdiction in this case.").

[140] Order Den. Respondent's Mot. for Leave to File Add'l Grounds in Supp. of Opp'n to Pet. to Confirm Arb. Award  at 3-4, May 11, 2016,  *Stati*, No. 1:14-cv-01638-ABJ (D.D.C. Mar. 19, 2021), ECF No. 36.

[141] *Id.*

relied heavily on the ongoing Swedish annulment proceedings to argue that the Republic's fraud allegations were already being fully and fairly adjudicated.  For example, the Statis argued that the Republic could "show no harm resulting from denial of its Motion to Amend because it will air the very same allegations in Sweden."

366.    On August 5, 2016, the Court *sua sponte* stayed its proceedings pending the outcome of the Swedish annulment proceedings.  In its decision, the Court relied on the Statis' representations that the fraud allegations would be litigated in Sweden and therefore did not need to be litigated in the Court:

> *Petitioners pointed out that Kazakhstan 'has the opportunity to litigate the very same fraud allegations in the courts of Sweden, which is the seat of arbitration and primary jurisdiction in this case.' In respondent's reply, it confirmed that the parties are litigating the fraud issue in Sweden, but it argued that the Sweden proceeding should not affect the Court's review of the petition to confirm, or the motion for reconsideration.*
>
> *....*
>
> *[W]hile the Court recognizes that a stay will not promote the expeditious resolution of this matter, a decision by the Svea Court of Appeal may limit or eliminate the need for continued and expensive litigation.*[142]

367.    As is now known, the Statis, at the same time as they were urging this Court to defer to the Swedish annulment proceedings, were in the process of engaging in acts of deception and misrepresentation in those same proceedings.  This included the Statis' repeated reliance in those proceedings on the fraudulently-obtained KPMG audit reports and falsified financial statements and active concealment of the 2016 KPMG correspondence.

368.    There now exists clear and convincing of the Statis' deceit in the Swedish

---

[142] Mem. Opinion & Order at 17-18, 20, *Stati*, No. 1:14-cv-01638-ABJ (D.D.C. Mar. 19, 2021), ECF No. 43.

annulment proceedings.

369.    In August 2020, Patrik Schöldström, now a judge on the Svea Court of Appeal, issued an expert opinion that addressed, among other issues, the Republic's applications to set aside and/or annul the Arbitration Award in the Swedish courts.  He concluded in pertinent part that that the Statis, in the Swedish proceedings, "violated the duty to tell the truth and the duty not to litigate 'against better knowledge" and that accordingly, the Svea Court "did not have a correct and truthful basis for its 2016 Decision" in which it refused to annul or set aside the Arbitration Award.[143]

370.    In the Belgium Judgment, the Brussels Court of Appeal found that the Statis deceived the Swedish courts during the annulment proceedings and, specifically that, the Statis "knowingly concealed… the truth" and "deliberately misled the Swedish courts…which – purposefully – prevented these jurisdictions from ruling on the matter on the basis of all the information and evidence available."[144]

### C.    The Statis Deploy The Swedish Annulment Decisions In This Court To Obtain Confirmation Of The Arbitration Award

371.    After the Svea Court of Appeal issued its December 2016 decision dismissing the Republic's application to annul or set-aside the Arbitration Award, the Statis then deployed that decision in this Court to obtain confirmation of the Award, despite knowing that the Swedish court ruling was based on the Statis' acts of deception and misrepresentation.

372.    In so doing, the Statis knowingly and falsely represented to this Court that the Republic's then-existing, limited fraud allegations had been fully and fairly litigated in Sweden.

---

[143] Expert Opinion of Patrik Schöldström ¶¶ 84, 87, Aug. 23, 2020.

[144] Belgium Judgment at 7-8.

Those representations, it is now known, were false.

373.    For example, in arguing that the stay in this Court should be lifted, the Statis made

the following representations:

> The Svea Decision thoroughly and forcefully rejected the ROK's
> claim that the Award was 'procured by fraud,' as well as each of the
> other grounds raised by the ROK in opposition to the Award. The
> Svea Decision was **rendered after a full hearing** and upon
> consideration of all the evidence proffered by the ROK. While the
> ROK continues to tell courts around the world that the Award was
> 'procured by fraud' and seeks to stave off the day of reckoning by
> promising all these courts that it will prove that proposition, the
> **ROK has had its day in court**. It presented its fraud case in full to
> the Svea Court, and it lost.[145]

374.    In the March 23, 2018 Order confirming the Arbitration Award, the Court expressly

relied on the Swedish court decisions.  Specifically, the Court stated as follows:

> [P]etitioners emphasized that respondent presented its "fraud case
> in full" to the Svea Court of Appeal, the seat of the arbitral award,
> which concluded "[t]hat the Award was not the product of fraud,"
> and its ruling was left undisturbed by the Swedish Supreme Court.
>
> […]
>
> While the Court acknowledges that the legal standards to be applied
> in each situation are different, the fact that the Svea Court of Appeal
> heard and rejected respondent's fraud claims, and that its ruling
> was upheld by the Swedish Supreme Court, lends force to this
> Court's view that it would not be contrary to the public policy of the
> United States, and it would not violate this country's "most basic
> notions of morality and justice," ... to let the Court's May 11, 2016,
> Order stand and decline to hear the evidence again in the limited
> context of this enforcement proceeding.[146]

375.    In relying on the Statis' invocation of the Swedish annulment decisions, the Court

never permitted the Republic the opportunity to present even the limited fraud evidence it had

---

[145]  Mot. to Lift Stay at 9, Sep. 29, 2017, *Stati*, No. 1:14-cv-01638-ABJ (D.D.C. Mar. 19, 2021),
ECF 60 (emphasis added).

[146] *Stati v. Republic of Kazakhstan,* 302 F. Supp. 3d 187, 201 (D.D.C. 2018).

uncovered with respect to the fictitious transactions underlying the LPG Plant.

376.    As importantly, the Court (and the Republic) did not at the time have knowledge or evidence of either the much broader fraud schemes committed by the Statis as alleged herein or the specific acts of deception and misrepresentation undertaken by the Statis in the Swedish annulment proceedings.

377.    Confirming this, the Brussels Court of Appeal stated as follows in the Belgium Judgment:

> *the decisions relating to the exequatur application of the Statis do not relate to the fraudulent acts discovered only in 2019, on the contrary, the American courts have declined to examine the accusations of fraud on the basis of the consideration - obviously mistakenly - that Kazakhstan was aiming at the re-examination of the dispute resolved by the arbitral tribunal, while the alleged fraud had not yet been discovered at that time, and even the Swedish courts were not aware of it when they ruled in the context of the annulment proceedings, of which only the first proceeding had resulted in a decision on the merits.*[147]

## COUNT I
## RULE 60(D)(1) –RELIEF FROM THE JUDGMENT

378.    The Republic re-alleges and incorporates by reference each and every allegation above as if fully set forth herein.

379.    Under Rule 60(d)(1), relief from the Judgement is required to prevent a grave miscarriage of justice.

380.    The Judgment should not, in equity and good conscience, be enforced.  Over the course of more than a decade, the Statis *inter alia*: (1) fraudulently obtained audit reports from KPMG that legitimized their falsified financial statements; (2) deployed those fraudulently-obtained audit reports to conceal their embezzlement and laundering of hundreds of millions of

---

[147] Belgium Decision at 14.

dollars from their Kazakh operating companies; (3) used those fraudulently-obtained audit reports, and other acts of deception, to fraudulently obtain the Arbitration Award, which ordered the Republic to compensate the Statis for the very same monies that they had embezzled and laundered; (4) deceived and misled the courts of Sweden in order to avoid annulment of the Arbitration Award; and (5) used the resulting Swedish annulment decisions, and other misrepresentations, to obtain a judgment from this Court that gave the force of U.S. law to the fraudulent Arbitration Award.

381.    These fraud schemes were deliberately planned and carefully executed.

382.    As part of these schemes, the Statis knowingly asked multiple courts around the world, including this Court, to confirm an arbitral award that the Statis knew they had obtained by fraud.

383.    In the course of seeking such recognition and enforcement of the fraudulent Arbitration Award, the Statis then made knowing misrepresentations to this Court, the Swedish annulment courts, and to the courts of England, the Netherlands, Belgium, Luxembourg, and Italy.

384.    In turn, the Statis' efforts to obtain recognition and enforcement of the fraudulent Arbitration Award in this Court, as well as other courts around the world, was an integral part of their underlying schemes to embezzle and launder hundreds of millions of dollars from their companies in Kazakhstan.

385.    The Statis' fraud involved far more than an injury to a single litigant.  Through their various schemes, the Statis defrauded their investors (the Tristan Noteholders), their auditors (KPMG), the Arbitration Tribunal, the Swedish courts during the annulment proceedings, this Court, and multiple other enforcement courts.

386.    This matter does not concern only private parties, but a foreign sovereign and the

highest standards of the public policy of the United States.

387.    The Statis only were able to subject the Republic to the jurisdiction of the Court by using the fraudulently-obtained Arbitration Award to establish an exception to the jurisdictional immunity set forth in the United States Foreign Sovereign Immunities Act, 28 U.S.C. § 1605.

388.    A good defense to confirmation of the Arbitration Award exists.  The Statis obtained the Arbitration Award by fraud, and the United States has a well-established public policy against recognizing international arbitration awards that are obtained by fraud.

389.    The evidence of the Statis' fraud is now clear, convincing. and indisputable.  This evidence was litigated and determined in a final, conclusive, and enforceable judgment in the Belgium Judgment and, separately, in the Amsterdam Judgment.

390.    Unlike in the Swedish annulment proceedings, and the prior confirmation proceedings in this Court, the Statis had the opportunity for a full and fair litigation of their fraud in the proceedings that resulted in the Belgium Judgment and the Amsterdam Judgment.

391.    The Brussels Court of Appeal and the Amsterdam District Court are courts of competent jurisdiction.  Both litigated the Statis' fraud upon regular proceedings that were instituted by the Statis, and with the full appearance and participation of the Statis.

392.    Both the Belgium Judgment and the Amsterdam Judgment were issued under systems of jurisprudence that secure an impartial administration of justice between the citizens of those countries and those of other countries.

393.    The Belgium Judgment and the Amsterdam Judgment thus estop the Statis from re-litigating the merits of the fraud in this action.

394.    Even without collateral estoppel, the underlying evidence of the Statis' fraudulent schemes is clear, convincing, and indisputable.

395.     The Statis' fraudulent schemes prevented the Republic from obtaining the benefit of their defense.   This occurred in the underlying Arbitration, in the Swedish annulment proceedings, and in the prior confirmation proceedings in this Court.

396.     The Republic is not at fault and was not negligent in discovering the full evidence of the Statis' fraud.

397.     Given that the time for filing a motion for relief from the Judgment under Rule 60(b) has passed, the Republic has no other adequate remedy at law to obtain relief from the Judgment.

## COUNT II
## RULE 60(D)(3) – SET ASIDE THE JUDGMENT

398.     The Republic re-alleges and incorporates by reference each and every allegation above as if fully set forth herein.

399.     Under Rule 60(d)(3), the Judgment should be set aside for fraud on the Court.

400.     As alleged, the Statis' fraud was egregious.   It defiled the Court itself, by converting into a judgment of this Court an arbitration award that the Statis obtained by fraud and that, as the available evidence now shows, was part of larger schemes of fraud, embezzlement, and money laundering.   In so doing, the Statis have, through a series of deceptions and misrepresentations, turned this Court into an instrument of their fraud.

401.     The Statis' fraud was deliberate and directly subverted and abused multiple judicial processes, starting with the Arbitration, continuing through to the Swedish annulment proceedings, and then into the subsequent recognition and enforcement proceedings that the Statis initiated in multiple courts around the world, including the confirmation proceedings in this Court.

402.     The Statis' fraud did not consist of isolated acts.   The Statis repeatedly and

knowingly lied to the Arbitration Tribunal, the Swedish annulment courts, this Court, and the courts of other jurisdictions concerning issues that are central to the truth-finding process.

403.    The Statis' fraud involved far more than an injury to a single litigant.

404.    The Statis accomplished their fraud on the Court through their attorneys.  The same attorneys represented the Statis in the underlying Arbitration and in the concurrent Vitol Arbitration from which the evidence of the LPG Plant fraud scheme was first discovered.  These same attorneys acted as global counsel to the Statis, coordinating and directing all of the legal efforts undertaken on behalf of the Statis to resist the Republic's efforts to annul the Arbitration Award in the Swedish courts and to obtain recognition and enforcement of the fraudulent Arbitration Award in multiple jurisdictions, including in this Court.  These same attorneys also represented Mr. Lungu in his deposition.  These same attorneys knew, or reasonably should have known, about the Statis' fraud.

405.    The Statis' deceptions directly impinged on the integrity of the Court and its ability to function impartially.  This occurred when the Statis knowingly hindered the Court's fair adjudication of the case and the Republic's defense of the action.  This occurred first in the underlying Arbitration, then in the Swedish annulment proceedings, and then in the confirmation proceedings in this Court that resulted in the Judgment.

406.    This also occurred, initially, in the confirmation proceedings in England, Belgium, the Netherlands, and Luxembourg.  However, after the Republic discovered the full, existing evidence of the Statis' fraud schemes, and presented that evidence, the courts in those jurisdictions reversed course.  In Belgium and the Netherlands, the courts reversed the orders that initially confirmed the Arbitration Award and conclusively held that the Statis obtained the Arbitration Award by fraud and that the Award is therefore unenforceable as contra the public policy of those

jurisdictions. In England, the Arbitration Award is permanently unenforceable as a direct consequence of the Statis' fraud. In Luxembourg, the initial court orders confirming the Arbitration Award have been reversed, the Statis' further efforts to obtain recognition and enforcement of the Arbitration Award have been stayed pending the outcome in the criminal proceedings against the Statis and, in those proceedings, the Statis have now been criminally indicted.

407. The evidence of the Statis' fraudulent schemes is clear, convincing, and indisputable.

## PRAYER FOR RELIEF

408. WHEREFORE, the Republic requests that the Court enter judgment in its favor as follows:

     i.     relieving the Republic from the Judgment pursuant to Federal Rule of Civil Procedure 60(d)(1);

     ii.     setting aside the Judgment pursuant to Federal Rule of Civil Procedure 60(d)(3) for fraud on the Court;

     iii.     awarding the Republic its attorneys' fees and costs incurred in the proceedings in which the Judgment was entered;

     iv.     awarding the Republic its attorneys' fees and costs incurred in the instant action; and

     v.     awarding such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury as to all issues triable herein.

Dated: March 1, 2023                    Respectfully submitted,

<u>/s/ Matthew H. Kirtland</u>
Matthew H. Kirtland (D.C. Bar No. 456006)
Esha Kamboj (D.C. Bar No. 1643795)
NORTON ROSE FULBRIGHT US LLP
799 9th Street NW, Suite 1000
Washington, D.C.  20001-4501
Telephone: (202) 662-0200
Facsimile: (202) 662-4643
matthew.kirtland@nortonrosefulbright.com
esha.kamboj@nortonrosefulbright.com

*Attorneys for Plaintiff Republic of Kazakhstan*