# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| REPUBLIC OF KAZAKHSTAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:23-cv-00565 (APM) |
| | ) | |
| ANATOLIE STATI; GABRIEL STATI; | ) | |
| ASCOM GROUP, S.A.; TERRA RAF | ) | |
| TRANS TRAIDING LTD. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' MOTION TO DISMISS COMPLAINT

Defendants Anatolie Stati, Gabriel Stati, Ascom Group, S.A., and Terra Raf Trans Traiding Ltd., by their undersigned counsel, hereby move pursuant to Rule 12 of the Federal Rules of Civil Procedure, for dismissal of the action, with prejudice, on the grounds that Plaintiff cannot sustain an independent action under Rule 60(d)(1) or (3). The grounds for this motion are set forth in more detail in the memorandum of law and declaration submitted herewith. A proposed order is attached.

DATED:  July 12, 2023                     Respectfully submitted,

                                          By:  /s/ Edward H. Davis Jr.
                                          Edward H. Davis Jr.
                                          Fernando J. Menendez, Jr.
                                          Joseph B. Rome
                                          Leidy M. Morejon
                                          SEQUOR LAW
                                          1111 Brickell Drive, Suite 1250
                                          Miami, Florida 33131
                                          Tel: 305-372-8282
                                          edavis@sequorlaw.com
                                          fmenendez@sequorlaw.com
                                          jrome@sequorlaw.com
                                          lmorejon@sequorlaw.com
                                          *Pro Hac Vice Pending*

                                          By:  /s/ M. Zachary Bluestone
                                          M. Zachary Bluestone (D.C. Bar No. 994010)
                                          BLUESTONE, P.C.
                                          1717 K Street, Suite 900
                                          Washington D.C. 20006
                                          Tel: (202) 655-2250
                                          mzb@bluestonelaw.com

                                          *Attorneys for Defendants Anatolie Stati,
                                          Gabriel Stati, Ascom Group, S.A., and Terra Raf
                                          Trans Traiding Ltd.*

2

**<u>CERTIFICATE OF SERVICE</u>**

I, M. Zachary Bluestone, hereby certify that on July 12, 2023, I caused the foregoing

Motion to be electronically filed with the United States District Court for the District of Columbia

through the Court's ECF service, and which will send notice to all attorneys of record.

Executed this 12th day of July 2023 at Washington, D.C.


<u>     /s/ M. Zachary Bluestone     </u>

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

REPUBLIC OF KAZAKHSTAN,

       Plaintiff,

   v.

ANATOLIE STATI; GABRIEL STATI;
ASCOM GROUP, S.A.; TERRA RAF
TRANS TRAIDING LTD.,

       Defendants.

Case No. 1:23-cv-00565-APM

Judge Amit P. Mehta

## DEFENDANTS' MEMORANDUM OF LAW IN
## SUPPORT OF MOTION TO DISMISS

Edward H. Davis, Jr.
Fernando J. Menendez, Jr.
Joseph B. Rome
Leidy M. Morejon

SEQUOR LAW
1111 Brickell Drive, Suite 1250
Miami, Florida 33131
Tel: 305-372-8282
edavis@sequorlaw.com
fmenendez@sequorlaw.com
jrome@sequorlaw.com
lmorejon@sequorlaw.com
*Pro Hac Vice Pending*

*Attorneys for Defendants Anatolie
Stati, Gabriel Stati, Ascom Group, S.A.,
and Terra Raf Trans Traiding Ltd.*

M. Zachary Bluestone
(D.C. Bar No. 994010)

BLUESTONE, P.C.
1717 K Street, Suite 900
Washington D.C. 20006
Tel: (202) 655-2250
mzb@bluestonelaw.com

*Attorneys for Defendants Anatolie
Stati, Gabriel Stati, Ascom Group, S.A.,
and Terra Raf Trans Traiding Ltd.*

## **TABLE OF CONTENTS**

I.  PRELIMINARY STATEMENT ...................................................................................... 1

II.  STATEMENT OF FACTS ........................................................................................... 2

    A.  THE ARBITRATION .......................................................................................... 2

    B.  THE SWEDISH COURTS CONFIRM THE AWARD MULTIPLE TIMES ............................ 4

    C.  BELGIUM, THE NETHERLANDS, AND LUXEMBOURG (THE "BENELUX" COUNTRIES) 7

    D.  MULTIPLE LAWSUITS IN THE UNITED STATES ................................................... 12

    E.  THE INSTANT COMPLAINT REPEATS THE SAME ALLEGATIONS THAT KAZAKHSTAN HAS MADE FOR YEARS ................................................................................... 15

III.  ARGUMENT ......................................................................................................... 16

    A.  KAZAKHSTAN FAILS TO MEET THE REQUIREMENTS FOR RELIEF UNDER RULE 60(D)(1) ....................................................................................................... 16

        i.  Kazakhstan fails clearly and convincingly to allege why the judgment should not be enforced "in equity and good conscience." ....................... 18

        ii.  Kazakhstan fails to clearly and convincingly allege any defense to confirmation of the Award that it was prevented from making ............... 21

        iii.  Even if Kazakhstan had any "newly discovered evidence," which it does not, it fails to clearly and convincingly show that it acted diligently to obtain that evidence. ................................................................... 26

        iv.  Kazakhstan's delay waived its remedy at law, and its claims are now barred by laches. .......................................................................... 34

        v.  Not only are the foreign court orders Kazakhstan presents entitled to no weight, but the Swedish judgments upholding the award are entitled to special weight as emanating from the Arbitral Seat. ................................ 35

        vi.  Kazakhstan's allegations of intrinsic fraud cannot support an action under Rule 60(d)(1) .............................................................................. 38

        vii.  Kazakhstan's collateral attack on the judgment is barred by res judicata and issue preclusion. ...................................................................... 39

    B.  KAZAKHSTAN FAILS TO MEET THE REQUIREMENTS FOR RELIEF UNDER RULE 60(D)(3) ....................................................................................................... 41

        i.  Kazakhstan fails to allege an "egregious" fraud on the court, let alone provide clear and convincing evidence of such a fraud. ......................... 42

        ii.  Kazakhstan fails to show that the Stati Parties acted with any intent to commit fraud on this court. ............................................................... 44

        iii.  Kazakhstan has already tried and failed to present this exact same argument in other contexts. ............................................................... 45

IV.  CONCLUSION ....................................................................................................... 45

# TABLE OF AUTHORITIES

## CASES

*Apotex, Inc. v. Food & Drug Admin.*,
393 F.3d 210 (D.C.Cir.2004) ................................................................ 39

*ARMA, S.R.O. v. BAE Sys. Overseas, Inc.*,
961 F.Supp.2d 245 (D.D.C. 2013) ......................................................... 20

*Baltia Air Lines, Inc. v. Transaction Mgmt., Inc.*,
98 F.3d 640 (D.C. Cir. 1996) ................................................... 41, 43, 44

*\*United States v. Beggerly*, 524 U.S. 38, 45 (1998) ............................... 32, 41

*Bowie v. Maddox*,
677 F. Supp. 2d 276 (D.D.C. 2010) ................................................. 32, 41

*Brannock Assocs., Inc. v. Capitol*,
801 Corp., 807 F.Supp. 127 (D.D.C.1992) ............................................ 39

*Brodie v. U.S. Dep't of Health & Hum. Servs.*, No. 13-5227,
2014 WL 211222 (D.C. Cir. Jan. 10, 2014) ..................................... 16, 17

*Bryson v. Gere*,
268 F.Supp.2d 46 (D.D.C. 2003) ........................................................... 42

*Canady v. Erbe Elektromedizin Gmbh*,
99 F. Supp. 2d 37(D.D.C. March 31, 2000) .......................................... 27

*Censke v. United States*,
314 F.R.D. 609 (N.D. Ill. 2016) ............................................................ 30

*Davis v. U.S. Dep't of Health & Hum. Servs.*,
968 F. Supp. 2d 176 (D.D.C. 2013) ....................................................... 43

*Dowdy v. Hawfield*,
189 F.2d 637 (D.C. Cir. 1951) .............................................................. 38

*Duse v. Int'l Bus. Machs. Corp.*,
75 F. App'x 44 (2d Cir. 2003) ..................................................... 21, 23, 24

*Edwards v. Best Buy Co.*, No. CV 19-3316 (EGS),
2021 WL 4399562 (D.D.C. Sept. 27, 2021) .......................................... 18

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*,
40 F.4th 56 (2d Cir. 2022) .................................................................... 36

*Fleming v. Medicare Freedom of Info. Grp.* No. 15-1135,
    2023 WL 4295519 (D.D.C. June 30, 2023) ........................................................... 17

*Frankel v. ICD Holdings S.A.*,
    939 F. Supp. 1124 (S.D. N.Y. 1996) .................................................................... 27

\*Galatolo v. United States,
    394 Fed. Appx. 670 (11th Cir. 2010) .................................................................. 18

*Galen Hosp. Alaska, Inc. v. Azar*,
    474 F. Supp. 3d 214 (D.D.C. 2020) .................................................................... 40

*Goland v. Cent. Intel. Agency*,
    607 F. 2d 339 (D.C. Cir. 1978) ........................................................................... 17

*Gucci Am., Inc. v. Weixing Li*, No. 10 Civ. 4974,
    2012 WL 1883352 (S.D.N.Y. May 18, 2012) ............................................... 30, 31

*Hardison v. Alexander*,
    655 F.2d 1281 (D.C.Cir.1981) ........................................................................... 39

*In re Salas*, No. CV 20-3091 (FYP),
    2022 WL 1154596 (D.D.C. Apr. 19, 2022) .................................................. 29, 30

*Johnson Waste Materials v. Marshall*,
    611 F.2d 593 (5th Cir. 1980) ............................................................................. 16

*Jordan v. United States Dep't of Lab.*, No. 19-5201,
    2020 WL 283003 (D.C. Cir. 2020) .............................................................. 41, 42

\*Kaz. v. Stati, Case No. 1:17-cv-02067-ABJ,
    380 F. Supp. 3d 55 (D.D.C. 2019) ...................................................................... 13

*Kettey v. Saudi Ministry of Educ.*,
    53 F. Supp. 3d 40 (D.D.C. 2014) ........................................................................ 18

\*Klayman v. Jud. Watch, Inc., No. 19-CV-2604 (TSC),
    2021 WL 602900 (D.D.C. Feb. 16, 2021) ..................................................... 17, 35

*Kotlicky v. U.S. Fid. & Guar. Co.*,
    817 F. 2d 6 (2d Cir. 1987) .................................................................................. 17

*Kuenzel v. Allen*,
    880 F. Supp. 2d 1205 (N.D. Ala. 2011) .............................................................. 32

*Kupferman v. Consolidated Research & Mfg. Corp.*,
    459 F.2d 1072 (2d Cir. 1972) ............................................................................. 44

*Kurzweil v. Philip Morris Cos., Inc.*, Nos. 94 Civ. 2373 (MBM), 94 Civ. 2546 (MBM), 1997
    WL 167043 (S.D.N.Y. Apr. 9, 1997) ........................................................................ 30

*Lee v. Marvel Enterprises, Inc.*,
    765 F. Supp. 2d 440 (S.D. N.Y. 2011 ...................................................................... 42

*Liberty Mut. Ins. Co. v. FAG Bearings Corp.*,
    153 F.3d 919 (8th Cir. 1998) ........................................................................... 28, 29

*\*LinkCo, Inc. v. Akikusa*,
    615 F. Supp. 2d 130 (S.D.N.Y. 2009) ....................................................................... 35

*Lockwood v. Bowles*,
    46 F.R.D. 625 (D.D.C 1969)............................................................................... 38

*Lucas v. D.C.*, No. CV 13-00143 (TFH),
    2023 WL 2072440 (D.D.C. Feb. 17, 2023) ............................................................... 35

*Metzler Investment Gmbh v. Chipotle Mexican Grill, Inc.*,
    970 F.3d 133 (2d Cir. 2020) ................................................................................ 28

*Odeon Cap. Grp. LLC v. Ackerman*,
    864 F.3d 191 (2d Cir. 2017) ................................................................................ 20

*Owen–Williams v. BB & T Inv. Servs., Inc.*,
    717 F.Supp.2d (D.D.C. 2010) .............................................................................. 41

*Pigford v. Johanns*,
    421 F.Supp.2d 130 (D.D.C. 2006)........................................................................... 42

*Questrom v. Federated Dep't Stores, Inc.*,
    192 F.R.D. 128 (S.D.N.Y. 2000) ............................................................................ 27

*\*Rep. of Kazakhstan v. Chapman*,
    76 Misc. 3d 948 (N.Y. Sup. Ct. 2022) ...................................................................... 14

*\*Rep. of Kaz. v. Chapman*, No. 2022-04277,
    2023 WL 3958317 (N.Y. App. Div. June 13, 2023).......................................................... 2, 14

*\*Rep. of Kazakhstan, Ministry of Just. v. Stati*,
    801 F. App'x 780 (D.C. Cir. 2020) ......................................................................... 14

*\*Republic of Kazakhstan v. Stati*,
    380 F. Supp. 3d 55 (D.D.C. 2019) .......................................................................... 44

*\*Rep. of Kaz. v. Stati*,
    205 L. Ed. 2d 219 (2019)................................................................................... 13

*Rimi v. Obama,*
   60 F. Supp. 3d 52 (D.D.C. 2014)............................................................................. 17, 19

*S. v. Estate of Stonehill,*
   660 F.3d 415 (9th Cir. 2011) ............................................................................................ 42

*Salini Costruttori S.p.A. v. Kingdom of Morocco,*
   233 F. Supp. 3d 190 (D.D.C. 2017)................................................................................ 36, 38

*Sieverding v. Am. Bar Ass'n,*
   439 F. Supp. 2d 111 (D.D.C. 2006)................................................................................ 39, 40

*\*Stati v. Rep. of Kaz.,*
   302 F. Supp. 3d 187 (D.D.C. 2018) ........................................................................... passim

*\*Stati v. Rep. of Kaz.,*
   773 F. App'x 627 (D.C. Cir. 2019)................................................................................... 12

*\*TermoRio S.A. E.S.P. v. Electranta S.P.,*
   487 F.3d 928 (D.C. Cir. 2007)........................................................................................ 36

*Travelers Indem. Co. v. Gore,*
   761 F.2d 1549 (11th Cir. 1985) ...................................................................................... 39

*United States v. Int'l Bhd. of Teamsters,*
   247 F.3d 370 (2d Cir. 2001) .................................................................................... 31, 32

*United States v. Sierra Pacific Industries, Inc.,*
   862 F.3d 1157 (9th Cir. 2017) ....................................................................................... 45

*Weese v. Schukman,*
   98 F.3d 542 (10th Cir. 1996) ......................................................................................... 45

*Weldon v. United States,*
   70 F.3d 1 (2d Cir. 1995) ................................................................................................. 39

*Wilson v. Upjohn Co.,*
   808 F. Supp. 1321 (S.D. Ohio 1992) .............................................................................. 27

**RULES**

Fed. R. Civ. P. 9 .................................................................................................................. 18

Fed. R. Civ. P. 12 ............................................................................................................ 1, 12

Fed. R. Civ. P. 60 ........................................................................................................ passim

Defendants Anatolie Stati, Gabriel Stati, Ascom Group, S.A., and Terra Raf Trading Ltd. (collectively, the "Stati Parties") respectfully file this motion to dismiss Plaintiff Republic of Kazakhstan's ("Kazakhstan") Complaint ("Complaint") under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## I.     PRELIMINARY STATEMENT

Setting aside its own misrepresentations and omissions, Kazakhstan's Complaint fails to allege the clear and convincing evidence of fraud or fraud on the court required to sustain an independent action under Rule 60(d)(1) or (3). Far from alerting the Court to newly discovered evidence, the Complaint merely rehashes over 10 years of accumulated allegations that this Court has already considered and dismissed.

Kazakhstan now brings this untimely Complaint not because it actually has any "newly discovered evidence," but as an improper attempt to leverage a pair of favorable rulings in secondary jurisdictions. These rulings do not provide grounds for relief under heightened pleading standards of the Rule 60. Nevertheless, Kazakhstan attempts to parlay those rulings into yet another bite at the apple to avoid paying the judgment against it in the U.S. These rulings are not new evidence, do not overrule the clear decisions against Kazakhstan here or in Sweden, the arbitral seat, and remain under appeal in their own jurisdictions. Kazakhstan admits in the Complaint that it uncovered the so-called "newly discovered evidence" that forms the basis for this action years ago; in fact, it has already adduced that evidence in various forums. Despite Kazakhstan's bombastic language, its allegations of indirect fraud scarcely approach the sort of egregious conduct legally required to sustain an independent action under Rule 60(d).

The words of a recent holding from a New York appellate court, addressing precisely the same "new evidence" in furtherance of Kazakhstan's claims against third-parties, apply equally well to the Complaint:

> [Kazakhstan] has litigated the fraud alleged herein before Swedish arbitrators, the Swedish (Svea) Court of Appeal, and the District Court for the District of Columbia, which enforced the arbitral award under the Federal Arbitration Act. Plaintiff's purportedly 'new' evidence thus relates to this same fraud claim plaintiff has been pursuing for over a decade.

*Rep. of Kaz. v. Chapman*, No. 2022-04277, 2023 WL 3958317 (N.Y. App. Div. June 13, 2023).

In sum, the instant Complaint fails to allege the existence of new evidence of fraud sufficiently clear and convincing to support a claim under Rule 60(d)(1) or (3), and is simply the latest in series of collateral attacks on a confirmed arbitral award. For these and the other reasons set forth below, the Complaint should be dismissed with prejudice.

## II.   STATEMENT OF FACTS

Kazakhstan's Complaint alleges only two counts, both of which rely on lengthy and digressive factual allegations. Not only do these allegations fail to meet the heightened pleading standard under Rule 60(d), they are also replete with mischaracterizations, false inferences, exaggerations, and the occasional outright falsity. Because Kazakhstan has an enhanced burden to present more than mere *prima facie* allegations when demanding relief in an independent action under Rule 60(d), a brief recitation of facts is warranted. *See infra*, ¶¶ 17-19 (discussing burden).

### A.   THE ARBITRATION

The Stati Parties, with support from U.S. investors, acquired and developed various oil and gas interests in Kazakhstan from 1999 until the government of Kazakhstan wrongfully expropriated those assets in July 2010. **Exhibit 01**, Decl. of Robert Bedford, July 12, 2023. (describing the considerable investments in the development of oil and gas fields at Borankol and Tolkyn, as well as exploration activities at Tabyl").

On July 26, 2010, the Stati Parties filed a request for arbitration under the Energy Charter Treaty before the Stockholm Chamber of Commerce (the "Arbitral Tribunal"). After more than three years of litigation, including discovery, on December 19, 2013, the Arbitral Tribunal awarded

the Stati Parties US$497,685,101 in compensation for violations of Kazakhstan's treaty obligation to provide fair and equitable treatment to foreign investors (the "Award"). *See* **Exhibit 02**, Award, Dec. 19, 2013; *see also Stati v. Rep. of Kaz.*, 302 F. Supp. 3d 187 (D.D.C. 2018) ("Confirmation Order") (summarizing procedural history and confirming award).

The Arbitral Tribunal concluded that the Stati Parties and their Kazakh operations had been subjected to a "string of measures of a coordinated harassment by various institutions of [Kazakhstan]." Ex. 2, Award ¶¶ 1086, 1095. It held that Kazakhstan's actions unlawfully challenged title to their investments, subjected them to millions of dollars in unwarranted tax assessments, harassed them through a vast number of onerous and tactical inspections and audits, levied baseless criminal penalties, and engaged in aggressive criminal prosecutions of the Stati Parties' employees in Kazakhstan, all culminating in the seizure of their valuable assets. *Id.* ¶¶ 1092-5, 1532-4, 1798-1801.[1]

The Award included compensation for distinct expropriated properties: $277.8 million for the Borankol and Tolkyn oil and gas fields, $31.3 million for the subsoil use, $199 million for an unfinished liquefied petroleum gas ("LPG") plant, and $8,975,496.40 in legal costs. Ex. 2, Award ¶¶ 1085-95, 1856-61, 1885.

Crucially, the Award expressly considers Kazakhstan's present claim that the Stati Parties had committed financial fraud that inflated the valuation of the expropriated LPG plant. Ex. 2, Award ¶ 1450, *et seq*. Rather than parse the extent to which the fraud allegations affected the construction costs of the under-construction LPG plant, the Award disclaims reliance on either

---

[1] Kazakhstan's suggestion in the Complaint that the Stati Parties brought the arbitration "to further cover-up [their] embezzlement" makes no sense considering that the arbitration was commenced on July 26, 2010, less than a week after the physical expropriation of the Stati Parties' assets by Kazakh officials on July 21-22, 2010. Compl. ¶ 8; Ex. 2, Award ¶¶ 613-19.

party's proposed valuation methodology and instead determines the quantum of damages by its own method, *i.e.*, using the various contemporaneous third-party bids for the LPG plant as reference guides. *Id.* ¶ 1746. No doubt as a signal that the Arbitral Tribunal felt that the equities were against Kazakhstan, the final damages amount as to that single aspect of the arbitral award, US$199 million, matched the indicative bid made by KMG, a Kazakhstan state-owned entity, for the LPG Plant. *Id.* In addition, the Arbitral Tribunal rejected various other arguments by Kazakhstan that the loss and damage suffered by the Stati Parties was self-inflicted and that they had abandoned their investments, including by asset-stripping their Kazakh companies. Ex. 2, Award, ¶¶ 1415-6, 1453-8, 1540, 1618, 1621.[2]

### B.    THE SWEDISH COURTS CONFIRM THE AWARD MULTIPLE TIMES

Kazakhstan challenged the validity of the Award in the Swedish courts. On December 9, 2016, the Svea Court of Appeal (seated in Stockholm, Sweden) issued its decision rejecting Kazakhstan's effort to vacate the Award, including substantially the same fraud allegations that Kazakhstan alleges in the Complaint. Ex. 1, Bedford Decl, Ex. A, Judgment (Svea Court of Appeal, Dec. 9, 2016) (English translation). Among other arguments, Kazakhstan presented two theories of fraud, both now repeated in the Complaint. First, it argued that the Award was tainted by fraud that took place prior to the start of the arbitration. *Id.* at 9-10, § 3.1.2.1. It alleged that representatives for the Stati Parties presented financial statements that failed to properly disclose that transactions with Perkwood were related company transactions, thus falsely inflating the amounts invested in the LPG. *Id.* Second, Kazakhstan alleged that the Stati Parties had submitted this false evidence on the value of the LPG plant in the form of sworn testimony and expert reports

---

[2] On January 17, 2014, the Arbitral Tribunal issued a correction to the Award that did not change the substance above. Rectified Award, June 30, 2017, attached as **Exhibit 3** (adding certain administrative costs).

during the arbitration. *Id.* at 12-14, § 3.1.2.1. According to Kazakhstan, because the Arbitral Tribunal relied on the US$199 million indicative bid from the KazMunaiGas National Company ("KMG") to anchor the valuation of the LPG plant, a bid that in turn was partially based on the false financial reports, the Award was procured by fraud. *Id.*

Following a review of the full record over 13 days of hearings with multiple expert and fact witnesses, the Svea Court of Appeal rejected all of Kazakhstan's contentions Ex. 1, Bedford Decl, Ex. A, Judgment, at 44-46, § 5.3.1. In particular, it found that it was not sufficiently clear that the alleged fraud, even if true, would have changed the outcome of the Award. *Id.* Moreover, the Svea Court of Appeal concluded that because the KMG indicative bid was made "prior to the initiation of the arbitration," the bid did not constitute "*per se*" false evidence, even if "possibly incorrect information regarding the amount invested in the LPG plant was among the factors that KMG took into account when calculating the size of its offer." *Id.* at 46. It concluded that the allegedly false financial statements "did not directly constitute any basis for the arbitral tribunal's assessment of the value of the LPG plant." *Id.* In other words, Kazakhstan's fraud allegations both failed to amount to fraud and were too indirect to warrant annulment of the Award.

On October 24, 2017, the Supreme Court of Sweden denied Kazakhstan's petition to quash the Svea Court of Appeal's December 9, 2016 decision. Ex. 1, Bedford, Decl., Ex B, Decision (Supreme Court of Sweden, Oct. 24, 2017) (English translation).

On November 25, 2019, Kazakhstan submitted a new application to the Svea Court of Appeal to annul the Award based on newly discovered evidence, namely the same Lungu deposition transcript, KPMG withdrawal letter, and KPMG correspondence on which Kazakhstan now relies in this case. Ex. 1, Bedford Decl., Ex. C, Statement of Claim, ¶¶ 7, 84(b), 84(d), 184-94, 334 (Nov. 25, 2019) (English translation) (referring to exhibits K-44, K-76, K-77). Kazakhstan

also relied on documents from Rietumu Bank in Latvia that appear to be the same that Kazakhstan now presents as "newly discovered." *Id.* ¶ 8, 23, 45, 82(c), 106, 121, 197, 449.

On March 9, 2020, the Svea Court of Appeal denied Kazakhstan's renewed claims. Ex. 1, Bedford Decl., Ex. D, Minutes (Svea Court of Appeal, Jan. 31, 2020, rendered Mar. 9, 2020) (English translation). The three-judge panel held that the fraud challenge was "identical" to that pursued in the previous annulment application and that "the information provided by Kazakhstan shows that the action is based on circumstances which could have been relied on in the previous case." *Id.* at 4.

Kazakhstan promptly appealed to the Swedish Supreme Court, again presenting the same "new evidence" Kazakhstan now cites in the instant Complaint. *See* Ex. 1, Bedford Decl., Ex. E, Application for Cancellation, at 20-33, § F (Apr. 3, 2020) (English translation) (specifying as "new evidence" the Lungu deposition transcript, the KPMG withdrawal letter, and the KPMG correspondence). On May 18, 2020, the Swedish Supreme Court refused Kazakhstan's petition for a new trial. Ex. 1, Bedford Decl., Ex. F, Decision (Supreme Court of Sweden, May 18, 2020) (English translation). The three-judge panel reviewing the application found "Kazakhstan has not shown any facts that can give rise to review of the case." *Id.* at 2.

Relying on the proceedings just described, the Swedish Enforcement Agency, a government agency, seized certain securities with an approximate value of $70 million located in Sweden as partial fulfilment of the Award. Ex. 1, Bedford Decl. at 15. Kazakhstan and the National Bank of Kazakhstan ("NBK") appealed the seizure orders in part because, they argued, these securities belonged to NBK and not Kazakhstan, the securities were not located in Sweden, and the securities were protected from execution by sovereign immunity. Ex. 1, Bedford Decl., Ex. G, Decision (Svea Court of Appeal, Jun. 17, 2020) (English translation). On July 5, 2019, the Nacka

District Court ruled against Kazakhstan and NBK on all counts, but, on June 17, 2020, the Svea Court of Appeal reversed the decision on sovereign immunity grounds, ordering that the seizure be lifted on that basis only. *Id.* at 27-28 (declining "to review whether there is any bar to the attachments on either of the other grounds").

On November 18, 2021, the Supreme Court of Sweden held that the property at issue was not immune from enforcement and remanded the case to the Svea Court of Appeal. Ex. 1, Bedford Decl., Ex. H, Decision (Supreme Court of Sweden, Nov. 18, 2021) (English translation).

On January 16, 2023, the Svea Court of Appeal issued a new decision denying all of Kazakhstan's and NBK's arguments and granting enforcement against the seized securities. Ex. 1, Bedford Decl., Ex. I, Final Decision (Svea Court of Appeal, Jan. 16, 2023) (English translation). The Svea Court of Appeal considered, once again, Kazakhstan's latest claims of fraud. *Id.* at 10. Kazakhstan argued that the seizures were against public policy because they related to enforcement of an award tainted by fraud, and pointed to a decision from Belgium in its favor. *Id.* The Svea Court of Appeal disagreed, holding: "The circumstances referenced by Kazakhstan and the National Bank in this respect are the same as those examined in the earlier challenge and annulment cases. There is no reason to make a different assessment now." *Id.* at 10 ("The fact that courts in other countries may have reached a different conclusion does not impact the said assessment.").

On June 14, 2023, a three-judge panel of the Supreme Court of Sweden denied Kazakhstan's and NBK's application for leave to appeal. Ex. 1, Bedford Decl., Ex. J, Decision (Supreme Court of Sweden, Jun. 14, 2023) (English translation).

## C.   BELGIUM, THE NETHERLANDS, AND LUXEMBOURG (THE "BENELUX" COUNTRIES)

On November 16, 2021, after several years of litigation over the confirmation and execution of the Award in Belgium, the Brussels Court of Appeal issued a poorly-reasoned opinion

refusing to confirm the Award in Belgium based on the theory that, by failing to disclose to the Arbitral Tribunal that a supplier to the LPG plant was a related party, the Stati Parties somehow committed fraud on the tribunal. *See* Compl., Ex. A ("Brussels Ruling").

In addition to making several factual errors and false assumptions about whether the omission was purposeful or knowing—and not contesting, calling into doubt, or even addressing any of the larger facts surrounding Kazakhstan's unlawful expropriation itself—the Belgian appellate court made new factual findings differing from the lower court's and interpreted Belgian law as refusing to recognize an arbitral award where any hint of fraud influenced the outcome of an award, no matter how indirectly. Compl., Ex. A. The Complaint's reference to "in-person hearings" is deceptive to the extent that the Court of Appeal heard any submission in person other than arguments of counsel—the court did not subject any witnesses or experts to oral questioning. Compl. ¶¶ 63-64; Ex. 1, Bedford Decl. ¶ 6.[3] In short, the Brussels court applied a less rigorous evidentiary procedure than might be expected given its sweeping factual findings, and certainly less rigorous than the comparable proceedings in Sweden in 2016 (which included multiple witnesses and experts cross-examined over 13 days).

The Brussels Ruling is currently on appeal at the Belgian Court of Cassation, Belgium's highest court, which reviews questions of law and does not accept new evidence.[4] Ex. 1, Bedford Decl. ¶ 6.

---

[3] There is reason to believe that even the seven hours of total hearing time were insufficient to properly review the combined approximately 1307 pages of briefing and 25,000 pages of exhibits. Ex. 1, Bedford Decl. ¶ 6.

[4] Kazakhstan asserts that the Stati Parties "have not challenged any of the Belgium Court of Appeal's factual findings of fraud," but this is misleading because the Court of Cassation does not reconsider a lower court's evidentiary findings. Ex. 1, Bedford Decl., ¶ 6. The Stati Parties vigorously argue that the Court of Appeal erred because its factual findings do not create a presumption of fraud under Belgian law. *Id.*

Kazakhstan and NBK have also filed a new lawsuit in Belgium essentially for wrongful attachment of US$530 million (previously US$22 billion) in Kazakh assets that the Stati Parties were able to freeze there in execution proceedings, attachment that was lifted in Belgium in late 2021 as a result of the Brussels Ruling. *Id.* Kazakhstan makes no argument as to how these wrongful attachment proceedings relate to the counts in its Complaint.

Kazakhstan and NBK then attempted to attach the funds that the Stati Parties had seized in Sweden as a means of enforcing its claims in Belgium pre-judgment. Ex. 1, Bedford Decl., Ex. K, Minutes (Nacka District Court, Jun. 30, 2023) (English translation). The Nacka District Court in Sweden disagreed with Kazakhstan and dissolved the attachment. *Id.* at 5-6.

On January 9, 2023, after years of similar of litigation over the confirmation and execution of the Award in the Netherlands, the Amsterdam District Court issued a ruling denying confirmation of the Award under Dutch law ("Amsterdam Ruling").[5] Compl. ¶ 82; Compl., Ex. B. As in Brussels, the Amsterdam District Court reached its factual conclusion after document submissions and argument from counsel, and it expressly relied on the Brussels Ruling for support. *Id*. The Amsterdam court did not subject any witnesses or experts to oral questioning and held a one day, 8-hour hearing. Compl. ¶¶ 90-94.

Strikingly, despite Kazakhstan's specific allegations, the Amsterdam Ruling did not make any findings as to money laundering. *Compare* Compl. ¶ 82 *with* Compl. Ex. B (no mention of money laundering, but noting that "Stati et al. continuously pointed out that the arbitral tribunal held that Kazakhstan acted unlawfully to a serious degree and that Stati et al. is therefore entitled to compensation. That is correct in and of itself.").

---

[5] Kazakhstan admits that the Dutch Supreme Court vacated and remanded the first decision confirming the Award in the Netherlands on purely procedural grounds. Compl. ¶ 89.

On March 8, 2023, the Stati Parties appealed the Amsterdam Ruling on various grounds, including that the judge in that proceeding failed to properly review thousands of pages in the case file in accordance with the instructions of the Dutch Supreme Court on remand. Ex. 1, Bedford Decl. ¶ 7 (noting appellate hearing scheduled for December 2023).

In Luxembourg, the Stati Parties filed confirmation proceedings and obtained an interim attachment order over Kazakhstan's significant holding in a commodities corporation, Eurasian Resources Group. Ex. 1, Bedford Decl. ¶ 12. In May 2019, Kazakhstan filed a criminal complaint with civil action (a "*plaintes avec constitution de partie civile*") in Luxembourg. *Id.* Under Luxembourgish law, the filing obligates a judge to start an investigation. *Id.* Although Kazakhstan translates the name of this procedure as "indictment." Compl. ¶¶ 13, 105-112 ("*l'inculpation*"), the standard is far lower than that of an indictment in U.S. criminal law. *Id.*

The exact nature of the indictment is covered by a strict criminal privilege under Luxembourgish law, which is why Kazakhstan alleges no details about the cases other than to give a procedural overview. Compl. ¶¶ 105-117.[6] This strict privilege also creates a perverse incentive. Indictment does not mean that the case will ever be brought before a criminal court, and the investigating judge does not have the power to refer the case to a trial judge. *Id.* The public prosecutor (*Chambre du Conseil*) has the sole right to dismiss the complaint or to proceed to trial, and it makes this decision independently of the investigative judge's decision to indict. *Id.* Because suspects could be barred from participating in the investigation by criminal privilege, investigating judges in Luxembourg are incentivized to issue indictments in nearly all investigations in order to ensure that suspects have a right to receive a copy of the criminal file and to ask for their own

---

[6] Kazakhstan also makes up a "serious and corroborating evidence of guilt" standard, which is not a phrase used in the Luxembourg criminal code. Compl. ¶ 112; Ex. 1, Bedford Decl. ¶ 11.

investigative measures. *Id.* This unfortunate perverse incentive gives Kazakhstan its "talking point" about an indictment when in truth this case is not likely ever to progress beyond its current stage. *Id.*

Unlike the criminal proceedings, there is no privilege preventing the parties from discussing the civil court rulings in Luxembourg, and it is telling that Kazakhstan fails to do so. On February 11, 2021, the Luxembourg Court of Cassation set aside and annulled a Court of Appeal judgment that had previously held that "the fact that KPMG withdrew its reports . . . are not of such a nature as to constitute fraud vitiating the very basis of the [Stati Parties'] investment in Kazakhstan." Ex. 1, Bedford Decl. ¶ 12. The Court of Cassation ruled that the lower court had failed to properly consider the new exhibits presented by Kazakhstan, *i.e.*, the 2019 KPMG Letter, because it had failed to give the Stati Parties sufficient time to respond to the KPMG letters. *Id.* From the point of view of the United States, an adversarial system, it may seem odd for a court to overturn a decision because the *prevailing party* was denied a right, and Kazakhstan clearly appears to take advantage of that ambiguity to try and raise a cloud of suspicion that does not exist. Compl. ¶ 116.

On December 2, 2021, the Luxembourg Court of Appeal determined that the confirmation and criminal cases were factually interrelated, and so made a routine case management decision to stay the pending Award confirmation and enforcement cases in order to keep it on track with the criminal proceedings. Ex. 1, Bedford Decl. ¶ 13.

Accordingly, despite Kazakhstan's attempts to imply otherwise, there have been no factual findings as to Kazakhstan's fraud allegations by any court in Luxembourg (civil or criminal). Ex. 1, Bedford Decl. ¶ 10.

### D.    MULTIPLE LAWSUITS IN THE UNITED STATES

On September 30, 2014, the Stati Parties filed for recognition of the Award in this Court under the Federal Arbitration Act ("FAA"). *See Confirmation Order*, 302 F. Supp. 3d at 193 (summarizing history). Kazakhstan initially opposed confirmation on procedural grounds*. Id.* On April 5, 2016, Kazakhstan moved for leave to submit additional defenses to enforcement, namely that it had discovered "new evidence" of fraud by the Stati Parties. *Id.* at 193. Kazakhstan's fraud theory was essentially an early version of what it now alleges in the instant Complaint, *i.e.*, that the Stati Parties had lied about certain financial statements with the result of increasing the quantum of damages awarded for the expropriation of the LPG plant. *Id.* at 193-94. Judge Jackson denied the motion for leave in part because, on reviewing the merits of the motion, the fraud allegations were not material to the Award. *Id.* at 194.

Kazakhstan filed a motion for reconsideration of the denial of its motion for leave to amend. *Id.* at 194. Because the parties agreed that the fraud issue was being litigated before the Swedish courts, Judge Jackson granted a stay of the proceedings. *Id.*

After both the Svea Court of Appeal and the Supreme Court of Sweden denied Kazakhstan's fraud claims, Judge Jackson dissolved the stay and ordered fresh briefing. *Id.* at 199. Judge Jackson's denied was that Kazakhstan's motion for reconsideration not only because it improperly alleged new facts that had not been included in the underlying motion, but also because, among other things, reconsideration was not required by justice. *Id.* at 198.

Kazakhstan appealed this ruling, and, on April 19, 2019, the D.C. Circuit affirmed. *Stati v. Rep. of Kaz.*, 773 F. App'x 627 (D.C. Cir. 2019). After the D.C. Circuit entered its mandate, Judge Jackson entered final judgment in the amount of US$506,660,597.40 plus interest. Case No. 1:14-cv-01638-ABJ-ZMF, Doc. No. 112 (Judgment Jul. 16, 2019). It is this judgment that Kazakhstan presumably now seeks to avoid. Compl. ¶ 1.

On October 15, 2019, the Supreme Court denied Kazakhstan's petition for writ of certiorari. *Rep. of Kaz. v. Stati*, 205 L. Ed. 2d 219, 140 S. Ct. 381 (2019).

In the meantime, Kazakhstan filed a new lawsuit against the Stati Parties alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and the common law torts of fraud and civil conspiracy. *See Kaz. v. Stati*, Case No. 1:17-cv-02067-ABJ, 380 F. Supp. 3d 55, 65 (D.D.C. 2019) ("DC RICO Case"). Kazakhstan made the same fraud allegations that it had made elsewhere, but further argued that these purported fraud schemes also amounted to a pattern of racketeering activity involving mail fraud, wire fraud, and money laundering. *Id.* (describing the same alleged fraud scheme currently alleged in the instant Complaint); *cf.* Compl. ¶ 8.

On March 30, 2019, Judge Jackson granted the Stati Parties' motion to dismiss the RICO counts and declined to exercise supplemental jurisdiction over the state law claims. *DC RICO Case*, 380 F. Supp. 3d at 61. Judge Jackson held both that:

> the alleged RICO claims were entirely predicated on defendants' initiation and prosecution of non-frivolous litigation, and plaintiff's alleged domestic injuries consist of the legal costs it incurred in resisting the enforcement of a valid and binding arbitral award, [and also that] Courts do not allow allegedly fraudulent 'litigation activities,' such as filing fraudulent documents or engaging in baseless litigation to serve as predicate acts for RICO . . . where such acts constitute the only allegedly fraudulent conduct."

*Id.* The Court further held that Kazakhstan "failed to allege facts to support a conclusion that defendants engaged in the RICO predicate crime of money laundering." *Id.* at 63, n.6.[7]

---

[7] Judge Jackson also noted: "At bottom, this suit is yet another attempt to relitigate the underlying arbitral award. Whatever fraud Kazakhstan contends occurred before and during the SCC arbitration more than eight years ago, it had a full opportunity to raise those issues in the appeals process in Sweden and its allegations were rejected. Kazakhstan tried again in the numerous subsequent proceedings where it has resisted the enforcement of the arbitral award on the same grounds." *DC RICO Case*, 380 F. Supp. 3d at 64–65.

The D.C. Court of Appeals affirmed the dismissal, and denied *en banc* rehearing. *Rep. of Kaz., Min. of Just. v. Stati*, 801 F. App'x 780 (D.C. Cir. 2020).

On June 16, 2020, forgoing filing a motion under Rule 60 in either case in this District, Kazakhstan filed a new action in New York State Supreme Court, New York County, in which it accused U.S. based creditor Argentem Creek Partners and its CEO, Daniel Chapman, of aiding and abetting fraud by funding in part the Stati Parties' efforts to recover on their arbitral Award. *Rep. of Kaz. v. Chapman*, 76 Misc. 3d 948, 173 N.Y.S.3d 875 (N.Y. Sup. Ct. 2022).

On August 29, 2022, the New York court granted defendants' motion to dismiss. It held: "This action is predicated on an impermissible collateral attack of a confirmed arbitration award. Simply put, there can be no action for aiding and abetting fraud without an underlying fraud. The lawsuit against these defendants who funded the enforcement proceedings of the arbitration award therefore fails as a matter of law." *Rep. of Kaz. v. Chapman*, 76 Misc. 3d 948, 949, 173 N.Y.S.3d 875 (N.Y. Sup. Ct. 2022) (internal citations omitted). It further found:

> "The arbitration award was obtained by the court in Sweden and it is that court that has the charge of setting aside the arbitration award based on fraud, not this one. Arguments that the award was obtained by fraud were indeed considered and rejected by the court in Sweden and the District Court of the District of Columbia. The findings of the DC court are entitled to full faith and credit. It is wholly irrelevant that the plaintiff was able to convince a court in Belgium to indicate that the award was obtained by fraud and refuse to recognize it there."

*Id.* (internal citations omitted).

The Supreme Court of the State of New York, Appellate Division, First Judicial Department, affirmed the dismissal. *Rep. of Kazakhstan v. Chapman*, No. 2022-04277, 2023 WL 3958317 (N.Y. App. Div. June 13, 2023). Among other things, it held that "the doctrine of collateral estoppel bars this action" because Kazakhstan previously litigated the fraud in other forums, *supra* at 1-2 (quoting this decision), and because Kazakhstan did "not include detailed

14

allegations of an underlying fraud. Specifically, the allegations [did] not support justifiable reliance on the Statis' misrepresentations of fact or omissions." 2023 WL 3958317 at *2.

### E. THE INSTANT COMPLAINT REPEATS THE SAME ALLEGATIONS THAT KAZAKHSTAN HAS MADE FOR YEARS

On March 1, 2023, Kazakhstan filed the instant Complaint. Rehashing arguments it has rehearsed in multiple jurisdictions, Kazakhstan not only alleges five enumerated "fraud schemes" that allegedly taint the Award, Compl. ¶ 8, but also a number of other nebulously defined and inflammatory "schemes" that have only a vague nexus with the Award. Compl. ¶¶ 205-295.

For convenience, the instant Complaint makes the following categories of allegations:

a. Court rulings in Belgium, the Netherlands, and Luxembourg conclusively establish Kazakhstan's fraud claims (despite internal issues with those rulings and contrary rulings from the arbitral seat and the United States). Compl. ¶¶ 46-117.

b. Kazakhstan has discovered the following "new evidence": statements from Artur Lungu supposedly confirming the purported frauds, a letter from KPMG withdrawing audit reports for 2007-2009, a series of correspondence between the Stati Parties and KPMG during 2016, and bank statements from Rietumu Banka in Latvia related to the Stati Parties' accounts. Compl. ¶¶ 118-164.

c. An assortment of paid experts support Kazakhstan's interpretation of events. Compl. ¶¶ 165-194.

d. Kazakhstan also obtained an arguably favorable *prima facie* ruling in England. Compl. ¶¶ 195-204. It is unclear what nexus the English proceedings have to the relief requested in the Complaint.

e. The Stati Parties allegedly committed numerous financial frauds before the arbitration, some of which affected the valuation of the LPG plant. Compl. ¶¶ 205-

15

295.

    f.   The Stati Parties allegedly committed fraud during the arbitration by lying about fraudulent related party transactions. Compl. ¶¶ 296-315.

    g.   The Stati Parties allegedly committed fraud after the arbitration by claiming that they had not committed fraud during the arbitration. Compl. ¶¶ 316-355.

    h.   The Stati Parties allegedly committed fraud on this court by trying to enforce the Award here. Compl. ¶¶ 356-377, 398-407.

Kazakhstan also makes serious, unsupported claims that the Stati Parties' lawyers were complicit in the various fraud schemes. Compl. ¶ 10, n. 3 (claiming that King & Spalding LLP ("K&S") withdrew because of the frauds), ¶ 404 (claiming K&S lied to the court). Kazakhstan provides no evidentiary support for these allegations. Kazakhstan's conclusory allegations of fraud on the part of K&S are unsupportable, inflammatory false inferences that, as discussed further below, merit no consideration in and fail to meet the heightened pleading standard that applies to an independent Rule 60 action.

## III.   ARGUMENT

### A.   KAZAKHSTAN FAILS TO MEET THE REQUIREMENTS FOR RELIEF UNDER RULE 60(D)(1).

"An independent action to reform or set aside a judgment because of newly discovered evidence is not less extraordinary than a Rule 60(b)(2) motion. It may even be more so." *Johnson Waste Materials v. Marshall*, 611 F.2d 593, 597 (5th Cir. 1980) (internal citation omitted). "[L]itigants filing suit relying on Rule 60 as the basis for an independent action face a high bar because an independent action is a 'narrow avenue.'" *Brodie v. Dep't of Health & Hum. Servs.*, 951 F. Supp. 2d 108, 115 (D.D.C. 2013), *aff'd sub nom. Brodie v. U.S. Dep't of Health & Hum. Servs.*, No. 13-5227, 2014 WL 211222 (D.C. Cir. Jan. 10, 2014); *Klayman v. Jud. Watch, Inc.*, No.

19-CV-2604 (TSC), 2021 WL 602900, at *6 (D.D.C. Feb. 16, 2021), *aff'd*, 851 F. App'x 222 (D.C. Cir. 2021) (addressing "stringent and demanding standard" and collecting cases).

The indispensable elements of an independent cause of action under Rule 60(d)(1) are: "(1) the judgment should not, in equity and good conscience, be enforced; (2) a good defense exists; (3) fraud, accident, or mistake prevented him from obtaining the benefit of [plaintiff's] defense; (4) the absence of fault or negligence on [plaintiff's] part; and (5) the absence of any adequate remedy at law." *Fleming v. Medicare Freedom of Info. Grp.* No. 15-1135, 2023 WL 4295519, at *9 (D.D.C. June 30, 2023).

Moreover, in an independent action purportedly seeking relief based on newly-discovered evidence, as here, the plaintiff "must meet the same substantive requirements as govern a motion for like relief under Rule 60(b): he must show that the evidence was not and could not by due diligence have been discovered in time to produce [before the order issued]; that it would not be merely cumulative; and that it would probably lead to a judgment in his favor." *Rimi v. Obama*, 60 F. Supp. 3d 52, 57 (D.D.C. 2014), *aff'd*, 608 F. App'x 4 (D.C. Cir. 2015) (granting motion to dismiss for failure to state claim) (internal citation omitted).

Kazakhstan must also overcome a heightened pleading burden under Rule 60(d). In stark contrast to the common *prima facie* pleading standard, "a disappointed litigant may not avail herself of every imaginable inference from newly disclosed facts in order to upset a final judgment." *Goland v. Cent. Intel. Agency*, 607 F. 2d 339, 370 (D.C. Cir. 1978) (denying motion and refusing to disturb prior decisions as to liability). Courts "[g]enerally . . . require that the evidence in support of the motion to vacate a final judgment be highly convincing." *Kotlicky v. U.S. Fid. & Guar. Co.*, 817 F. 2d 6, 9 (2d Cir. 1987) ) (finding that undisputed documents submitted along with motion, including affidavit and flight logs, amounted to "highly convincing"

documentary evidence) (internal quotation omitted). Kazakhstan must "do more than simply present allegations of fraud, it must present *evidence* of actual fraud that 'prevented it from presenting its own case.'" *Jordan v. U.S. Dep't of Lab.*, 331 F.R.D. 444, 451 (D.D.C. 2019), *aff'd sub nom. Jordan v. United States Dep't of Lab.*, No. 19-5201, 2020 WL 283003 (D.C. Cir. Jan. 16, 2020) (denying Rule 60 motion) (emphasis added).

Kazakhstan must also allege fraud with particularity. Fed. R. Civ. P. 9(b) ("[A] party must state with particularity the circumstances constituting fraud or mistake."). Specifically, Kazakhstan must allege "matters such as the time, place and content of the false misrepresentations; the misrepresented fact; and what the opponent retained or the claimant lost as a consequence of the alleged fraud." *Kettey v. Saudi Ministry of Educ.*, 53 F. Supp. 3d 40, 54 (D.D.C. 2014). "In other words, Rule 9(b) requires that the pleader provide the 'who, what, when, where, and how' with respect to the circumstances of the fraud." *Edwards v. Best Buy Co*., No. CV 19-3316 (EGS), 2021 WL 4399562, at *8 (D.D.C. Sept. 27, 2021), *aff'd*, No. 20-5370, 2022 WL 566484 (D.C. Cir. 2022). In the Rule 60 context, "[c]onclusory averments of the existence of fraud made on information and belief and unaccompanied by a statement of clear and convincing probative facts which support such belief do not serve to raise the issue of the existence of fraud." *Galatolo v. United States,* 394 Fed. Appx. 670, 672 (11th Cir. 2010) (affirming dismissal of independent action for failure to "provide clear and convincing probative facts") (citing *Booker v. Dugger,* 825 F.2d 281, 284–85 (11th Cir. 1987) (affirming dismissal of independent action based on the pleadings)).

As set forth below, the instant Complaint falls far short of meeting this greatly heightened pleading standard.

     i.    ***Kazakhstan fails clearly and convincingly to allege why the judgment should not be enforced "in equity and good conscience."***

To obtain relief through such an independent action, Kazakhstan must meet a demanding standard: "an independent action should be available *only* to prevent a grave miscarriage of justice." *Rimi v. Obama*, 60 F. Supp. 3d 52, 57 (D.D.C. 2014), *aff'd*, 608 F. App'x 4 (D.C. Cir. 2015) (emphasis in original).

Kazakhstan's nearly hysterical claims of fraud cannot avoid the fact that it was the wrongdoer. At no point in its 110-page Complaint does Kazakhstan ever deny that it unlawfully expropriated the Stati Parties' assets. In particular, Kazakhstan does not even attempt to deny challenging title to the Stati Parties' investments, subjecting them to millions of dollars in unwarranted tax assessments, harassing them through a vast number of onerous and tactical inspections and audits, levying baseless criminal penalties, engaging in aggressive criminal prosecutions of the Stati Parties' employees in Kazakhstan, or ultimately seizing their Kazakh assets. *Id.* ¶¶ 1092-5, 1532-4, 1798-1801.

Instead, the supposedly "massive fraud . . . of such scope and magnitude" boils down to an alleged accounting scheme that indirectly caused one portion of the quantum of the Award to be a little higher than it otherwise would have been. *See* Compl. ¶¶ 2, 8. Even taking all of Kazakhstan's allegations as true (which is not the standard here), Kazakhstan's arguments that the judgment cannot be enforced "in equity and good conscience" fall flat. *See United States v. Beggerly*, 524 U.S. 38, 45 (1998) (J. Rehnquist) ("Independent actions must, if Rule 60(b) is to be interpreted as a coherent whole, be reserved for those cases of injustices which, in certain instances, are deemed sufficiently gross to demand a departure from rigid adherence to the doctrine of res judicata.") (internal citation omitted).

As to the secondary fraud allegations that the Stati Parties failed to properly disclose information about the financial fraud to the Arbitral Tribunal and various courts during and after

the arbitration, this kind of alleged fraud fails as a matter of law because it "does not nearly approach [the] demanding standard" required to plead an independent action under Rule 60(d)(1). *See Beggerly*, 524 U.S. at 47 (holding that party's failure to "thoroughly search its records and make full disclosure to the Court" created no "'grave miscarriage of justice,' and perhaps no miscarriage of justice at all") (citing Rule 60).

Unable to plausibly allege any "grave miscarriage" of justice, Kazakhstan instead attempts to smear the Stati Parties in the Complaint with bombastic language and insinuations of further frauds that have no nexus with the Award or the Judgment. Paragraphs 205-221 of the Complaint transparently reveal Kazakhstan's strategy. In this section, Kazakhstan alleges a number of other "fraud schemes," but never points to any particular piece of evidence in support or explains the nexus to either Count One or Count Two. For example, when alleging the purported "Tristan Circular" fraud, there is no explanation of how a misrepresentation "to investors in the Tristan Notes"—apparently a reference to a breach of contract damaging undefined third-party noteholders, but not directly damaging Kazakhstan—could possibly be relevant to Kazakhstan's public policy defense to enforcement of the arbitral Award. Compl. ¶¶ 205(a), 207-221 (no explanation of standing to allege fraud on presumably third-party noteholders); *Odeon Cap. Grp. LLC v. Ackerman*, 864 F.3d 191, 196 (2d Cir. 2017) ("petitioner must demonstrate a nexus between the alleged fraud and the decision made by the arbitrators"); *ARMA, S.R.O. v. BAE Sys. Overseas, Inc.*, 961 F.Supp.2d 245, 255 (D.D.C. 2013) (same).[8] Lacking any relevance to the relief prayed for in the Complaint, the only purpose for making these allegations is to blow smoke and hope that

---

[8] To be clear, the Stati Parties deny the allegations in these paragraphs, but there is no need to waste the Court's time to rebut these plainly irrelevant allegations.

the Court assumes that there must be a fire. This is far from the required showing of a "grave miscarriage of justice."

> ### ii. *Kazakhstan fails to clearly and convincingly allege any defense to confirmation of the Award that it was prevented from making.*

Fatally, Kazakhstan's Complaint never actually alleges facts to establish that it was prevented from alleging any of its fraud defenses, as required to support a claim under Rule 60(d). Rather, the Complaint simply concludes that Kazakhstan was unable to present its "full fraud case" in this Court. *E.g.,* Compl. ¶ 7, 28. This is an explicit attempt to try to relitigate the case *ab initio*, not a basis for relief in an independent Rule 60(d) action. *Klayman,* 2021 WL 602900, at *6 ("A party cannot use an independent action as a vehicle for the relitigation of issues.") (internal citation omitted). Rather, the standard under Rule 60(d) is whether Kazakhstan had "no *opportunity* to have the ground now relied upon to set aside the judgment fully litigated in the original action." *See also Duse v. IBM Corp.*, 212 F.R.D. 58, 62 (D. Conn. 2002) (emphasis added), *aff'd sub nom. Duse v. Int'l Bus. Machs. Corp.*, 75 F. App'x 44 (2d Cir. 2003). In *Duse*, for example, the court dismissed an independent action under a former version of Rule 60(b) because the complainant "did disclose to this Court by affidavit the presently alleged fraud during the 1994 litigation, and this Court demonstrated its familiarity with plaintiff's affidavit by referencing it no less than three times in its ruling." *Id.* ("Independent actions are thus barred where plaintiff had ample opportunity to or, in fact, did raise the alleged fraud in the underlying action."). Here, as in *Duse*, Kazakhstan had both the opportunity to and, in fact, did advance the fraud theories in the Complaint both in this Court and elsewhere.

Kazakhstan has argued in this Court since 2016 that the Award was obtained by fraud. *Confirmation Order*, 302 F. Supp. 3d at 193 ("According to [Kazakhstan], in June of 2015, it became aware of 'new evidence' that [the Stati Parties] had 'obtained the [arbitral] [a]ward through

fraud.' [Kazakhstan] waited till April 5, 2016, though—nearly a year after learning about the alleged fraud and completing the merits briefing in this case—to file a motion seeking leave to submit additional defenses to enforcement of the arbitral award") (internal citations omitted).

This history belies Kazakhstan's claim that: "The Statis' fraudulent schemes prevented the Republic from obtaining the benefit of their defense. This occurred in the underlying Arbitration, in the Swedish annulment proceedings, and in the prior confirmation proceedings in this Court." Compl. ¶ 395. In fact, Kazakhstan trumpeted various permutations of the same fraud claims in all of those proceedings. The fact that Kazakhstan was not able to persuade those tribunals does not mean that it was prevented from making any arguments.

Between 2010 and 2013, Kazakhstan argued in the arbitration that the Stati Parties:

> likely siphoned off more moneys by extending the due date on accounts receivables due from affiliated companies. Even the Tristan Oil Annual Report (2009) mentions that Claimants [the Stati Parties] would cancel delivery for equipment to the LPG Plant, and then a third company, Perkwood investments, would return the advance paid. Claimants have provided no trace of this money (USD 36,800,212) and likely pocketed it. Claimants would also divert cash to operating companies, such as by paying Anatolie Stati's CASCO double the market price to do work. There were also opaque service agreements with Ascom. Likely, there are other transactions, but Claimants' opaque financing structure makes it impossible to see those. FTI estimates that diverted monies could be as much as USD 226.6 million.

*Award*, ¶ 1450.

Further, Kazakhstan argued in the arbitration:

> Claimants [the Stati Parties] effectively abandoned the companies [KPM and TNG] in 2009 and 2010, stripping as much cash from KPM and TNG as possible, issuing a USD 72 million dividend in 2009 and 2010 and transferring receivables to Ascom. These were paid in violation of the Tristan note indenture. As a result, KPM had no cash inflow.

*Award*, ¶ 1449.

The Arbitral Tribunal expressly considered these arguments and rejected them. *Award*, ¶¶ 1457-8. In particular, it determined that:

> 1457. Respondent [Kazakhstan] has also not provided sufficient evidence that Claimants abandoned their investments. Rather, Claimants' actions seem to have been caused by Respondent's measures. . . .
>
> 1458. In view of these considerations, the Tribunal concludes that Respondent has not submitted sufficient evidence that Claimants' inexperience or own actions caused or contributed in a relevant way to the damages that occurred to Claimants' investment.

The similarity to the claims in the instant Complaint is unmistakable.[9] That Kazakhstan, in retrospect, now claims to have more detail relating to the same allegations does not change the fact that it presented its arguments to the Arbitral Tribunal and could have pursued it more fulsomely had it so chosen.

Kazakhstan complains that it "was not able to assert that the Arbitration Award was obtained by fraud" in this Court because Judge Jackson refused to allow it to amend its pleadings after May 2015. Compl. ¶ 24. In reality, Kazakhstan presented its fraud arguments in a motion for leave to file additional grounds in support of its opposition to the petition to confirm the arbitration award on April 5, 2016, and then moved for reconsideration of the denial on May 11, 2016. *Confirmation Order*, 199 F. Supp. 3d at 191. Again, just because it failed to persuade this Court to allow it to "conduct a mini-trial on the issue of fraud" does not mean it was prevented from presenting its arguments. *Id.* Indeed, Judge Jackson's ruling denying the motion for reconsideration quoted Kazakhstan's fraud arguments extensively, demonstrating that the Court had reviewed its fraud claims in detail. *Id.* at 198 ("Since [Kazakhstan] is not claiming that the

---

[9] Kazakhstan initially made numerous other accusations of fraud before 2010 as part of its campaign of harassment leading up to its expropriation of the Stati Parties' assets in Kazakhstan. *Award*, ¶¶ 650, 654, 770, 913, 1369, 1416.

evidence of [the KMG scheme] was not available to it at the time it filed its initial motion, but rather that it simply elected not to raise it, the Court finds that those facts are improperly raised now."). Despite the procedural issues with Kazakhstan's motion, Judge Jackson nevertheless considered the substance of its fraud arguments when she ruled that "the arbitrators expressly disavowed any reliance on the allegedly fraudulent material." *Id.*

In 2017, Kazakhstan presented its fraud arguments to this Court again in a 97-page complaint. *DC RICO Case*, Case No. 1:17-cv-02067-ABJ, Doc. No. 1 (attached hereto as **Exhibit 4**). Among other things, Kazakhstan alleged that the Stati Parties: procured fraudulent audited financial statements from KPMG, *id.* at 28-31, ¶¶ 103-15, 126-29; used the audited financial statements for various illicit purposes, *id.* at 32, ¶¶ 116, 130-34; used the audited financial statements to defraud the arbitral tribunal, *id.* at 39-49, ¶¶ 135-169; misled to the Swedish courts, at 52-54, ¶¶ 186-87; and lied to other courts around the world, *id.* at 55-57, ¶¶ 194-226. These claims overlap precisely with the fraud theories that Kazakhstan now alleges it was never able to raise. *See* Compl. ¶ 8. That Judge Jackson dismissed its complaint under Rule 12(b)(6) does not change the fact that Kazakhstan had a fair opportunity to present its arguments. *DC RICO Case*, 380 F. Supp. 3d at 57 ("the Court will grant defendants' motion and dismiss the ill-advised lawsuit. A RICO civil suit is not a vehicle to challenge non-frivolous litigation, or in this case, a valid and final foreign arbitral award.").

Tellingly, Kazakhstan omits mention of any of the details of the extensive Swedish proceedings on its fraud claims because they undermine its Complaint. Kazakhstan repeatedly claims that the Stati Parties lied to this Court that the Swedish courts "fully and fairly litigated" its fraud theories. Compl. ¶¶ 26, 27, 45, 316. Instead of quoting a single word from any Swedish pleading or decision, Kazakhstan relies exclusively on the faulty reasoning of the Brussels Ruling

and a paid opinion from Patrik Schöldström to suggest that "the Swedish courts never reached the merits of the Republic's allegations of fraud". Compl. ¶¶ 26, 27, 182-83, 369-70.

Kazakhstan misses the forest for the trees. It complains that the Swedish courts never entered a finding over whether or not fraud was actually committed, but, as described above, this is because the Swedish courts found that Kazakhstan's allegations did not state a claim upon which relief could be granted, rendering the need for a factual finding moot. *Supra* at 5-6. In fact, the Swedish courts considered and rejected Kazakhstan's applications to annul and/or set aside the Award multiple times:

    a. In its 2016 judgment, the Svea Court of Appeal rejected Kazakhstan's first application for annulment after almost three years of proceedings that encompassed extensive documentary evidence and a 13 day oral hearing spread over a four-week period from September-October 2016. Ex. 1, Bedford Decl. ¶ 14. Among other things, Kazakhstan alleged that the Stati Parties had created "significant fictitious value in the LPG plant" by various financial fraud schemes; had obtained false annual reports by lying to their auditors, KMPG; and had presented false evidence about these schemes to the Arbitral Tribunal. Ex. 1, Bedford Decl, Ex. A, Judgment, at 44-46, § 3.1.2.1.

    b. A three judge panel of the Swedish Supreme Court considered and rejected Kazakhstan's petition to quash Svea Court of Appeal's decision due to grave procedural error. Ex. 1, Bedford Decl, Ex. B, Decision.

    c. In 2020, the Svea Court of Appeal again rejected Kazakhstan's renewed application for annulment, which had presented Kazakhstan's purported newly discovered evidence. Ex. 1, Bedford Decl, Ex. C, Statement of Claim; Ex. 1, Bedford Decl.,

Ex. D, Minutes ("the information provided by Kazakhstan shows that the action is based on circumstances which could have been relied on in the previous case.").

d.  The Swedish Supreme Court again rejected Kazakhstan's appeal of the 2020 ruling and petition for a new trial of the 2016 judgment of the Svea Court of Appeal. Ex. 1, Bedford Decl., Ex. E, Application for Cancellation.

e.  In 2023, in the context of execution on the Award, the Svea Court of Appeal yet again denied Kazakhstan's arguments that the Award had been obtained by fraud. Ex. 1, Bedford Decl., Ex. I, Final Decision (rejecting arguments that were "the same as those examined in the earlier challenge and annulment cases").

Given this history, Kazakhstan's insistence that it never had a full hearing in Sweden is impossible to take seriously, but it also belies Kazakhstan's insistence that its fraud claims were "fully litigated" in Brussels and Amsterdam. Compl. ¶¶ 55-64. In Brussels, the court heard argument from counsel over about seven total hours, while the Svea Court of Appeal in Stockholm conducted 13 days of evidentiary hearings—including cross-examination of witnesses—in addition to extensive document submissions. Ex. 1, Bedford Decl. ¶ 14. The Amsterdam court followed a similar procedure as in Brussels. Compl. ¶ 94. The inescapable conclusion is Kazakhstan arbitrarily designates rulings that it likes as "fully litigated" while ignoring rulings that it does not like from the arbitral seat. Given this background, this Court was entirely justified in "enforcing an award after the jurisdiction that issued it has heard and rejected the [fraud] allegations." *Confirmation Order*, 302 F. Supp. 3d at 201.

### iii.  ***Even if Kazakhstan had any "newly discovered evidence," which it does not, it fails to clearly and convincingly show that it acted diligently to obtain that evidence.***

New evidence: "(1) . . . must have been in existence at the time of trial; (2) . . . must be such that [it] was not and could not by the exercise of due diligence have been discovered in time

to present it in the original proceeding; (3) it must not be merely cumulative or impeaching; [and] (4) . . . must be admissible and credible, and of such a material and controlling nature as will probably change the outcome." *Canady v. Erbe Elektromedizin Gmbh*, 99 F. Supp. 2d 37, 43-44 (D.D.C. March 31, 2000).

As an initial matter, to the extent that Kazakhstan implies that its assorted expert reports are "new evidence," they are not. Compl. ¶¶ 21-22, 165-194. As a matter of law, expert reports are not "new evidence" for the purpose of Rule 60. *See Wilson v. Upjohn Co.*, 808 F. Supp. 1321 (S.D. Ohio 1992) (holding affidavits of medical witnesses offered one year after summary judgment were not newly discovered evidence); *Frankel v. ICD Holdings S.A.*, 939 F. Supp. 1124 (S.D. N.Y. 1996) (holding "new" financial reports did not constitute new evidence when all the material facts in the new reports were in existence at the time of the original litigation); *Questrom v. Federated Dep't Stores, Inc.*, 192 F.R.D. 128, 132 (S.D.N.Y. 2000), *aff'd*, 2 F. App'x 81 (2d Cir. 2001) (holding that expert affidavits drafted after the close of evidence "are not newly discovered evidence"). The Court should disregard these new expert reports when analyzing whether Kazakhstan has sufficiently alleged newly discovered evidence to support its claims under Rule 60(d).

Expert reports aside, Kazakhstan claims that it has discovered new evidence consisting of:

a. The April 2019 deposition of the Statis' former Chief Financial Officer, Mr. Artur Lungu, Compl. ¶17.

b. A "no reliance" letter issued in August 2019, by KMPG. Compl. Ex. C ("2019 KPMG Letter"); *id.* ¶¶ 18, 145-152.

c. Prior correspondence between the Statis and KPMG dating back to 2016 allegedly obtained in October 2019. *Id.* ¶ 20, 153-159; Ex. 1, Bedford Decl., Ex. L, KPMG

Correspondence, at 1-2.

d.   Latvian bank statements obtained in August 2019 for Stati controlled companies ("Rietumu Documents"), *id* ¶¶19, 160-164.

Kazakhstan claims that it obtained all of this alleged new evidence between April and August 2019. Compl. ¶¶ 17-20. Kazakhstan provides no explanation whatsoever for why it waited three years to present the evidence to the Court after it allegedly obtained it in 2019. After over a decade of post-Award litigation, any delay is its own fault. *Compare* Compl. ¶ 4 ("Over the course of the past several years, the Republic has been engaged in a painstaking process of obtaining indisputable proof of the Statis' fraud.") *with Metzler Investment Gmbh v. Chipotle Mexican Grill, Inc.*, 970 F.3d 133 (2d Cir. 2020) (rejecting plaintiff's arguments that its allegedly new evidence satisfied the Rule 60(b)(2) standard because it received the information in small amounts over an extended period of time and needed significant time to understand and assimilate the information).

Kazakhstan claims that it "was only able to depose Mr. Lungu after it discovered that he was now living in Houston, Texas." Compl. ¶ 120. Kazakhstan does not say when it learned this information or why it could not have discovered it earlier. Regardless, Lungu left the employ of the Stati Parties and moved to "Houston in February of 2014," before the Stati Parties even filed the confirmation case from which Kazakhstan now seeks relief from judgment. Ex. 1, Bedford Decl., Ex M, Lungu Tr. 47:13-14, 103:16-19 (explaining wife and children had been living in the U.S. since 2011). It took over five years for Kazakhstan to depose Mr. Lungu after he became subject to general jurisdiction in the U.S. *See Liberty Mut. Ins. Co. v. FAG Bearings Corp.*, 153 F.3d 919 (8th Cir. 1998) (rejecting purported newly discovered evidence in another trial because movant failed to show why that evidence could not have been discovered earlier with due diligence).

Critically, Mr. Lungu submitted a witness statement and testified during the arbitration itself, and Kazakhstan had the opportunity to (and did) cross-examine him. *Award*, ¶¶ 111, 156. Indeed, Kazakhstan argued that it successfully caused Mr. Lungu to admit to lying while under cross-examination. *Id.* ¶ 1716. All of the "new" information that Kazakhstan claims to have obtained from Lungu in the 2019 deposition is information that it could have asked on cross-examination six years closer to the time of the actual events. In essence, the 2019 deposition was simply a "re-do" of Mr. Lungu's arbitration testimony.[10] *See In re Salas*, No. CV 20-3091 (FYP), 2022 WL 1154596, at *4 (D.D.C. Apr. 19, 2022) (affirming finding that transcript of witness testimony from later proceeding "did not constitute newly discovered evidence because the same testimony could have been elicited" in the subject case "through the exercise of due diligence").

The 2019 KPMG Letter suffers from a different problem. "Under Rule 60(b) [and thus also 60(d)], the new evidence must have existed at the time of the decision." Wright, Miller & Kane,

---

[10] Troublingly, Kazakhstan also fabricates Mr. Lungu's deposition testimony. For example, Kazakhstan claims: "Mr. Lungu testified that, based on his current knowledge, Anatolie Stati intentionally misled KPMG in its audits of the financial statements of Tristan, KPM, TNG by failing to identify Perkwood as a related party." Compl. ¶ 127 (citing eight deposition sections). Not one of the cited sections contains any testimony about Anatolie Stati's intent—Kazakhstan simply makes that part up. *See* Lungu Tr. 145:4–8, 150:7–18, 157:10–18, 166:19–167:11, 182:16–183:22, 197:15–198:4, 198:17–199:16, 200:16–201:4. As another example, Kazakhstan claims that "Mr. Lungu admitted" to directing KPMG to include incorrect information on a Vendor Due Diligence Report "on the instruction of Anatolie Stati." Compl. ¶ 139 (citing Lungu Tr. 275:15–277:21). Yet the transcript section cited for this proposition makes no mention of Anatolie Stati whatsoever. Lungu Tr. 275:15–277:21. On the contrary, Mr. Lungu expressly states that he did not even consult with Anatolie Stati about the incorrect information supplied to KPMG. Lungu Tr. 167:6-11 ("Q. You were also relying on the knowledge of Anatolie Stati, correct, in 2008? A. I did not question Anatolie Stati specifically about that—that issue, but since he signed the document I—I assume he was comfortable with—with the documents, with the representations.") Kazakhstan's overzealous and unsupported inferences drawn from the Lungu transcript not only undercut its specific arguments about Mr. Lungu's alleged admissions, but also raise serious doubts as to its credibility and good faith as a whole.

§ 2859 (citing cases).[11] On its face, the 2019 KPMG letter is dated August 21, 2019 and it was sent on this date to the Stati Parties. Ex. 1, Bedford Decl., Ex. L, KMPG Correspondence at 29. Substantially the same letter was also sent to Kazakhstan's representative, Dr. Patricia Nacimiento of Herbert Smith Freehills LLP, on the same date. *Id.* at 31. Indisputably, the 2019 KPMG Letter was created well after the 2018 confirmation order that the Complaint now seeks to avoid. *Kurzweil v. Philip Morris Cos., Inc.*, Nos. 94 Civ. 2373 (MBM), 94 Civ. 2546 (MBM), 1997 WL 167043, at *5 (S.D.N.Y. Apr. 9, 1997) (finding that evidence created after the original order "is not newly discovered evidence that was in existence at the time of the order; it is simply new evidence"); *Censke v. United States*, 314 F.R.D. 609 (N.D. Ill. 2016) (holding that medical report created nearly two years after trial was not "newly discovered evidence" able to support Rule 60 motion because it was not in existence at the time of the trial); *see also Gucci Am., Inc. v. Weixing Li*, No. 10 Civ. 4974, 2012 WL 1883352, at *2 (S.D.N.Y. May 18, 2012) (collecting cases and rejecting similar post-judgment letter supporting a moving party's argument as "newly discovered evidence" under Rule 60), *vacated on other grounds*, 768 F.3d 122 (2d Cir. 2014).[12]

As to the 2016 KPMG Correspondence, Kazakhstan's allegation that it was not aware of this correspondence is misleading. Kazakhstan omits to mention that the primary purpose of this correspondence was to alert the Stati Parties that Kazakhstan had been unilaterally corresponding with KPMG in relation to its audit reports of financial statements. Ex. 1, Bedford Decl., Ex. L,

---

[11] The 2019 KPMG Letter also substantively fails to support Kazakhstan's fraud claims. It does not cite any fraud nor imply that any misstatement was intentional. Ex. 1, Bedford Decl., Ex. L, KMPG Correspondence at 29.

[12] Kazakhstan also appears to have obtained the 2019 KPMG Letter under unlawful circumstances. According to KPMG's written letters, Kazakhstan pressured KPMG—apparently in breach of Kazakh law—to issue the 2019 KPMG Letter for a specific hearing in the Netherlands in 2019. *See* Ex. 1, Bedford Decl., Ex. N, Sergei Yurievich Vataev, Second Legal Opinion of Kazakh Law, Sept. 17, 2022. Kazakhstan filed the 2019 KPMG Letter in the Dutch court the day after it was issued, *i.e.* on August 22, 2019. Ex. 1, Bedford Decl. ¶ 16.

KMPG Correspondence at 2 (Letter from Assel Khairova to Anatolie Statie, Feb. 15, 2016).
KPMG stated: "We have been approached by a legal firm, Norton Rose Fulbright LLP ('the legal firm'), who is representing the Ministry of Justice of the Republic of Kazakhstan in court hearings between the Republic of Kazakhstan and Ascom Group S. A." *Id.*

By a responsive letter, Anatolie Stati questioned the circumstances and the procedural propriety of KPMG's letter and, in particular, KPMG's unilateral contact with Kazakhstan's representatives. *Id.* at 4-5 (Letter from Anatolie Stati to KPMG Audit LLC, Feb. 26, 2016). KPMG ignored the questions, and instead noted that it had been compelled to provide information to the General Prosecutor's Office of the Republic of Kazakhstan. *Id.* at 7 (Email from Sergey Dementyev to Ascom Group S.A., Feb. 29. 2016).[13] As the party that first reached out to KPMG, as well as because of its prosecutor's requests, Kazakhstan had reason to know that there were communications between KPMG and the Stati Parties regarding the financial statements well before the 2016 KPMG correspondence was formally disclosed to Kazakhstan as part of the Dutch exequatur proceedings in October 2019. Even if Kazakhstan did not possess this correspondence, it could have applied for disclosure from any of the courts in which it was at the time litigating.

In any case, the 2016 KPMG Correspondence is defective for Rule 60 purposes because it is cumulative and goes only to the impeachment of a witness. *United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 395 (2d Cir. 2001) ("[O]rdinarily, newly discovered evidence that merely goes to impeachment of a witness is not grounds for a new trial."). On its own, the 2016

---

[13] As the Stati Parties highlighted in their email response, this information was surprising and concerning. *Id.* at 6 (Email from Ascom Group S.A. to Sergey Dementyev, Mar. 2, 2016). KPMG then failed to reply for over three years. Tellingly, KPMG did not approach the Stati Parties to revisit or clarify matters in relation to the financial statements until Kazakhstan's representatives (specifically, Dr. Patricia Nacimento of Herbert Smith Freehills LLP) again approached KPMG did it evidently revisit the issue in 2019. *Id.* at 31.

KPMG Correspondence does not prove or disprove anything; rather, Kazakhstan claims only that the "correspondence demonstrates that the Statis knew as early as February 2016 that KPMG did not believe that its audit reports of the Statis' financial statements were made on a true and accurate basis" and that they "also knew that KPMG was expressly questioning the truthfulness of the Statis' financial statements." Compl. ¶ 157. Even accepting this claim as true (which is not the standard for an independent action under Rule 60 and is undermined by the fact that KPMG apparently did nothing for three years in response the correspondence), Kazakhstan describes quintessential impeachment evidence. *Id.* Moreover, Kazakhstan consistently argued that the KPMG audit statements were incorrect in both the arbitration and the underlying court hearings, making the 2016 KPMG Correspondence cumulative of the other evidence it supplied to try and prove the Stati Parties' purportedly purposeful fraud. *See Kuenzel v. Allen*, 880 F. Supp. 2d 1205, 1220 (N.D. Ala. 2011) ("At best the evidence is cumulative of trial evidence and does nothing more than raise impeachment issues").

The Rietumu Documents are difficult to discuss because Kazakhstan has not clearly described what they are.[14] This failure to allege with particularity what the fraudulent documents are is itself sufficient basis to dismiss Kazakhstan's fraud claims arising from these documents. *Bowie v. Maddox*, 677 F. Supp. 2d 276, 282 (D.D.C. 2010) (finding plaintiff failed to present clear and convincing evidence of fraud where he alleged the judgment and verdict were procured through a forged affidavit, but proffered only "bare allegations and hypotheses"). Equally problemetic, without any detail as to what these documents are, it is impossible to determine to what extent their substance has already been submitted to previous tribunals, as seems likely.

---

[14] As Kazakhstan admits, it obtained these documents through diplomatic channels open only to a sovereign state, so the Stati Parties have never been provided full copies of what it obtained. Compl. ¶ 160.

*Compare* Compl. ¶ 206(b) (alleging Stati Parties diverted monies in the low hundreds of millions) *with* Award at ¶ 1450 (noting Kazakhstan's allegations that Stati Parties diverted monies circa US$226.6 million).

Kazakhstan fails to mention its previous reliance in other forums on Rietumu bank documents from Latvia. Puzzlingly, in the complaint filed in New York Supreme Court on June 16, 2020, nearly a year after it allegedly received the "new" production of documents from Latvia in 2019, Kazakhstan discusses Rietumu Bank documents it received in 2016, but makes no mention of any new production. Ex. 1, Bedford Decl., Ex. O, Complaint ¶¶ 45, 60, 93, 95-96, 107, 119 (discussing Lungu deposition), ¶¶ 46, 214 (discussing 2019 KPMG Letter), ¶ 199 (discussing the "newly discovered" correspondence), ¶ 207 (discussing 2016 Rietumu Bank documents and admitting that it had "introduced documents that it had obtained from Latvian authorities" to the Svea Court of Appeal on September 5, 2016) (Jun. 16, 2020). Kazakhstan's conclusory allegation that it received documents in August 2019 does not clearly and convincingly show that it relies on any documents other than those it has already described to courts in Sweden and New York.

Nevertheless, even Kazakhstan's conclusory statements demonstrate that the Rietumu Bank documents on which it seeks to rely relate to financial transactions that took place well before the arbitration. Compl. ¶ 160-64. Kazakhstan does not even attempt to explain why it did not exercise any due diligence to obtain these documents before the Confirmation Order in 2018, let alone before the Award issued in 2013.

Neither can Kazakhstan show clear and convincing evidence that any of the "newly discovered evidence" would have changed either the Award or the Confirmation Order. Judge Jackson, agreeing with the Swedish courts, was correct that the Arbitral Tribunal did not rely on the alleged fraudulent conduct. *Confirmation Order*, 302 F. Supp. 3d at 197 (rejecting

Kazakhstan's arguments to the contrary). Kazakhstan now alleges that it has more evidence of that alleged fraudulent conduct, but does not explain with clear and convincing evidence how cumulative evidence of the same fraud allegations would have caused Judge Jackson to have reached a different decision.

**iv.** ***Kazakhstan's delay waived its remedy at law, and its claims are now barred by laches.***

Kazakhstan filed the Complaint nearly four years after the judgment issued on July 16, 2019. Kazakhstan's undue delay bars its action under the doctrine of laches. Kazakhstan admits that it can no longer avail itself of a legal remedy under Rule 60(b), but an independent action under Rule 60(d)(1) is not a "free pass" to ignore time limitations. Compl. ¶ 397; *see Beggerly,* 524 U.S. at 47 (noting laches applies to independent actions in equity).

As discussed above, Kazakhstan admits it obtained all of its purported "newly discovered evidence" well before the expiration of the one-year deadline to make a motion under Rule 60(b) to vacate the judgment it now seeks to avoid, July 16, 2020. *Supra* at 12 (judgment entered July 16, 2019); Compl. ¶¶ 17-20 (admitting that it obtained all the alleged "newly discovered evidence" by August 2019). Thus, Kazakhstan had "adequate remedies at law, specifically, a fair opportunity to advance" its fraud allegations "via seeking relief under Rule 60(b). That those adequate remedies at law are no longer available (. . . because [Kazakhstan] failed timely to seek Rule 60(b) relief) is due to [Kazakhstan's] own neglect." *See In re Salas*, No. 18-00260, 2020 WL 6054783, at *22 (Bankr. D.D.C. Oct. 13, 2020) (holding claimant waived adequate remedy at law where known facts supporting claim not timely-raised under Rule 60(b)).

"For a court to find a claim is barred by laches, two elements must be present: "a (1) lack of diligence by the party against whom the defense is asserted, and (2) prejudice to the party asserting the defense. . . . for the second element, there are two types of prejudice that can support

a laches defense: trial prejudice and economic prejudice. *Lucas v. D.C.*, No. CV 13-00143 (TFH), 2023 WL 2072440, at \*5 (D.D.C. Feb. 17, 2023); *Klayman*, 2021 WL 602900, at \*6 (noting remedy at law available when plaintiff could have and did raise "same issues" earlier).

Kazakhstan has no explanation why it decided to wait nearly four years after obtaining its "newly discovered evidence" before filing its Complaint. Kazakhstan did not hesitate to rely on its "new" evidence in other forums around the world and, in particular, in the U.S. in its complaint in New York state court. *See* Ex. 1, Bedford Decl., Ex. O, Complaint. Such delay in this Court is inexcusable. *See LinkCo, Inc. v. Akikusa*, 615 F. Supp. 2d 130, 142 (S.D.N.Y. 2009), *aff'd sub nom. LinkCo, Inc. v. Naoyuki Akikusa*, 367 F. App'x 180 (2d Cir. 2010) (finding multi-year delay in bringing Rule 60(d) action based on alleged fraud to be inexcusable delay). Kazakhstan's delay in bringing its motion has prejudiced both the Stati Parties, who have expended considerable resources as part of their execution efforts, and the U.S. courts that have relied on the Confirmation Order substantively supporting the judgment. *Cf. LinkCo, Inc.*, 615 F. Supp. 2d at 142 ("Allowing this action to proceed would not only be greatly prejudicial to Fujitsu, but also to this Court"). Not least, Judge Jackson relied on the Confirmation Order when dismissing the DC RICO Case, and, more recently, both the New York Supreme Court and the Supreme Court, Appellate Division, relied on the Judge Jackson's rulings to find that Kazakhstan's fraud claims against the Stati Parties' creditors were barred by the full faith and credit clause of the U.S. Constitution. *DC RICO Case*, 380 F. Supp. 3d at 57; *Chapman*, 76 Misc. 3d at 949;

    **v.**  ***Not only are the foreign court orders Kazakhstan presents entitled to no weight, but the Swedish judgments upholding the award are entitled to special weight as emanating from the Arbitral Seat.***

Kazakhstan describes the Brussels and Amsterdam Rulings at length, claiming that they "conclusively" confirm the Statis' fraud. Compl. ¶¶ 9, 41, 46, 65, 389, 406. Despite the transparent effort to mislead the Court that these rulings create some sort of issue preclusion, neither of these

decisions are "conclusive" under U.S. law, nor are they even final within their own jurisdictions.

The New York Convention contemplates that an arbitral award may be issued in one country but confirmed in another country. 21 U.S.T. 2517, arts. I, V. It distinguishes between the country where the arbitration was seated, which has "primary jurisdiction" over the award, and other courts where enforcement is sought, which have "secondary" jurisdiction. *See Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp.*, 40 F.4th 56, 62 (2d Cir. 2022); Judicial proceedings in the "primary jurisdiction" have special weight because only the primary jurisdiction's courts can set aside an award. *See TermoRio S.A. E.S.P. v. Electranta S.P.,* 487 F.3d 928, 937 (D.C. Cir. 2007) (rejecting argument that "a court in a secondary State is free as it sees fit to ignore the judgment of a court of competent authority in a primary State vacating an arbitration award"). The D.C. Circuit has thus cautioned U.S. courts—"in determining whether to enforce an award"—against "second-guess[ing] the judgment of a court in a primary State." *Salini Costruttori S.p.A. v. Kingdom of Morocco*, 233 F. Supp. 3d 190, 201 (D.D.C. 2017) (holding that rulings from secondary jurisdiction not entitled to comity because "those courts lack the authority under the New York Convention to set aside or modify the arbitral award").

Moreover, Brussels Ruling is presently on appeal to the Court of Cassation (Belgium's highest court). Compl. ¶ 73. The Belgium Court of Cassation, like most appellate courts, only reviews legal and not factual error. *See supra* at 8. This does not suggest that the Stati Parties have in any way waived their objections to the Brussels Ruling's factual findings. *Id.*

Similarly, the Amsterdam Ruling is presently on appeal to the Amsterdam Court of Appeal. Ex. 1, Bedford Decl. ¶ 7 (appeal filed March 8, 2023). The Amsterdam Court of Appeal is then subject to review by the Supreme Court of the Netherlands. *Id.* ¶ 7.

Kazakhstan does not even attempt to allege that rulings from Luxembourg and England

should have any evidentiary value. As discussed above, the Luxembourg courts have yet to make any evidentiary findings, and the secrecy of the proceedings makes it impossible for the parties to fully brief the court of their substance. *Supra* ¶¶ at 10-11.

Kazakhstan's allegations regarding proceedings in England are equally irrelevant and fail to provide support for its Rule 60 claims. ¶¶ 195-204. The Stati Parties dispute Kazakhstan's inflammatory characterization of events—not accidentally, Kazakhstan supplies a link to the trial court ruling that Kazakhstan alleged a *prima facie* case of fraud under English law, but neglects to mention the subsequent ruling of the appellate court. [2018] EWCA Civ 1896)[15] ("[Kazakhstan's] allegations of fraud were insufficient to invalidate the award. The most that those allegations provided were a defence to enforcement as a matter of English public policy. . . . An application to enforce such an award could hardly be a fraud on the English court.").[16] Regardless, an extended discussion of the English proceedings is unnecessary because there is no suggestion that there were any evidentiary findings whatsoever.[17] Ironically, given the context of the Complaint, one of the

---

[15] Available at http://www.bailii.org/cgi-bin/format.cgi?doc=/ew/cases/EWCA/Civ/2018/1896.html&query=(title:(+stati+))+AND+(title:(+v.+))+AND+(title:(+kazakhstan+)), last accessed July 11, 2023.

[16] In a later ruling on attorney's fees, Judge Jacobs further commented: "The present case cannot, in my view, be approached on the basis either that fraud against the Statis had been established, or indeed that there is an overwhelming case of fraud. *In his 2017 judgment, Robin Knowles J. went no further than saying that there was a prima facie case of fraud, and that this merited a trial. . . . I do not consider that any facts have emerged since May 2018 which enable the Court to go beyond these considered findings.*" ([2019] EWHC 1715 (Comm)) (Emphasis added.).

[17] Kazakhstan's reference to "*three harsh conditions*" is also wrong and misleading. Compl. ¶ 203. Unlike in the U.S., in any civil claim in England, if a party discontinues an action it would not usually be permitted to file a fresh claim in respect of the same matters. Ex. 1, Bedford Decl. ¶ 17. As such, the fact that the Stati Parties provided an undertaking not to bring fresh enforcement proceedings in England was unremarkable. *Id.* This principle is also reflected in the requirement in English Civil Procedure Rule (CPR) 38.7 for a party to seek the permission of the court if it wishes to "make another claim against the same defendant" arising from the same subject matter. In addition, English CPR 38.6 provides for the discontinuing party to pay the costs of the other party up to the notice of discontinuance. *Id.*

issues on appeal in England was whether an English decision on confirmation would have any evidentiary value in other countries, including the U.S., and the appellate court ruled that it likely would not. *Id.* ("There is no evidence that a ruling in the present case on English public policy would be relevant to any of the enforcement proceedings being taken in other countries.").

In short, Kazakhstan's discussion of rulings from secondary jurisdictions has no evidentiary value, let alone enough to meet its pleading burden of clear and convincing evidence.

### vi. *Kazakhstan's allegations of intrinsic fraud cannot support an action under Rule 60(d)(1).*

Kazakhstan fails to allege an extrinsic fraud, and relief may not be granted under Rule 60 by independent action for intrinsic fraud. An "intrinsic fraud" is one that "is discoverable through the ordinary processes of the trial itself, such as the right to cross-examine", while an extrinsic fraud is one that is "collateral to the matter tried by the first court." *Lockwood v. Bowles*, 46 F.R.D. 625, 630–31 (D.D.C 1969). Relevant to this case, it is settled law that perjury or false testimony is an intrinsic fraud. *Id.* ("While there is some authority that intrinsic fraud will support an independent action under Rule 60(b), the general view is that the fraud alleged must be extrinsic or collateral to the matter tried by the first court. . . . In any event, it is now settled that, in an independent action, a court will not set aside a judgment because it was founded on perjured evidence or testimony."); *Dowdy v. Hawfield*, 189 F.2d 637, 638 (D.C. Cir. 1951) ("Public policy as announced in the Throckmorton case, supra, demands that there be an end to litigation and decrees that a final judgment shall not be set aside for intrinsic fraud.") (citing *United States v. Throckmorton*, 98 U.S. 61, 25 L.Ed. 93 (1868)).

All of Kazakhstan's fraud allegations in the Complaint amount to intrinsic fraud allegations of false testimony or perjury, before, during and after the arbitration. *See* Compl. ¶¶ 298-310 (describing various supposed "false statements," "false evidence," and "misrepresentations" that

the Stati Parties presented to the arbitral tribunal). None of these allegations amount to the sort of extrinsic fraud that could support an independent action under Rule 60. *See Travelers Indem. Co. v. Gore*, 761 F.2d 1549, 1552 (11th Cir. 1985) ("Perjury is an intrinsic fraud which will not support relief from judgment through an independent action."). Unable to allege any extrinsic fraud, the Kazakhstan's fraud allegations all fail.

### vii.    *Kazakhstan's collateral attack on the judgment is barred by res judicata and issue preclusion.*

Res judicata bars a subsequent suit between the same parties where the two suits "share a common nucleus of facts." *Apotex, Inc. v. Food & Drug Admin.*, 393 F.3d 210, 212 (D.C.Cir.2004). The four factors that must exist for res judicata to apply are (1) an identity of parties in both suits; (2) a judgment rendered by a court of competent jurisdiction; (3) a final judgment on the merits; and (4) the same cause of action in both suits. *See Brannock Assocs., Inc. v. Capitol*, 801 Corp., 807 F.Supp. 127, 134 (D.D.C.1992) (internal citation omitted). The purpose of res judicata is to "conserve judicial resources, avoid inconsistent results, engender respect for judgments of predictable and certain effect, and to prevent serial forum-shopping and piecemeal litigation." *Hardison v. Alexander*, 655 F.2d 1281, 1288 (D.C.Cir.1981).

Kazakhstan seeks to avoid the *res judicata* effect of the judgment in the confirmation case. Indeed, that is the entire purpose of the Complaint. As discussed above, Kazakhstan fails to state a claim under Rule 60's clear and convincing pleading standard, so its independent action is precluded by *res judicata. See Sieverding v. Am. Bar Ass'n*, 439 F. Supp. 2d 111, 117 (D.D.C. 2006) ("[R]es judicata bars the plaintiffs' independent action because they already raised arguments regarding the defendants' alleged fraudulent conduct in the Colorado courts, and those courts ruled that the plaintiffs' claims were meritless."); *Weldon v. United States*, 70 F.3d 1, 5 (2d Cir. 1995) (dismissing independent action under Rule 60 that alleged misrepresentation and fraud

upon the court because they were raised or should have been raised during the pendency of the earlier case).

But Kazakhstan makes no allegations or argument about the preclusive effect of the dismissal of its RICO case, which has issue preclusive effect in this case. Unsurprisingly, Kazakhstan fails to even mention the RICO case it lost. "An issue is precluded from further consideration if (1) the same issue now being raised was contested by the parties and submitted for judicial determination in the prior case, (2) the issue was actually and necessarily determined by a court of competent jurisdiction in that prior case, and (3) preclusion in the second case does not work a basic unfairness to the party bound by the first determination." *Galen Hosp. Alaska, Inc. v. Azar*, 474 F. Supp. 3d 214, 227 (D.D.C. 2020) (internal citations omitted). "In determining whether issue preclusion exists, a court may take judicial notice of all relevant facts that are shown by the court's own records, as well as public records from other proceedings." *Id.*

All four Stati Parties and Kazakhstan were parties to both the confirmation case and the DC RICO Case. Judge Jackson's dismissal of Kazakhstan's RICO complaint was a final judgment on the merits for purposes of issue preclusion, and it was affirmed on appeal. *DC RICO Case*, 380 F. Supp. 3d at 59–65, *aff'd* 801 F.Appx. at 780. Crucially, as explained above, Kazakhstan presented in the DC RICO Case the very same fraud theories on which it now relies in this independent action. *Supra,* 24-25. Judge Jackson ruled that Kazakhstan's alleged facts did not add up to fraud or money laundering. *Id.*

Finally, because Kazakhstan is unable to show that the Award cannot be enforced "in equity and good conscience," *supra* at 19-21, applying preclusion does not work a basic unfairness to a party bound by Judge Jackson's judgment. *Cf. Sieverding v. Am. Bar Ass'n*, 439 F. Supp. 2d 111, 117 (D.D.C. 2006) ("[R]es judicata bars the plaintiffs' independent action because they

already raised arguments regarding the defendants' alleged fraudulent conduct in the Colorado

courts, and those courts ruled that the plaintiffs' claims were meritless.").

### B.   KAZAKHSTAN FAILS TO MEET THE REQUIREMENTS FOR RELIEF UNDER RULE 60(D)(3).

Count 2 of the Complaint fails to allege fraud on the court under Rule 60(d)(3), which is

distinguished from and narrower than fraud under Rule 60(b)(3): "First, the fraud must be

egregious. . . . Second, the perpetrator of the fraud must possess a sufficient mental state. . . . Third,

the extraordinary step of setting aside a judgment requires 'clear and convincing' evidence of fraud

on the court." *Bowie v. Maddox*, 677 F. Supp. 2d 276, 278–79 (D.D.C. 2010). Fraud on the court

is more than mere "fraud between the parties or fraudulent documents, false statements or

perjury"—it must be "directed to the judicial machinery itself." *Id.* Accordingly, relief under

60(d)(3) is "rarely warranted, and is typically confined to the most egregious cases, such as bribery

of a judge or juror, or improper influence exerted on the court by an attorney, in which the integrity

of the court and its ability to function impartially is directly impinged." *Jordan v. U.S. Dep't of

Lab.*, 331 F.R.D. at 451.

"Fraud on the court . . . is fraud which is directed to the judicial machinery itself and is not

fraud between the parties or fraudulent documents, false statements or perjury." *Baltia Air Lines,

Inc. v. Transaction Mgmt., Inc.*, 98 F.3d 640, 642–43 (D.C. Cir. 1996) (quoting *Bulloch v. United

States*, 721 F.2d 713, 718 (10th Cir.1983)). Fraud upon the court refers only to "very unusual cases

involving far more than an injury to a single litigant" such as the bribery of a judge or the knowing

participation of an attorney in the presentation of perjured testimony. *Id.*

In the context of arbitration awards, courts in this District have demanded proof that the

misconduct or fraud had some bearing on the arbitrator's final decision. *See Owen–Williams v. BB

& T Inv. Servs., Inc.*, 717 F.Supp.2d [1] at 17–18 (D.D.C. 2010) (finding that even if party had

made fraudulent misrepresentations in order to secure delay in arbitral proceedings, no proof that this changed outcome of arbitration and so conduct was immaterial); *Pigford v. Johanns*, 421 F.Supp.2d 130, 135 (D.D.C. 2006) (unethical misrepresentation as to counsel's bar status not enough to satisfy nexus requirement because no showing that it led to different result); *Bryson v. Gere*, 268 F.Supp.2d 46, 50 (D.D.C. 2003) (movant must prove that substantial misconduct actually prejudiced outcome of arbitration).

Again, Kazakhstan has the burden of pleading fraud on the court by clear and convincing evidence, not just a prima facie allegation. *S. v. Estate of Stonehill*, 660 F.3d 415 (9th Cir. 2011) (affirming denial of Rule 60 motion); *Lee v. Marvel Enterprises, Inc.*, 765 F. Supp. 2d 440 (S.D. N.Y. 2011), *aff'd*, 471 Fed. Appx. 14 (2d Cir. 2012). Specifically, Kazakhstan must "do more than simply present allegations of fraud, it must present evidence of actual fraud that 'prevented it from presenting its own case.'" *Jordan v. U.S. Dep't of Lab.*, 331 F.R.D. 444, 451 (D.D.C. 2019), *aff'd sub nom. Jordan v. United States Dep't of Lab.*, No. 19-5201, 2020 WL 283003 (D.C. Cir. Jan. 16, 2020) (denying Rule 60 motion).

### i. *Kazakhstan fails to allege an "egregious" fraud on the court, let alone provide clear and convincing evidence of such a fraud.*

Kazakhstan alleges that "the Statis' fraud was egregious" because it "defiled the Court itself, by converting into a judgment of this Court an arbitration award that the Statis obtained by fraud and that, as the available evidence now shows, was part of larger schemes of fraud, embezzlement, and money laundering." Compl. ¶ 400. Notably, Kazakhstan does not allege that the Stati Parties engaged in any bribery, fabricated evidence, or exerted undue influence on the court.

No court in this District has supported the theory that applying for confirmation of a defective arbitration award *per se* amounts to fraud on the court. In contrast, courts have dismissed

allegations of fraud on the court that merely allege that the underlying award may have been obtained by fraud. *E.g., Baltia Air Lines, Inc. v. Transaction Mgmt., Inc.*, 98 F.3d 640, 643 (D.C. Cir. 1996) ("Fraud upon the court' sufficient under Federal Rules of Civil Procedure to justify granting airline's untimely request for relief from judgment confirming an arbitration award in favor of the airline's consulting firm in a fee dispute was not established by suggestions that principals of the consulting firm may have been involved in underhanded dealings, that the consulting agreement may have been fraudulently obtained, that the principals may have perjured themselves during arbitration, and that the consulting firm's attorney may have misled the court during the confirmation proceedings, especially since any misrepresentations to the court were not relevant to the court's decision to confirm the award.").

Neither can Kazakhstan rely on vague references to alleged "larger schemes of fraud, embezzlement, and money laundering" to support a claim of fraud on the court. Compl. ¶ 400. Failure to "specifically allege any improper influence directed at 'the judicial machinery itself,' other than what [movant] contends was an incomplete presentation of the evidence" does not amount to fraud on the court. *Davis v. U.S. Dep't of Health & Hum. Servs*., 968 F. Supp. 2d 176, 184 (D.D.C. 2013), *aff'd*, No. 1:12-CV-01246-JDB, 2014 WL 2178705 (D.C. Cir. 2014).

Kazakhstan makes a conclusory allegation that "The Statis' fraud [on the court] involved far more than an injury to a single litigant." Compl. ¶ 403. Revealingly, Kazakhstan had previously claimed that the Stati Parties had injured "their investors (the Tristan Noteholders), their auditor (KPMG), the Arbitration Tribunal, the Swedish courts during the annulment proceedings, this Court, and multiple other enforcement courts." *Id.* ¶ 385. Kazakhstan makes no attempt to provide any evidence of such injury, let alone explain what nexus such injuries have to the counts in its

Complaint.[18] It also misses the point of the "injury to a single litigant" rule: the doctrine is that fraud on the court must invoke some sort of systemic harm, not that fraud on the court will lie against two or more injured victims. *See Baltia Air Lines, Inc. v. Transaction Mgmt., Inc.*, 98 F.3d 640, 643 (D.C. Cir. 1996) (rejecting allegations that enforcing award potentially tainted by "underhanded dealings" amounted to fraud on the court). Kazakhstan's failure to allege any particular injury to any party other than itself amounts to a tacit admission that there is no such systemic injury.

No doubt cognizant of its deficient pleading, Kazakhstan states that the Stati Parties' previous counsel, K&S, "knew, or reasonably should have known, about the Statis' fraud." Compl. ¶ 404. Kazakhstan does not, because it cannot, allege any particularized facts to support this claim. *Supra* ¶ 55. This conclusory allegation falls far from the "clear and convincing", particularized standard required to allege fraud on the court. *Cf. Kupferman v. Consolidated Research & Mfg. Corp.*, 459 F.2d 1072 (2d Cir. 1972) (refusing to characterize as "fraud upon the court" attorney's failure to disclose an instrument that he could have supposed reasonably, though erroneously, to have been known to his adversary).

### ii. *Kazakhstan fails to show that the Stati Parties acted with any intent to commit fraud on this court.*

Kazakhstan's only allegation of fraud on the court is that the Stati Parties, acting through counsel, "knowingly lied" to the Court that the Award was enforceable. Compl. ¶¶ 400-404 (failing to identify any particular statement). Not only does Kazakhstan fail to identify any particular statement as a lie, its argument is impossible to maintain given that the Award has been

---

[18] Judge Jackson already ruled, in the RICO context, that Kazakhstan was the only victim of its fraud scheme allegations. *DC RICO case*, 380 F. Supp. 3d at 64 (finding the alleged fraud had a "single discrete goal" . . . to artificially inflate the value of the LPG plant to enrich themselves. Moreover, plaintiff pled a single, discrete injury – legal fees – and a single victim – itself.").

upheld multiple times by the Supreme Court of Sweden, the only jurisiction able to invalidate the Award. *Weese v. Schukman*, 98 F.3d 542, 553 (10th Cir. 1996) ("Intent to defraud is an absolute prerequisite to a finding of fraud on the court.").

### iii. ***Kazakhstan has already tried and failed to present this exact same argument in other contexts.***

As discussed above, Kazakhstan has previously presented its fraud arguments in multiple forums on multiple occasions both before and after the entry of the judgment. *Supra* at 21-27. The fact that Kazakhstan's fraud arguments have been aired and rejected before, including before the arbitral seat in Sweden, is fatal to its fraud on the tribunal claim. *See United States v. Sierra Pacific Industries, Inc*., 862 F.3d 1157 (9th Cir. 2017) (holding that "even when viewed together" newly discovered evidence "did not significantly change the picture already drawn by the previously available evidence.").

## IV.    CONCLUSION

For the foregoing reasons, the Stati Parties respectfully request that the Court dismiss Kazakhstan's Complaint with prejudice.

DATED:  July 12, 2023

Respectfully submitted,

By:  /s/ Edward H. Davis Jr.
Edward H. Davis Jr.
Fernando J. Menendez Jr.
Joseph B. Rome
Leidy M. Morejon
SEQUOR LAW
1111 Brickell Drive, Suite 1250
Miami, Florida 33131
Tel: 305-372-8282
edavis@sequorlaw.com
fmenendez@sequorlaw.com
jrome@sequorlaw.com
lmorejon@sequorlaw.com
*Pro Hac Vice Pending*

By:  /s/ M. Zachary Bluestone
M. Zachary Bluestone (D.C. Bar No. 994010)
BLUESTONE, P.C.
1717 K Street, Suite 900
Washington D.C. 20006
Tel: (202) 655-2250
Fax: (202) 792-6658
mzb@bluestonelaw.com

*Attorneys for Defendants Anatolie Stati,*
*Gabriel Stati, Ascom Group, S.A., and Terra Raf*
*Trans Traiding Ltd.*